1  okay, and he put me in.  He wrote it on the paper and then
2  he put it into the computer.
3          Then, I don't know if the next day or that
4  afternoon, he says to me, Sorry -- I don't remember if it
5  was the next day or that afternoon he says to me, Sorry,
6  John said no, he wants you with him.  And he literally
7  shifted the day I picked and he goes, No, you're going to
8  go on this one.
9     Q.   Were there any days in which you left early from
10 training?
11    A.   Yes.  There was an incident in which I told --
12 which I had told Miguel, my immediate supervisor, that --
13 because I got hurt on February 27th, and I had to go to the
14 orthopedic -- I had to see the orthopedic surgeon on this
15 particular day, and this is -- I think it was an hour left
16 in the class, and I told Miguel, and he says, All right.  I
17 said, Pretty much, we're already done.  He goes, Well, go
18 ahead, no problem, just leave.
19         I already told him.  He said okay, and I went and
20 I went to the -- to the surgeon, got my doctor's note, went
21 back, came back and then he -- John Fiorentino said he put
22 me AWOL for the entire day.
23         And it's interesting, because this is what I'm
24 talking about, retaliation, because before that, or right
25 -- before that, there was a guy named Paul Halverson and he

1  went -- he took off four hours early for no -- for no
2  particular reason, and it was, oh -- and when they did a
3  roll call, he wasn't there in the class, and he laughed
4  about it, Oh, you know Paul.
5           And the only reason why he never got docked, the
6  only reason why nothing -- why they had to go talk to Paul
7  was because the union got involved and said, Hey, you just
8  said you're going to just write Ed up for AWOL?  You just
9  said -- and then, actually, it went all the way to Jan, and
10 when Jan heard the incident was like, Oh, man, what are we
11 gonna do?
12          I don't know if they did dock me an hour on that
13 or not, but -- and that was interesting, because I got hurt
14 on the job, so you are supposed to have -- fire department
15 rules, if you got hurt on the job, if you gotta go for that
16 particular accident, it's supposed to give you some
17 accommodation.  But they've been writing me up for every
18 time I went out for the doctor.  I've always gotten written
19 up for a doctor's appointment even though they had the, you
20 know, MRIs and they knew about it.  I got written up for
21 going for an MRI.
22      Q.    You said that Paul Halverson didn't show up for
23 roll call on a day?
24      A.    Yes.  So let's say after lunch, he didn't come
25 back.

1      Q.      Okay.
2      A.      And when they did roll call, he wasn't there, and
3  it was just a big laugh, no big deal.  The only time it
4  became a big deal was a couple days later because they knew
5  they docked me.  They're like, Oh, my God, how are we going
6  to clean this up?
7              This is what I'm trying to tell you with the
8  retaliation.  If Paul wasn't -- if that incident didn't
9  happen with Paul or that didn't happen to me, Paul would
10 have just skated away.  It was no big deal.  It --
11     Q.      Do you know -- sorry.
12     A.      Go ahead.
13     Q.      Do you know if anything happened to Paul
14 Halverson on this occasion, whether he was docked a day or
15 whether anything else happened?
16     A.      Nothing happened.  I know that because he was my
17 partner.
18     Q.      Do you know why he left that day?
19     A.      No reason.  I don't know.
20     Q.      Is there a policy for how you're supposed to
21 request to leave early on a given day?
22     A.      I don't know the policy.
23     Q.      Do you know if there was a policy?
24     A.      No.
25             I know you have to tell your supervisor anything

1  you do, even to this day.  I know you -- and they give you
2  -- they say yes no, you know, they're the ones that say
3  make sure you fill this out, make sure you do this.
4       Q.    Do you know if Paul Halverson spoke to anyone
5  before leaving the work site?
6              MR. BARRETT:  Objection.
7       A.    No, I don't know that.
8       Q.    Okay.  So.
9       A.    Gregory Seabrook was there.  He was the shop
10 steward, and he bought it up and complained that day, I
11 believe that day, to the unfairness of what's been going
12 on.
13      Q.    So I'm going to turn back to the Complaint for a
14 second, okay, and I'd like to direct your attention to
15 paragraph 41 of the complaint.
16             You allege here that you received a text message
17 from Correa allowing you to leave; is that accurate?
18      A.    Yes.
19             MR. BARRETT:  Objection.
20      Q.    Is that the same occasion we just spoke about?
21             MR. BARRETT:  Objection.
22             You can answer.
23      A.    I'm assuming that's it, yes.  I believe that's
24 it, yeah.
25      Q.    So did you speak with Correa on that occasion and

E. PITRE

Page 118

1  actually, but she was the one that you're supposed to go
2  through for the grant.
3      Q.    Okay.  And so -- and your email here references
4  page 21, photograph 6?
5      A.    Right.
6      Q.    And that's the type of discretionary grant that
7  you were talking about before?
8      A.    Correct.
9      Q.    Okay.  And underneath your email, there is a
10 reply from Maryann Murray; is that correct?
11     A.    Right.  The five non-chargeable days she's
12 talking about, I think it's a contract thing in which you
13 get hurt on the job, you automatically get the five days,
14 what she's talking about, the five.
15           I was discussing the grant, which -- in which
16 guys got it, my friends got it.  People have gotten it in
17 the department, 90 days, no questions asked.
18     Q.    So initially you were told here by Maryann Murray
19 that you couldn't receive five non-chargeable days because
20 your medicals were late; is that correct?
21     A.    Right.
22     Q.    Okay.
23     A.    What she's discussing that, here, is when I got
24 hurt, she's not talking about my -- meaning that my
25 Workers' Comp paperwork goes to Miguel.  Miguel was out.

1   When I got hurt, Miguel was out for a week or week and a
2   half, I don't remember.
3           He was out, so my job is -- I got hurt on the
4   job, I fill out my thing, the witness fills it out who is
5   there on the job.  He does his portion, I do my portion.
6   Once that packet is done, you hand in the packet to your
7   immediate supervisor and then it goes up the ladder.
8           So, but when I got hurt, in that -- some time
9   frame when all of the paperwork was being done, I handed it
10  to Miguel.  Miguel was out.  I think he was out for a week,
11  week and a half, and that's how it made it delayed.  It had
12  nothing to do with me; it had to do that he was out, and so
13  when he came back is when he handed in the paperwork.
14          My paperwork didn't go directly to headquarters.
15  That's not how it goes.  I fill it out, the witness fills
16  it out, you hand in the paperwork to the immediate
17  supervisor; then he goes.
18          So that's the excuse that she gave me, because
19  Miguel was out.  He was the one that handed in the
20  paperwork late.  I don't give it to headquarters; I give it
21  to him.  He makes a copy, puts it in my folder, then it
22  goes up the ladder.
23      Q.    When did you give Miguel the paperwork?
24      A.    I called, told him the incident, right.  I --
25      Q.    When did you call him about the incident?

Page 120

1  A. When it happened. So he knew immediately it
2  happened. Right after I got hurt, he knew it.
3      I sent the paperwork. The paperwork is at the
4  office, and then when he came back, he gave in the
5  paperwork.
6      I didn't get the paperwork until the end of the
7  day. So the next day, I come back, do my paperwork, Felix
8  did his part, my partner at the time, Felix Garcia. He
9  gets his part, I get my part. The witness -- I fill out
10 mine, he fills out his, we put it together, and we hand it
11 to him. Then he was out. Excuse me. Then he was out for,
12 I guess, like I said, a week? I don't remember how long he
13 was out. So that's where the delay was, not me.
14 Q. So your injury occurred on February 27th of 2015;
15 is that accurate?
16 A. That's correct, yes.
17 Q. And so you filled out the paperwork the next day?
18 A. I filled it out -- my half, I can't tell you
19 exactly, but it was quick, because then I got the witness
20 part of it and then I -- because I can't hand in mine
21 without handing his. Got it together and handed it in to
22 Miguel.
23 Q. Do you remember how long after your injury that
24 was?
25 A. I don't remember at this time.