UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

EDWARD PITRE,                                    :

                          Plaintiff,          :          **MEMORANDUM & ORDER**

              - v -                      :          18 Civ. 5950 (DC)

THE CITY OF NEW YORK, JAN BORODO,     :
and JOSEPH M. MASTROPIETRO,

                                    :

                       Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**APPEARANCES:**              DEREK SMITH LAW GROUP, PLLC
                                By:    Seamus Barrett, Esq.
                                        Ian Michael Bryson, Esq.
                                        Zachary Ian Holzberg, Esq.
                              One Penn Plaza, Suite 4905
                              New York, NY 10119
                              Attorneys for Plaintiff

                              SYLVIA O. HINDS-RADIX, Esq.
                              Corporation Counsel of the City of New York
                              By:    Lauren Fae Silver, Esq.
                                        Desiree Denise Alexander, Esq.
                                        Maria Fernanda DeCastro, Esq.
                                        Assistant Corporation Counsels
                              100 Church Street, Room 2-176
                              New York, New York 10007-2601
                              Attorney for Defendants

**CHIN, Circuit Judge:**

      In this case, plaintiff Edward Pitre, a former employee of the New York

City Fire Department, contends that his rights under the Family and Medical Leave Act

(the "FMLA"), the New York State Human Rights Law (the "NYSHRL"), and the New York City Human Rights Law (the "NYCHRL") were violated by defendants City of New York (the "City"), Jan Borodo, and Joseph M. Mastropietro, as well as by the late John Fiorentino. Borodo is a current official of the Fire Department, and Mastropietro and Fiorentino were formerly with the Fire Department. In particular, Pitre contends that he was discriminated and retaliated against because of his race and his filing of a prior lawsuit, and he contends further that he was unlawfully denied medical leave and reasonable accommodations for a purported disability.

On January 22, 2024, the fourth day of trial, I dismissed this action in the interest of justice. I did so for three reasons. First, I concluded that Pitre was attempting to commit a fraud on the Court because he had previously brought -- and failed to disclose -- a state court case based on the same purported accident that is the basis of this lawsuit. Trial Tr. at 575. Second, the revelation that Pitre had failed to disclose the prior lawsuit reflected, in my view, "the culmination of circumstances, the poor lawyering throughout." *Id*. Third, although Pitre had substantially completed his case, he had presented little, if any, proof from which the jury could rule in his favor.

Dismissal is a "drastic remedy" that should be used only on "rare occasions," *Spencer v. Doe*, 139 F.3d 107, 114 (2d Cir. 1998) (citing *Colon v. Mack*, 56 F.3d 5, 7 (2d Cir. 1995)), that is, "only in extreme situations," *Bobal v. Rensselaer v. Polytechnic Inst.*, 916 F.2d 759, 764 (2d Cir. 1990). The Second Circuit has long recognized, however,

that "in this day of burgeoning, costly and protracted litigation courts should not shrink from imposing sanctions where . . . they are clearly warranted." *Jones v. Niagara Frontier Transp. Auth.*, 836 F.2d 731, 735 (2d Cir. 1987) (quoting *Cine Forty-Second St. Theatre Corp. v. Allied Artists Pictures Corp.*, 602 F.2d 1062, 1068 (2d Cir. 1979)).  As the Supreme Court has noted,

> the most severe in the spectrum of sanctions provided by statute or rule must be available to the district court in appropriate cases, not merely to penalize those whose conduct may be deemed to warrant such a sanction, but to deter those who might be tempted to such conduct in the absence of a deterrent.

*Nat'l Hockey League v. Metro. Hockey Club, Inc.*, 427 U.S. 639, 643 (1976) (per curiam); *see also Aoude v. Mobil Oil Corp.*, 892 F.2d 1115, 1119 (1st Cir. 1989) ("Courts cannot lack the power to defend their integrity against unscrupulous marauders; if that were so, it would place at risk the very fundament of the judicial system."); *Wyle v. R.J. Reynolds Indus., Inc.*, 709 F.2d 585, 589 (9th Cir. 1983) ("[C]ourts have inherent power to dismiss an action when a party has willfully deceived the court and engaged in conduct utterly inconsistent with the orderly administration of justice." (citation omitted)).

As I explain in more detail below, this is an extraordinary case, and the drastic remedy of dismissal is clearly warranted.

A.    *The Prior Lawsuit*

Pitre testified on Monday, January 22, the fourth day of trial.  On direct examination, he testified that on February 27, 2015:

> I was on the passenger side of the [Fire Department] utility vehicle.  As I
> was exiting out, it had a big pile of snow.  There's actually two steps.  I
> was stepping out, and I slipped and fell onto the sidewalk.

Trial Tr. at 456.  He contended that he "fell off [the] truck and slipped." *Id*. at 563.  He

testified that he hit the ground and injured his left hand and left shoulder.  *Id*. at 456.

He claimed that because he was not given "light duty" by the Fire Department after the

incident, "[m]y injuries wouldn't be so severe," *id*. at 436, and, consequently, he was

"forced to retire" at age 45 when he otherwise would have worked until he was in his

60s, *id*. at 435-36.  He testified that as a consequence of being forced to retire early, he

lost income as "I was only getting one-third of my salary" and suffered emotionally as

well.  *Id*. at 518-19, 522.  He acknowledged that he was "basically alleging . . . that [he]

was disabled because of the fire department." *Id*. at 563.

Yet, on cross-examination, he admitted that in 2015, he filed a personal

injury lawsuit against J&F Meat Market based on the same alleged fall.  *Id*. at 563.  In the

verified complaint in that lawsuit, Pitre alleged that:

> On February 27, 2015, Plaintiff was *walking at the Premises* and slipped,
> tripped, and fell due to icy, black icy, snowy, wet, dirty, hazardous,
> defective, and unsafe Premises.

DX MM at ¶ 27 (emphasis added); *see also* DX NN at ¶ 4 (Bill of Particulars).  The

Premises were alleged to be "the building at 1975 Amsterdam Ave., Manhattan, New

York, and its adjoining sidewalk." DX MM at ¶ 8.  The verified complaint made no

mention of a Fire Department vehicle or any vehicle and did not allege that Pitre fell off

4

a truck or that he fell while disembarking from a utility vehicle.  The verified complaint alleged that Pitre's "resulting injuries" were "caused solely" by reason of the negligence and carelessness of the defendants in that case, that is, J&F Meat Market and its parent corporation.  *Id.* at ¶ 35.  It alleged that Pitre was "severely injured" and "rendered sick, sore, lame and disabled," "some of which injuries are permanent in nature and duration."  *Id.* at ¶ 42.  It also sought economic damages, as it alleged that Pitre "has suffered and in the future will necessarily suffer additional loss of time and earnings from employment."  *Id.* at ¶ 45.  It also alleged that Pitre would be "unable to pursue the usual duties with the same degree of efficiency as prior to this occurrence, all to Plaintiff's great damage."  *Id.* at ¶ 46.

Hence, Pitre filed a prior lawsuit based on the same alleged fall but asserting inconsistent and contradictory theories.  In the present case, he alleges that he fell off a Fire Department utility truck, while in the earlier case he alleged that he slipped and fell while "walking at the Premises" of J&F Meat Market.  Moreover, there is a substantial overlap between the damages he is seeking here and the damages he sought in the prior case.  Further, the docket in the state court case shows that Pitre settled the case for a sum of money.  A stipulation so ordered on May 23, 2018, provides as follows:

> [T]he matter is settled subject to workers compensation approval.  Upon receipt of signed releases and written workers compensation approval, all claims and all third party claims will be discontinued.

5

*Pitre v. Morningside Heights SN*, Stipulation, Index No. 157588/15 (S. Ct. N.Y. Co. May 23, 2018).

Hence, it is clear that Pitre has already been compensated at least in part for the injuries for which he is seeking damages in this case.  Just as workers' compensation payments were an issue in the state case, they are also an issue in this case.  *See* Trial Tr. at 549-52 (Pitre acknowledging receiving "around $169,000" in workers' compensation payments).  Pitre did not disclose to the City or other defendants in this case anything about the state court case or the settlement in the state court case or the amounts paid to him as a result of that settlement.  Indeed, Pitre's lead counsel (Seamus Barrett, Esq.) disavowed any knowledge of the prior lawsuit.  *Id.* at 565, 573 (Barrett: "I was not aware of the other lawsuit.").  Obviously, if the state court settlement compensated Pitre for lost income or other economic damages or pain and suffering, in whole or in part, he would not be permitted to recover for the same injuries in this case, even though the two cases proceeded on different legal theories.  *See Bender v. City of New York*, 78 F.3d 787, 793 (2d Cir. 1996) ("A basic principle of compensatory damages is that an injury can be compensated only once.  If two causes of action provide a legal theory for compensating one injury, only one recovery may be obtained." (citations omitted)); *see also Phelan v. Local 305*, 973 F.2d 1050, 1063 (2d Cir. 1992) ("A plaintiff may not recover twice for the same injury." (citations omitted)).

In fact, on cross-examination, Pitre was asked about other income since his accident, as this could impact his loss-of-income damages in this case.  He identified some other income and then testified as follows:

> Q.    Other than workers' compensation money, your pension, and the disability that you received before getting your pension, have you received any other income with respect to your injury?
>
> A.    Social Security.
>
> Q.    Beside social security, any other income?
>
> A.    No.

Trial Tr. at 552.  The last answer was flat-out false, as Pitre had received "other income with respect to [his] injury," namely, the settlement in the state court action.

This was indeed an attempted fraud on the Court (and perhaps as well a fraud on the state court in the prior action) and therefore dismissal was appropriate.  *Cf. Israel Aircraft Indus., Ltd. v. Standard Precision*, 559 F.2d 203, 208-09 (2d Cir. 1977) (reversing a *sua sponte* dismissal "because we find lacking the element of fraud" but noting that "[w]e are most sympathetic with the District Judge's concern for the integrity of the judicial process, and we agree wholeheartedly that no litigant should be permitted to tamper with the administration of justice"); *see also Almeciga v. Ctr. for Investigative Reporting, Inc.*, 185 F. Supp. 3d 401, 427 (S.D.N.Y. 2016) ("[A] court has the inherent power to impose sanction on a party for perpetrating a fraud on the Court.");

7

*Radecki v. GlaxoSmithKline*, 646 F. Supp. 2d 310, 315-19 (D. Conn. 2009) (dismissing the case with prejudice as a sanction for perjury at trial).

**B.      *The Poor Lawyering***

This case has been plagued by poor lawyering on Pitre's side throughout, both before trial and at trial.  While poor lawyering in itself may not be a reason to dismiss a lawsuit, *see, e.g., Perry v. Guerrieri*, No. 18-CV-6443L, 2020 WL 8855260, at *3 (W.D.N.Y. Aug. 27, 2020) ("[W]here an attorney has been at fault, courts have recognized that it would often be unfair to penalize the client for his counsel's neglect." (collecting cases)), here, there was a pattern of ineptitude on the plaintiff's side that resulted in an enormous waste of time and resources, and Pitre himself must share the blame because of his actions and inactions.  *Cf. Hillig v. Comm'r of Internal Revenue*, 916 F.2d 171, 174 (4th Cir. 1990) ("A dismissal sanction is usually inappropriate when it unjustly penalizes a *blameless* client for the attorney's behavior." (emphasis added)).

**1.      *Before Trial***

Pitre failed to meet his obligations in discovery.  As became apparent at trial, he failed to produce many relevant documents.  Although he disclosed the names of ten fact witnesses, he failed to provide sufficient notice as to the subjects of their testimony.  He also failed to comply with Federal Rule of Civil Procedure 26(a) with respect to economic damages -- that is, he did not provide in his Rule 26(a) responses a calculation of economic losses.  It was only in the context of settlement discussions, long

after the close of discovery, that Pitre and his counsel provided a one-and-a-half-page

chart setting forth a purported calculation of damages.  But the document was wholly

inadequate.  In my memorandum decision entered November 6, 2023, I granted

defendants' *in limine* motions in part and precluded Pitre from offering certain damages

evidence, including evidence as to the loss of pension income.  Doc. No. 120.  Pitre had

not identified an expert witness to testify to damages, nor had he shown that he was

qualified to testify as to economic losses beyond "a simple calculation of lost wages."  *Id.*

at 7, 12.

I saw the parties at a final pretrial conference on Friday, January 12, 2024,

a few days before the start of trial.  Barrett asked me to reconsider my decision on

pension damages.  I did not deny the request but instructed him to speak to defense

counsel and to submit, if the parties could not agree, "a letter as soon as you can," to

explain his position.  1/12/2024 Tr. at 11.  Barrett did not submit a letter.  Instead, over

the weekend, he provided one page of handwritten notes that purported to be a

damages calculation.  *See* Doc. No. 127 Ex. A.  The document still did not provide a

pension analysis, and so I precluded (once again) Pitre from seeking damages for lost

pension.  Trial Tr. at 24.  Barrett then addressed the backpay calculation and noted that

he had incorporated a 3% raise each year.  He explained that he based the annual 3%

raise on "documents recently obtained from the union."  *Id*. at 25-26.  When I asked him

whether he had produced the documents, he responded "[w]e're not relying on those

documents." *Id.* at 26.  In follow-up questioning, Barrett showed a lack of

understanding of the rules of evidence. *Id.* at 26-30.

   At the January 12th conference, I asked whether the parties had submitted

proposed *voir dire.*  1/12/2024 Tr. at 5.  Barrett first responded "Yes," although he seemed

uncertain because "[i]t was so long ago." *Id.*  Then he said, "I believe I did file it." *Id.* at

6.  Then it became clear he had not. *Id.*  I directed him to submit any proposed *voir dire*

by Tuesday morning, to allow time for me to review his submission before the start of

jury selection on Wednesday morning. *Id.*  Barrett did not submit proposed *voir dire*

until Tuesday evening.  Trial Tr. at 2.

   **2.**  ***At Trial***

   On the first day of trial -- January 17th, Pitre and two of his lawyers

arrived late for the start of trial and jury selection. *Id.* at 2-3.  Because of their repeated

failings, I put Pitre and his counsel on notice that I was going to start imposing

sanctions. *Id.* at 3.

   That same day, defense counsel reported that Pitre had provided

deposition designations over the weekend (to be read to the jury) -- but Barrett had only

provided "full pages," with no line numbers, and the pages began in the middle of a

question. *Id.* at 16.  I advised Barrett that he had to be more precise so that his

designations could be identified.  Barrett responded:

> Honestly, just as you may have recognized, and I think some of what you
> said today reflects this.  This is my first federal trial in front of a jury, and

I've been a bit overwhelmed.  And I will most certainly be able to get them
the line numbers.

*Id.* at 16-17.  I instructed Barrett to provide the line numbers by 6:00 pm, and Barrett

responded "[n]ot a problem with that." *Id.* Barrett did not, however, send the

designations until "late in the evening," and therefore defense counsel did not have time

before the start of the next trial day to review them for objections and make counter-

designations.  *Id.* at 125.  Consequently, we had to delay the reading of the deposition

excerpts.  *Id.* at 281-83.

During the less than four days of trial, as shown by word searches of the

transcript, I sustained objections to Barrett's questions over one hundred times, he

withdrew or struck questions some twenty times, *id.* at 385 (the Court to Barrett: "I don't

know how many times you have said 'strike that.'  There are so many questions that

you have started to ask and you say 'strike that.'"), and he apologized to the Court at

least a dozen times.  The transcript does not clearly show it, but there were repeated

long pauses between a witness's answer and the next question.  *See id.* at 384 (the Court:

"What the record is not reflecting is how much time we are losing because there are

pauses between the answer and the next question as you are trying to formulate your

next question.  And that's because you're not prepared."); *see also, e.g., id.* at 61 (the

Court: "This has got to go faster.  It can't be a long pause between each question."), 136,

261, 272, 274, 384, 435.  And there were numerous occasions where the questions were

so clearly improper that no objection was necessary.  For example:

Q.    Let me correct the phrasing.  You received an email that said in part, C/E Pitre --

THE COURT:          Show us the email.  What exhibit?

MR. BARRETT:        This is Plaintiff's exhibit 1.  It is the fourth page.

THE COURT:          Plaintiff's Exhibit 1 is not in evidence.  1F was in evidence.  Did it come in as a defense exhibit?  Is it in evidence?

MR. BARRETT:        It's 1A.  It's not in.  May I introduce it?

THE COURT:          Is there an objection to it?

MS. SILVER:         Yes, your Honor.

THE COURT:          Lay a foundation then.

MR. BARRETT:        Okay.

MS. DECASTRO:       Just so we're clear, your Honor, it is what page?

MR. BARRETT:        It's just one page.

THE COURT:          Why don't you show it to him, ask him if it's an email he got.

MR. BARRETT:        May I show it to him?

THE COURT:          I just said show it to him, please.  Mr. Borodo, is this up on your screen?

THE WITNESS:        Yes.

THE COURT:          Take a look at this email.

BY MR. BARRETT:

12

Q.      Have you been able to read this email?

A.      Yes.

Q.      In reading this email, what is John Fiorentino --

          MS. SILVER:          Objection.

          THE COURT:          Sustained.  It's not in evidence yet.  All
you asked him was whether he read it.  He's read it.

Q.      You see where it says --

          MS. SILVER:          Objection.

          THE COURT:          You can't say what it says.  It's not in
evidence.  Is this an email that you received in or about August of 2015?

              THE WITNESS:      Yes, it is.

              THE COURT:        Is there an objection?

          MS. SILVER:          No, your Honor.

              THE COURT:        Exhibit 1A is received.

              . . .

              THE COURT:        Until it's received, you can't read from
it.  This should have taken about 20 seconds. . . .

*Id.* at 240-42.

          On the third day of trial, a witness appeared.  She had been subpoenaed

by plaintiff's counsel -- but she was the wrong person.  She had nothing to do with the

case, and her name was similar to but different from a potential witness who had

worked at the Fire Department.  She informed the Court that she had emailed Pitre's

13

counsel to advise that she was the wrong person but received no response.  She felt she had to come to court because she was concerned about not responding to the subpoena. *Id*. at 331-32.

At various times, three lawyers appeared at trial for Mr. Pitre, although two of them were not always present.[1]  Barrett conducted the examination of witnesses. On the fourth day of trial, one of Barrett's co-counsel moved on behalf of Pitre for a mistrial -- based on *Barrett's* conduct:

> THE COURT:          What are the grounds?
>
> MR. HOLZBERG:    The grounds is the basis of Mr. Barrett's conduct up to this point.  As your Honor is aware, your Honor has admonished him on numerous occasions, and that's the basis for the mistrial request.
>
> THE COURT:          The basis for the mistrial request is Mr. Barrett's conduct?
>
> MR. HOLZBERG:    That's correct.  Your Honor even commented on it at one point that this was the worst tried case in 30 years.
>
> THE COURT:          I think he's doing a lot better today, but I believe that, and I've tried a lot of cases.  I don't know if that's a proper basis.  What do defense counsel have to say?

---

[1]     The day before trial, one of Pitre's lawyers, who described himself as "second chair," wrote a letter to the Court announcing that he would not be present for the start of trial (jury selection) because he would be attending a deposition and further that he would be leaving the trial at 1:30 pm on January 18 for "a previously scheduled meeting."  Doc. 126.  Of course, trial counsel may not come and go as they please during a trial, and certainly not without leave of the Court.  *Id*.  Yet, this continued during the trial, reflecting plaintiff's counsel's cavalier attitude toward the proceedings.  Trial Tr. at 125, 226-27, 393.

MS. DECASTRO:    Your Honor, I've never heard that as a basis for
moving for a mistrial.  This is his own attorney's conduct. . . .  If anything,
defendants have been prejudiced by all of this conduct. . . .

*Id*. at 487-88.[2]

The poor quality of lawyering and lack of preparation was also reflected

more substantively, including by apparent perjury on the part of witnesses other than

Pitre.  One of Pitre's key witnesses was Gregory Seabrook, a co-worker and friend of

Pitre who testified that, for example, Pitre had unfairly had his commuter driving

privileges revoked.  *Id*. at 371, 374-75.  Seabrook testified that he was also permitted to

drive a Fire Department truck home and that he had never lost his commuter driving

privileges.  *Id*. at 376 ("I never lost them.").  Yet, on cross-examination, he admitted that

that statement was not true, *id*. at 421 ("That's not true."), because he lost his driving

privileges *twice* -- once after being arrested for drunk driving right before he retired and

once years earlier after he was charged with criminally negligent homicide for driving

under the influence, *id*. at 421-24.

---

[2]    Holzberg first moved for a mistrial before the start of proceedings on January
22nd.  Trial Tr. at 393.  I denied the motion, and I deferred discussion until later in the
day because all the jurors had arrived, and we were ready to proceed.  I also noted that
if I were to grant a mistrial, I would consider motion practice.  *Id*. at 393-94; *see also id*. at
451 (the Court: "[I]t seems to me there were some fair issues that should have been
addressed by motion practice.").  At the start of the morning break, I gave Holzberg a
chance to address his mistrial motion.  Instead, he withdrew the motion.  *Id*. at 452.
Fifteen minutes later, as we were about to resume the trial, Holzberg renewed the
request for a mistrial.  *Id*. at 453.  I deferred discussion until we broke for lunch.  *Id*. at
487-91.

Another of Pitre's witnesses, Dudley Placide, testified that he was a witness to a conversation between Pitre and Miguel Correa (Pitre's immediate supervisor) wherein Correa gave Pitre permission to leave a fiberoptics training seminar to see the doctor. *Id*. at 380-82.  Placide testified that he overheard the conversation at the Union Street facility, in the morning, before the seminar (which was held in Queens).  This was inconsistent with what Barrett represented in his opening statement and suggested in his questioning -- that *during* the seminar, Correa sent Pitre a text message saying he could leave to go get treatment.  *Id*. at 41, 109, 409-10.[3]  Pitre did not testify to any such conversation, and Placide did not recall any text message.  *Id*. at 382.  Moreover, on cross-examination, Placide acknowledged that he had been charged (in disciplinary proceedings) with two counts of making false statements by impersonating a police office, that a hearing was held, and that he accepted the loss of 40 days' pay and probation of three years as a penalty.  *Id*. at 357-63.

A significant legal issue arose on the third day of trial.  Placide testified that in 2012 Fiorentino came to Ed's mother's wake and "wasn't personable at the wake" and that he "demanded" Ed produce a death certificate.  *Id*. at 322.  He also testified that in approximately 2013 he heard Fiorentino call Pitre a "Puerto Rican prick" (Pitre was

---

[3]      Fiorentino testified at his deposition that Pitre left the training session in the afternoon and never returned; Fiorentino marked Pitre absent without leave "because he left without asking."  Trial Tr. at 305.

not present). *Id.* at 324-25. He testified further that Fiorentino had a "disposition and demeanor" toward Pitre because of his race. *Id.* at 326-27.

At the lunch break, defense counsel explained that Pitre had signed a general release on October 22, 2014, as part of the resolution of the 2011 lawsuit. *Id.* at 333. Defense counsel provided a copy of the general release, which provided in relevant part:

> KNOW THAT I, EDWARD PITRE, plaintiff in the federal action entitled Gregory Seabrook, et al. v. City of New York, et al., . . . do hereby waive, release and discharge defendants City of New York, . . . their respective successors or assigns, and any and all past or present officials, employees, representatives and agents of the Fire Department of the City of New York . . . from any and all liability, claims, demands, causes of action, obligations, damages, and grievances whatsoever of every kind and nature, at law or in equity, whether joint or several, whether known or unknown, and whether or not discoverable, which plaintiff may have *resulting from anything which has happened from the beginning of the world up to and including the date of the execution of this release,* including, but not limited to, any and all liability, claims or rights of action which were or could have been alleged in this action, including but not limited to, all claims for costs, expenses, and attorneys' fees.

DX AAA (emphasis added); *see* Trial Tr. at 333. Defense counsel moved for the testimony to be stricken. *Id.*

After a discussion, I advised the parties that I was going to think about it during the lunch break, but that I was inclined to strike the testimony. *Id.* at 338. Pitre's counsel seemed to conflate the concept of protected activity with adverse action. *Id.* at 335. I explained that I did not believe that evidence of adverse actions that occurred before Pitre signed the release was admissible, but that a protected activity before the

17

signing of the general release -- *e.g.*, the 2011 lawsuit -- could be the subject of a

retaliation claim as long as Pitre presented evidence of post-release adverse conduct. *Id*.

at 334-38.[4]

        After the lunch break, I advised the parties that I was inclined to strike the

testimony, but I gave Barrett a chance to be heard. *Id*. at 338.  He argued that the pre-

release conduct was admissible "just by way of background and the totality of the

circumstances." *Id*. at 339.  I asked if there was "a case that says a plaintiff can rely on

conduct that occurred before a general release as background evidence." *Id*.  Barrett did

not have one, explaining that he "did not have an opportunity to research that during

the break." *Id*.  After further discussion, I ruled that I would strike the testimony and,

once the jury was present, I so advised the jury. *Id*. at 339-42, 344.

        At the start of the Monday session, when he moved for a mistrial,

Holzberg raised the issue of the release again, but he was also confused, as he

contended that I had ruled that the 2014 settlement was not a protected activity for the

purpose of the retaliation claim. *Id*. at 393.  That was not my ruling.  *See id*. at 334-38.

Later in the morning, I asked Holzberg if he had any authority for the proposition that

---

[4]     I explained my thinking to counsel: "The filing of a lawsuit is a protected activity.
What I'm saying is if you're arguing retaliation based on the lawsuit, retaliation requires
an adverse act, but you can't rely on pre-October 22, 2014 adverse acts because those
would be given up by this general release.  If there is something that happened after
October 22, 2014, that is retaliatory in nature and that qualifies, that is something that
you could rely on, assuming it's admissible . . . ."  Trial Tr. at 337.

an adverse action that occurred before a release was signed was admissible to show

retaliation. *Id*. at 489.  Holzberg did not answer my question, and I again asked if he

had any law to support his position.  I noted that he and his co-counsel had had "all

weekend" to research the issue. *Id*.  Holzberg responded: "I don't have a specific

citation." *Id*.  Barrett then stood up and contended that he had looked for law over the

weekend, but that while he found law to the effect that a settlement could be a protected

activity (which was not disputed), he did not find any law to the effect that a pre-release

adverse action was admissible as background evidence. *Id*. at 490-91.  I adhered to my

decision to exclude the evidence. *Id*. at 491.

At the conclusion of the afternoon recess, again with the jury ready to go,

Pitre's counsel wanted "to make a record." *Id*. at 538.  Barrett asserted that "[w]e have

found case law supporting our position that those [pre-release] facts should be

admissible." *Id*. at 538.  I expressed my frustration:

> Go ahead.  Although what am I supposed to do with it now?  I['ve] got a
> jury waiting.  You had all weekend to do this.  Go ahead.  Tell me what
> the cites are, and we'll take a look.  But for now my rulings stand.  This is
> not the right way to do it.  Make a record.

*Id*.

Barrett proceeded to read three citations into the record (although he

repeated one). *Id*. at 539.  The following colloquy ensued:

THE COURT:        Have you read the cases?

19

MR. BARRETT:     I've read the excerpts of the pieces that go to the
point, the proposition that we're trying to provide for the Court right now
for which is that the --

THE COURT:     I can't --

MR. BARRETT:     I'll make it quick.

THE COURT:     No.  No.  No.  The jury is waiting.  You were late
coming back from lunch.  The jury is waiting.  [Y]ou're giving me research
now.  What am I supposed to do with those cases now?  Am I going to
hold a recess and go up and read those cases?  This is not the way to do it.
I let you put the cites on the record.  That's it.  We're going to start.  We'll
bring out the jury.

*Id.* at 539.

Barrett cited three cases: *Davis-Garett v. Urban Outfitters, Inc.*, 921 F.3d 30

(2d Cir. 2019); *Twyman v. Dilks,* No. Civ. A. 99-4378, 2000 WL 1277917 (E.D. Pa. Sept. 8,

2000); and *MacKenzie v. NYC Dep't of Educ.*, No. 21-CV-5711-LTS, 2023 WL 2711848

(S.D.N.Y. March 30, 2023).  *See* Trial Tr. at 538-39.  Now that I have had an opportunity

to read the cases, I am not persuaded that my ruling was wrong.

    *Davis-Garett* did not involve a general release.  Instead, the Second Circuit

reiterated the well-settled rule that "expiration of the limitations period does not bar 'an

employee from using the prior acts as background evidence in support of a timely

claim.'"  921 F.3d at 42 (quoting *Nat'l R.R. Passenger Corp. v. Morgan,* 536 U.S. 101, 113

(2002)).  In a statute of limitations situation, evidence of prior acts or statements of a

decisionmaker "may" constitute relevant background evidence in support of a "timely"

claim.  *Id.; accord Petrosino v. Bell Atl.*, 385 F.3d 210, 220 (2d Cir. 2004).  The statute of

limitations cases, however, are different because the mere passage of time may not,

depending on the circumstances, undermine the relevancy of prior acts -- the earlier

acts, even if time-barred, may still show intent to discriminate.  Where a plaintiff has

signed a general release, the prior conduct may indeed be proof of intent to

discriminate, but the plaintiff has agreed, in return for consideration, to give up any and

all claims based on that conduct.  Permitting a plaintiff to rely on pre-release acts to

support a new claim of discrimination or retaliation would undermine the very purpose

of a release.  *See, e.g., Pasternack v. Shrader*, 863 F.3d 162, 173 & n.8 (2d Cir. 2017)

(acknowledging that settlements and releases are "designed to 'establish[] a general

peace'" (citation omitted)); *Okemo Mountain, Inc. v. U.S. Sporting Clays Ass'n*, 376 F.3d

102, 109 (2d Cir. 2004) (Jacobs, J., dissenting) ("In considering the intention of the

parties, it is critical to keep in mind that a general release is bought to secure peace as

well as to settle pending or impending claims.  Such peace is (at the least) freedom from

the risk, trouble, and expense of litigation over the underlying events. . . .").

  *MacKenzie* did involve a release -- but not a general release.  There, the

release carved out an age discrimination claim, as it provided that "this Agreement shall

not waive [Plaintiff's] right to bringing [sic] an age discrimination claim challenging his

discontinuance." 2023 WL 2711848, at *3.  The issue presented was what the parties

intended by the phrase "an age discrimination claim challenging his discontinuance."

*Id*. at *8-9.  The court held that the exception was to be narrowly construed and that

therefore plaintiff preserved only an age-based termination of employment claim, and he was barred by the general release from suing for "claims arising under separate legal theories such as hostile environment and retaliation." *Id*. at *9. The case says nothing about the admissibility of pre-release acts as background evidence.

Finally, *Twyman* does contain some language helpful to Pitre, as the court wrote: "It is well-settled that in discrimination cases, evidence of discrimination occurring outside an actionable time period or *included in a previous settlement agreement* may constitute relevant background evidence in determining discriminatory and retaliatory conduct." 2000 WL 1277917, at *4 (emphasis added). But the decision deserves little weight with respect to the issue at hand. First, as the decision was decided by the district court for the Eastern District of Pennsylvania applying Pennsylvania law, it is not controlling on this Court. *Id*. at *4. Second, the *Twyman* court cited four cases, but none of the cases involved a general release or the admissibility of evidence of pre-general release acts to prove a post-release claim.[5] While I agree that the law is well-settled as to the admissibility of prior conduct in a statute of limitations situation, it is not well-settled as to the admissibility of pre-release conduct.

---

[5]       The four cases cited by *Twyman* are: *United Air Lines, Inc. v. Evans,* 431 U.S. 553, 558 (1977); *Aman v. Cort Furniture Rental Corp.,* 85 F.3d 1074, 1082-83 (3d Cir. 1996); *Glass v. Phila. Elec. Co.,* 34 F.3d 188, 195 (3d Cir. 1994); *Andrews v. City of Phila.,* 895 F.2d 1469, 1484 (3d Cir. 1990).

In any event, even assuming that pre-release conduct *may* be admissible as background evidence to prove a post-release claim, here, I would exercise my discretion not to admit the evidence of the pre-release actions (assuming they actually occurred). The 2012 conduct (Fiorentino was not "personable" at Pitre's mother's wake), the 2013 comment (Fiorentino called Pitre a "Puerto Rican prick" outside of his presence), and the observations about Fiorentino's disposition and demeanor (which lack any specificity) have little probative value, as they occurred long before the purportedly retaliatory and discriminatory acts in 2015 and 2016.  *See, e.g., Lively v. WAFRA Inv. Advisory Grp, Inc.,* 6 F.4th 293, 306-07 (2d Cir. 2021) ("[S]tray remarks are rarely given great weight, particularly if they were made temporally remote from the date of the decision." (citation omitted)).  At the same time, given the inflammatory nature of the conduct, the danger of unfair prejudice was high.  The evidence was properly excluded.

This evidentiary issue was a fair issue, but it was one that should have been raised before trial in the motions *in limine*.  Moreover, once the issue was raised on the third day of trial (Friday, January 19th), Pitre's counsel should have researched the issue over the weekend and submitted a letter to the Court, while giving defense counsel an opportunity to respond.  Instead, Pitre's counsel finally did some research during the lunch break on Monday, and Barrett did not bring his cases to my attention until it was too late, when there was no time to review them without delaying a trial that was already taking too long.  And in the end, the cases were not helpful in any

event.  Pitre's counsel's failure to do legal research on a timely basis was yet another example of their failure to take this case seriously.

## C.    *The Lack of Proof*

Finally, I address Pitre's lack of proof.  I do so not because I am granting judgment as a matter of law, but as a further indication of the utter waste of time and resources this process has been.

Although Pitre had not completed his case when I dismissed the action, he had substantially completed it.  He had completed his direct examination.  *Id*. at 537. He had only one other witness he was planning to call, Joseph Adams.  *Id*. at 426, 576 (THE COURT: "Your only other witness was going to be Adams?"; MR. BARRETT: "Yes.").  Adams was another communications electrician who apparently was retired, had been a plaintiff in the 2011 lawsuit, and was a friend of Pitre.  *Id*. at 318, 370, 540. Accordingly, he was similarly situated to Placide and Seabrook, other communications electricians who testified, who were plaintiffs in the 2011 lawsuit and friends of Pitre. *Id.* at 310, 314, 318-19, 395, 417-18.

Despite the near completion of Pitre's case, there was little if any evidence in the record to support his claims.  The following are examples:

As to the race and retaliation claims, Pitre provided no admissible evidence that race played any role in any of the Fire Department's employment

24

decisions.  He provided evidence that he was Hispanic -- but that was it.  *Id.* at 351.[6]  He

provided no evidence that he was denied reasonable accommodations or leave or was

otherwise adversely treated because he was Hispanic or because he had been a plaintiff

in the 2011 lawsuit.  Indeed, Pitre's direct supervisor (who gave him positive

evaluations) is Hispanic.  Ismael Ortiz, who was promoted to a supervisor position, is

also Hispanic and had been a plaintiff in the lawsuit.  *Id.* at 320, 351-52.  Pitre's partner

Felix Garcia is Hispanic.  *Id.* at 456-57.  Seabrook, who received an accommodation, is

Black and was also a plaintiff in the lawsuit.  *Id.* at 100, 188, 414, 417.  And there was

evidence that White employees were disciplined and received supervisory conferences.

*Id.* at 101, 211-12.

Pitre's friend Seabrook testified that Pitre "was disciplined differently than

everyone else."  *Id.* at 371.  He testified that communications electricians were granted

reasonable accommodations "[a]ll the time."  *Id.* at 410.  When Pitre was asked who else

was treated the way he was by Fiorentino, Pitre responded "none."  *Id.* at 444.  The fact

that Fiorentino treated Pitre treated differently from "everyone else" suggests he did not

treat Pitre differently for a discriminatory or retaliatory reason, given the number of

communications electricians who were Black or Hispanic and who had also been

plaintiffs in the 2011 lawsuit.  *See, e.g., Jackson v. NYS Dep't of Lab.,* No. 09 Civ. 6608

---

[6]       In fact, in his opening statement, Barrett did not identify Pitre's race, and he did
not specifically argue that Pitre was discriminated against because he was Hispanic.
Trial Tr. at 36-45.  Nor did Pitre ever testify as to his race.  *Id.* at 427-564.

(KBF), 2012 WL 843631, at *4 (S.D.N.Y. Mar. 12, 2012) (holding that plaintiff's conclusory assertion that supervisor would treat her "different[ly] from everyone else fail[ed] to connect her alleged disparate treatment to her race" (citation omitted)).  Seabrook also testified that Fiorentino was his friend, his partner at work at one point, a "very jovial person," and "a nice guy."  *Id.* at 403.  Fiorentino may very well have been "upset with Ed about something," as Seabrook testified, *id.* at 404, but Pitre provided no evidence that Fiorentino was upset *because* Pitre was Hispanic or *because* he had been a plaintiff in the lawsuit.  Indeed, if Fiorentino was upset, it was undoubtedly because of Pitre's many latenesses, absences without leave, last-minute call-outs, and parking violations. *See* DXs H, J, K, L.[7]  While Pitre disputed one of the parking infractions on his direct testimony, *id.* at 479-86, he did not challenge the latenesses, absences without leave, or call-outs in his testimony.  On this record a reasonable jury could not find that Pitre was discriminated against or retaliated against because of his race or protected activity.

   Pitre's counsel argued in his opening statement that Pitre received a text message from Correa the afternoon of the fiberoptics training giving him permission to

---

[7]  DX L consists of two memos -- one dated May 27, 2015, and one dated August 12, 2015.  Together, they show: 10 latenesses; 11 unscheduled leaves without pay; 6 call-outs (calling-out for sick leave or personal business on less than an hour's notice); 4 instances of declining weekend overtime with late notification after advising of availability; and 2 incidents leaving work early.  Other memos documented Pitre's failure to park his Fire Department vehicle in authorized locations.  DXs H, I, J, K.  In one of the memos, Pitre confirms that he "will be parking my commuter vehicle" at authorized locations, an apparent admission that he had not done so.  DX I.

leave.  Yet, Pitre offered no proof of receiving such a text.  He did not so testify, he did

not offer a copy of a text, and he did not call Correa.  Nor did he testify to a

conversation with Correa at the Union Street facility in the morning before the seminar,

as Placide claimed to have overheard.

Pitre testified (vaguely) as to the loss of leave.  He contended he had two

paystubs -- one showed he had leave and in the next paystub the leave was gone.  *Id.* at

477-78.  But he did not offer the paystubs.  Moreover, he offered no payroll or leave

records, and surely, he could have obtained records from the Fire Department showing

the leave he had accumulated and used or otherwise had deducted.[8]

Pitre also failed to offer sufficient proof from which the jury could find

that he was eligible for FMLA leave.[9]  To be eligible for FMLA benefits, an employee

must have been employed for at least twelve months and worked at least 1,250 hours in

the twelve months preceding the date on which eligibility is to be determined.  *Woodford*

*v. Cmty. Action of Greene Cnty., Inc.,* 268 F.3d 51, 54 (2d Cir. 2001).  "The determination of

whether an employee . . . is eligible must be made as of the date the FMLA leave is to

---

[8]     Pitre testified that he showed the two paystubs to Correa and Joe Adams.  Trial
Tr. at 478.  He was not going to call Correa, however, and while he had stated his
intention to call Adams, Adams would not have been permitted to testify to what he
saw in documents that were not in evidence, as these would have been hearsay -- out-
of-court statements offered for the truth of the matter asserted therein.

[9]     To succeed on a claim of FMLA interference, a plaintiff must show that his
employer "denied or otherwise interfered with a benefit to which [the employee] was
entitled under the FMLA."  *Graziado v. Culinary Inst. Of Am.,* 817 F.3d 415, 424 (2d Cir.
2016).

start." *Smith v. Westchester Cnty.*, 769 F. Supp. 2d 448, 465 (S.D.N.Y. 2011) (alterations

adopted) (quoting 29 C.F.R. 825.110(d)).  Eligibility is a threshold matter, and a plaintiff

cannot merely assert in conclusory manner that he is eligible.  *Spurlock v. NYNEX*, 949 F.

Supp. 1022, 1033 (W.D.N.Y. 1996).  A mere allegation that an employee was "employed

full-time" is not enough to establish that the 1,250-hour requirement has been met.

*Simmons v. N.Y.C. Transit Auth.*, No. 96-CV-3414, 2001 WL 984905, at *2 (E.D.N.Y. July 6,

2001).

          Although he had substantially completed the presentation of his evidence,

Pitre failed to establish his FMLA eligibility.  He never testified as to *when* he asked for

FMLA leave or *when* he wanted his FMLA leave to start.[10]  *See Spurlock*, 949 F. Supp. at

1933 (noting that the complaint was deficient when it failed to allege specific dates

establishing FMLA eligibility).  He offered no evidence as to how many hours he

worked in any twelve-month period and did not identify the twelve-month period

purportedly preceding the date on which he requested FMLA leave (assuming he did).

When I raised the issue on the third day of trial, Barrett represented that Pitre "made

$134,000, over $134,000 in 2014."  Trial Tr. at 233.  He asserted that "[w]e'll be able to

---

[10]     In colloquy with the Court, Barrett represented that Pitre had applied for FMLA
leave but he was unable to point to any written record of such an application actually
submitted to the Fire Department.  Trial Tr. at 224-26.  Barrett represented that Pitre
submitted a request to the shop steward, but he did not provide a copy of any such
document, nor did he indicate when the request was submitted.  *Id.* at 225-26.  Defense
counsel represented that Pitre testified at his deposition that "he never filed an FMLA
application."  *Id.* at 225.

show through evidence and testimony how many hours he worked." *Id.*  In fact, Pitre

presented no evidence of "how many hours he worked."  And the fact he made $134,000

in 2014, *id*. at 438, does not mean that he worked 1,250 hours in the twelve-month

period preceding the request for leave, whenever -- if ever -- that was.  Not only are the

dates imprecise, only "actual hours worked" are counted, *Donnelly v. Greenburgh Cent.*

*Sch. Dist. No. 7*, 691 F.3d 134, 142-43 (2d Cir. 2012) (noting that regulations refer to

"actual hours worked"), and the record is unclear as to how much of the $134,000 Pitre

apparently received in 2014 was for paid leave.  On this record, the jury could only

speculate as to whether Pitre actually worked the requisite hours.

      Pitre's medical condition and treatment obviously were also important to

his claims.  To be eligible for FMLA leave, an employee (or the employee's spouse,

child, or parent) must have a "serious health condition," which is defined in the statute

as "an illness, injury, impairment or physical or mental condition that involves" either

"inpatient care" in a hospital or other care facility or "continuing treatment by a health

care provider." 29 U.S.C. §§ 2611(11)(A), (B), 2612(C), (D).  Both the NYSHRL and the

NYCHRL have specific definitions of the term disability.  *See* N.Y. Exec. Law § 292(21)

("a physical, mental or medical impairment resulting from anatomical, physiological,

genetic or neurological conditions which prevents the exercise of a normal bodily

function or is demonstrable by medically accepted clinical or laboratory diagnostic

techniques or a record of such an impairment or a condition regarded by others as such

an impairment"); N.Y.C. Admin. Code § 8-102 ("any physical, medical, mental or

psychological impairment, or a history or record of such impairment").

Yet, Pitre did not offer *any* medical evidence -- he did not call a doctor and

he did not offer a single medical report or note from a doctor or physical therapist. He

did not even describe his injury, other than to say "[l]eft hand, left shoulder was my

injury." *Id*. at 456. He was not clear on what treatment he received or how many days

leave he took, other than to say there was pain and that he did not seek treatment right

away. *Id*. at 457-58. He went back to full duty after "four days, five days." *Id*. at 460.

He testified that he saw an orthopedic surgeon and a hand surgeon, and they wanted

him to start physical therapy and provided a note. *Id*. at 461. But he did not offer the

note, nor did he describe when he saw these doctors or the extent of the visits or

treatment. *Id*. The record is muddled because it appears Pitre went back to work

within a few days and was able to work a full load until September 2015.

The record is also muddled as to whether Pitre requested an

accommodation and gave sufficient notice to the Fire Department that he wanted an

accommodation or FMLA leave. *See id*. at 89-90 (Mastropietro: Pitre never told me he

was disabled; he never told me his injury was stopping him from working; he came

back to work after the injury); *id*. at 189 (Borodo: Pitre "came back to work" after he

claims he was injured in February 2015; he never advised that his injury prevented him

from working; he never said he "couldn't perform his duties"; he did not provide

30

specifics of his injuries; and he did not request a reasonable accommodation).  Pitre

offered only one document -- a single sheet of paper requesting a transfer to Queens --

and he provided no supporting documentation, medical or otherwise, showing that he

needed an accommodation or leave.  On the one sheet of paper, which is dated May 19,

2015, Pitre wrote that "[d]ue to my injuries suffered on the Job on 2-27-15 I need to be

close to my doctors so I can received [sic] Physical Therapy."  PX 17.  No documentation

was attached to the form, however, and when the Fire Department asked Pitre for "any

documentation for physical therapy that he wanted to do in Queens," he failed to

provide anything.  Trial Tr. at 192-93.  Moreover, there is no reason why Pitre could not

have found a physical therapy facility in Manhattan.  Indeed, Pitre acknowledged that

he was doing physical therapy in *California* in 2015 because of his February 2015 injury.

*Id*. at 555, 559.[11]

      Finally, the record is devoid of any evidence that Borodo and

Mastropietro -- who are sued individually (including for punitive damages) --

discriminated or retaliated or otherwise took wrongful action against Pitre.  Borodo was

not even on the scene until late 2014 or early 2015 and neither he nor Mastropietro had

anything to do with the 2011 lawsuit.  *Id*. at 99-100, 130-32, 146-47, 443.  Borodo and

Mastropietro did not have day-to-day interactions with Pitre; Mastropietro met Pitre

---

[11]    Pitre married his wife in 2011 or 2012.  She owned a home in California.  She was
a flight attendant for an airline and thus Pitre was able to fly back and forth from New
York or California for free.  Trial Tr. at 553-55.

once or twice; and Borodo met him once, in a supervisory conference. *Id.* at 73-74, 129,

147, 154-55. Seabrook testified that he had no knowledge of how Borodo and

Mastropietro treated Pitre, because the communications electricians dealt with their

foreman most of the time and not those above in the chain of command. *Id.* at 379-80.

While Borodo and Mastropietro had some limited involvement with the circumstances

of Pitre's employment, there is nothing in the record from which a jury could find that

they had any intent or shared the intent or purpose to discriminate or retaliate against

Pitre or to otherwise violate his rights.[12]

## CONCLUSION

For the reasons set forth above, the drastic remedy of dismissal is

warranted by the extraordinary circumstances of this case. With his case substantially

complete, Pitre had offered little in terms of concrete evidence to support his claims.

For example, he offered no evidence of race discrimination, he provided not a single

piece of paper documenting that he had a "serious medical condition" or a "disability,"

---

[12]    *See, e.g., Malena v. Victoria's Secret Direct, LLC,* 886 F. Supp. 2d 349, 366 (S.D.N.Y.
2012) ("[A]s is clear from the text of the NYSHRL retaliation provision and the
NYCHRL, individual liability under them is limited to cases where 'an individual
defendant . . . actually participates in the conduct giving rise to the plaintiff's
[discrimination or] retaliation claim.'" (citations omitted)); *id.* at 367 (explaining that
under NYSHRL, aider-and-abettor liability requires that the individual defendant
"actually participated in the conduct giving rise to the claim" (citation omitted)); *see also
Dillon v. Ned Mgmt., Inc.,* 85 F. Supp. 3d 639, 662 (E.D.N.Y. 2015) (explaining that under
NYCHRL, aider-and-abettor liability requires that the individual defendant was
"involved, or participated in, [the discrimination or] retaliation" (citation omitted)).

and he provided no time records or other concrete proof to show that he worked the requisite 1,250 hours for his FMLA claim. His lawyers felt they could come and go as they pleased, failed to conduct necessary legal research, and were in general wholly unprepared. Pitre's lead lawyer performed so poorly that his co-counsel moved for a mistrial based on *his* performance. Pitre and his witnesses showed a disregard for the truth, and in the end Pitre attempted to commit a fraud on the Court.

 Pitre and his lawyers litigated this case shoddily, recklessly, and, indeed, in bad faith, as they sought to recover a judgment from the City and the individual defendants dishonestly, with little proof and little effort. Their conduct was "utterly inconsistent with the orderly administration of justice," *Wyle v. R.J. Reynolds Indus., Inc.*, 709 F.2d 585, 589 (9th Cir. 1983) (citation omitted), and "seriously affect[ed] the integrity of the normal process of adjudication," *Gleason v. Jandrucko*, 860 F.2d 556, 559 (2d Cir. 1988) (citation omitted).

 I am mindful that "the decision to impose sanctions . . . [must be] made with restraint and discretion," and that sanctions may not be imposed without notice and an opportunity to be heard. *Schlaifer Nance & Co. v. Est. of Warhol*, 194 F.3d 323, 334-36 (2d Cir. 1999) (citations omitted). Both before and during the trial, however, I gave Pitre and his lawyers an ample opportunity to be heard. Indeed, my decision "was based on well-known facts contained in the existing record," *id.* at 335, and throughout the proceedings, I made it clear to Pitre and his lawyers that I expected them to do

better.  They did not do better and, indeed, they did worse.  Nonetheless, before I enter judgment, I will give Pitre and his lawyers an additional opportunity to be heard.

Pitre and his lawyers may move for reconsideration of my decision to dismiss the complaint.  If they wish to so move, they must file papers on or before February 16, 2024.  If defendants wish to move for sanctions, they shall do so on or before February 16, 2024, as well.

Opposition papers shall be filed no later than March 1, 2024.  Reply papers, if any, are to be filed no later than March 8, 2024.

SO ORDERED.

Dated:       New York, New York
             January 29, 2024

_____
DENNY CHIN
United States Circuit Judge
Sitting By Designation