O1MBPIT1

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    EDWARD PITRE,

4                    Plaintiff,

5            v.                              18 Civ. 5950 (DC)

6    THE CITY OF NEW YORK, FIRE
     DEPARTMENT OF THE CITY OF NEW
7    YORK, JAN BORODO,
     individually, JOHN FIORENTINO
8    individually, and JOSEPH M.
     MASTROPIETRO, individually,,

9
                     Defendants.
10   ------------------------------x        Trial

11                                          New York, N.Y.
                                            January 22, 2024
12                                          9:30 a.m.

13   Before:

14                        HON. DENNY CHIN,

15                                          Circuit Judge
                                            –and a Jury–
16

17                        APPEARANCES

18   DEREK SMITH LAW GROUP, PLLC
             Attorneys for Plaintiff
19   BY:   SEAMUS BARRETT
           ZACHARY I.  HOLZBERG
20
     NEW YORK CITY LAW DEPARTMENT
21           Attorneys for Defendants
     BY:   LAUREN SILVER
22         DESIREE D. ALEXANDER
           MARIA F. DECASTRO
23
     Also Present:  Jan Borodo, Defendant
24                  Joseph M. Mastropietro

25

O1MBPIT1

1          (Trial resumed; jury not present)

2          THE COURT:  For the record, I sent an email to

3    Mr. Barrett on Friday advising that co-counsel were welcome to

4    come back and join him at counsel table as long as they stay

5    for the entire rest of the trial.  Okay.  We'll bring out the

6    jury.  Is your witness here?

7          MR. HOLZBERG:  Your Honor, before we bring the jury

8    in, we'd like to respectfully request that your Honor grant a

9    mistrial.

10          THE COURT:  On the basis that?

11          MR. HOLZBERG:  Based on the prior conduct of counsel,

12    as well as -- I apologize.  I was not here Friday afternoon,

13    but I believe your Honor's ruling with respect to the fact that

14    the 2014 settlement is not considered protected activity for

15    purpose of the plaintiff's retaliation claim.

16          THE COURT:  I did not rule that the 2014 -- first of

17    all by the way, I've been here and you could have asked for me

18    to come out and talk because now finally that the jury has

19    arrived we're taking time.  Let's do this.  The motion for

20    mistrial is denied, and I'll hear you at the break or at lunch

21    time.  Are we ready to proceed?

22          MR. BARRETT:  Yes, your Honor.

23          THE COURT:  Okay.  Let's bring out the jury.  Is your

24    witness here?

25          MR. BARRETT:  He's here.

O1MBPIT1

1           THE COURT:  Let's go get him.  Thank you.  If I were

2    to grant the mistrial, I would consider motion practice, but

3    you can think about that.

4           (Continued on next page)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              (Jury present)

2              THE COURT:  Please be seated.  Mr. Seabrook, if you

3     would come up, please, and retake the stand.  Mr. Seabrook, you

4     are reminded that you are still under oath.

5     GREGORY SEABROOK,

6          called as a witness by the Plaintiff,

7          having been previously sworn, testified as follows:

8     DIRECT EXAMINATION (cont'd)

9     BY MR. BARRETT:

10    Q.  Good morning, Mr. Seabrook.  Remind us what was your title

11    at the fire department?

12    A.  Communications electrician.

13    Q.  For how long?

14    A.  25 years.

15    Q.  Are you currently employed there?

16    A.  I'm retired.

17    Q.  How old were you when you retired?

18    A.  56.

19    Q.  When did you retire?

20    A.  2018, January.

21    Q.  When was your last day physically present on the job?

22    A.  August of 2017.

23    Q.  Why was there that difference?

24    A.  Terminal leave.

25              MS. ALEXANDER:  Objection.

O1MBPIT1                          Seabrook - Direct

1          THE COURT:  You can answer.  In other words, you were

2     physically last on the job in 2017, but you didn't retire

3     officially until 2018?

4          THE WITNESS:  I got my last paycheck in January of

5     2018. I was still on the books until then.

6     Q.  Could you speak up. I couldn't hear what you just said.

7          THE COURT:  Make sure the microphone is close to you.

8     A.  I got my last paycheck in January of 2018.  I last worked

9     in August of 2017.  It's terminal leave.  You got a month off

10    for every 10 years you worked.

11    Q.  Where did you work out of?

12    A.  87 Union Street, Brooklyn.

13    Q.  For how long?

14    A.  24 years.

15    Q.  When, if ever, did you work out of a separate location?

16    A.  I worked out of Manhattan 77th Street when I first started

17    working for the fire department.

18    Q.  What year was that?

19    A.  '92.

20          THE COURT:  We covered all of this.

21          MR. BARRETT:  I'll move on.

22    Q.  On Friday you mentioned that you were a shop steward, do

23    you remember saying that?

24    A.  Yes, I was a shop steward.

25    Q.  What was your role as shop steward?

O1MBPIT1                          Seabrook - Direct

1   A.  I liaison between the communication electricians and their

2   foremen, if there was any problems we try to work them out.

3   Q.  Can you give an example of when you did that?

4   A.  Ed Pitre called me when he was ready to come back to work.

5              MS. ALEXANDER:  Objection.

6              THE COURT:  Overruled.  That answer can stand.  In

7   general you can't testify to what Mr. Pitre told you.  That

8   would be hearsay just so we're clear on that.

9   Q.  Without telling us what Ed told you, please continue with

10  your example?

11  A.  I spoke to John Fiorentino after the conversation with Ed

12  and I informed him that --

13             MS. ALEXANDER:  Objection.

14             MR. BARRETT:  He's saying what he said.

15             THE COURT:  I informed him what Ed told me, that would

16  be a problem.  The question was an example of what he did as a

17  shop steward, what he did.  Just give us a generic example of

18  what you did.

19  A.  If there was any problems between the communication

20  electrician and the foreman if it was something we could talk

21  it out, work it out, I would be the person to try to mediate

22  that problem.

23  Q.  When, if ever, did you do that for Ed?

24  A.  Like 2015 thereabouts.

25  Q.  What was the circumstances?

O1MBPIT1                        Seabrook – Direct

1    A.   He was ready to come back to work.  He got hurt and he had

2    recovered sufficiently to come back to work.

3              MS. ALEXANDER:  Objection.

4              THE COURT:  Let's have a sidebar.

5              (Continued on next page)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

O1MBPIT1                        Seabrook - Direct

1              (In the robing room)

2              THE COURT:  What are you trying to elicit here?

3              MR. BARRETT:  So Greg was in his role as shop steward

4     contacted Fiorentino to let him know -- to request that Ed be

5     allowed to come back to work.

6              THE COURT:  What's the objection?

7              MS. ALEXANDER:  It's still hearsay.  Any statement, as

8     you know, he's talking about statements that were made outside

9     of court without an exception.

10             MR. BARRETT:  It's what he said.

11             THE COURT:  Stop.  Stop.  You always address the

12    Court.  Not every out-of-court statement is hearsay.  Like the

13    conversation that Seabrook saw between Pitre and Correa, it may

14    not be offered for the truth.  It maybe he witnessed it, so

15    it's not just that it's an out-of-court statement that makes it

16    hearsay.  It's an out-of-court statement that's offered for the

17    truth of the matter asserted therein.  And so here you would

18    have Mr. Seabrook testify that Mr. Pitre was ready to come back

19    to work.

20             I think it should be overruled.  I can give an

21    instruction if you want.  It's not being offered to prove that

22    he was ready to come back to work.  It's being offered to prove

23    that he conveyed a request to the fire department that he was

24    ready to come back to work.

25             MS. DECASTRO:  I think the statement that they said

1    was that Seabrook requested that Ed be allowed to go back to

2    work, so that's his own --

3          THE COURT:  That's not hearsay.  That's Seabrook

4    saying I asked that Ed be allowed to come back.

5          MS. DECASTRO:  That's still an out-of-court statement,

6    your Honor, being offered for the truth of the matter.

7          THE COURT:  But the declarant is on the witness stand.

8          MS. DECASTRO:  We'd still object that it's an

9    out-of-court statement offered for the matter of the truth, but

10   we understand the Court's ruling.

11         THE COURT:  You can cross-examine.  That's the point.

12   Obviously people can testify to things that were said before.

13   That doesn't mean that's hearsay, but he's a declarant.

14         If he says I conveyed to Mr. Fiorentino that Ed was

15   ready to come back to work, I think that's not hearsay.  It

16   should be one person per witness by the way.

17         MS. ALEXANDER:  I'm the cross-examiner, so I'll keep

18   it to myself.  My apologies.  From just the last portion what I

19   heard from the witness's answer, it also sound like he was

20   making a representation that the plaintiff was actually cleared

21   or able and ready to come back to work which is a medical

22   opinion he can't give and is also based on hearsay.

23         THE COURT:  That's a different objection.  He can

24   testify that he told Mr. Fiorentino that Ed was ready to come

25   back to work.  You could cross-examine him on whether that's

O1MBPIT1                          Seabrook – Direct

1    true how he knew, but it seems to me that can come in.  Okay.

2              (Continued on next page)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

O1MBPIT1                        Seabrook – Direct

1              (In open court)

2              THE COURT:  The objection is overruled as we

3       discussed, but just ask the question again.  You had a

4       conversation with Mr. Fiorentino in 2015?

5              THE WITNESS:  Yes.

6              THE COURT:  Approximately when was that, meaning

7       roughly what month if you recall?

8              THE WITNESS:  I don't recall that.  It was probably

9       later in the year, maybe fall of '15.

10             THE COURT:  Good enough.  Go ahead.

11      BY MR. BARRETT:

12      Q.  When, if ever, did you see Edward return back to work?

13      A.  He never returned back to work.

14      Q.  How would you describe your relationship with

15      Mr. Fiorentino?

16             MS. ALEXANDER:  Objection.

17             THE COURT:  The question was his relationship or

18      Mr. Pitre's relationship?

19             MR. BARRETT:  His.

20             THE COURT:  The witness's relationship.  Overruled.

21      I'm not sure it's terribly relevant.

22      A.  John Fiorentino was my friend and he was my partner at work

23      at one point.

24      Q.  And what did you tell him about Ed when you spoke to him?

25      A.  He was ready to return to work.

1    Q.  What was John's response, if any?

2    A.  None.  He didn't go back to work.

3           THE COURT:  I think the question is did he say

4    anything in response when you told him that.

5           THE WITNESS:  He didn't have an answer at that time.

6           THE COURT:  What, if anything, did he say?

7           THE WITNESS:  That he have to look into it.

8    Q.  What was John's reputation among communication

9    electricians?

10          MS. ALEXANDER:  Objection.

11          THE COURT:  Sustained.

12   Q.  You mentioned that you were friends, what, if any, conduct

13   or relationship did he have with other C/Es?

14          MS. ALEXANDER:  Objection.

15          THE COURT:  Overruled.  You can answer generally.

16   A.  John was a very jovial person.  He's a nice guy.  He played

17   Santa clause every year.  He's a big guy.

18   Q.  Who, if anyone, did he not display that type of attitude

19   towards?

20   A.  His attitude towards Ed Pitre changed.

21   Q.  When?

22   A.  After the lawsuit.

23   Q.  How so?

24          THE COURT:  We're focusing in accordance with my

25   ruling, after 2014.

O1MBPIT1                        Seabrook - Direct

1           MR. BARRETT:  That's correct.

2    A.   That John seemed -- by me looking at him and knowing him,

3    it seem that he was upset with Ed about something.  Even his

4    tone of voice changed.

5    Q.   Anything else?

6    A.   Pretty much he just didn't get along with him.  It was like

7    oil and water at that point.

8    Q.   What did you see that makes you say that?

9    A.   I know John for 30 years.  I know him.  His attitude

10   changed.  He wasn't nice to Ed.

11   Q.   How so?  In what ways?

12          MS. ALEXANDER:  Objection.

13          THE COURT:  Sustained.  It's been asked and answered

14   twice now.

15   Q.   In what way, if any, were you acquainted with Mr. Pitre?

16   A.   Ed Pitre was my friend.  Ed Pitre was a vice chairman of

17   the union at that time, and I'm the shop steward so we were

18   pretty tight, good friends.

19   Q.   When, if ever, did you serve in the union at the same time?

20   A.   At least the last three or four years.

21   Q.   What, if anything, can you tell us about Ed's role as vice

22   chairman?

23   A.   If we had a union meeting, if we had labor talks, things

24   like that, he would attend those.  I would attend them.  We had

25   contract meetings, we would attend those.  He wasn't on the

1    annuity board.  I was on the annuity board, so.

2    Q.  Who from management attended those meetings if anyone?

3    A.  When we had the contract meetings, it was more of the city.

4    It wasn't the fire department.  We were talking to the city and

5    they would run the numbers.

6    Q.  What, if any, is your current relationship with Mr. Pitre?

7    A.  Ed is my friend.  I talk to him every couple of months.

8    Q.  What kind of jobs did you see him perform when he was

9    communications electrician?

10   A.  When Ed got to the fire department, it changed a little bit

11   because he worked for transit and he worked in power and they

12   pulled a lot of big cable.  So kind of we started pulling more

13   cable and stuff, so he was part of the rodding crew.  The

14   rodding crew would pull in new cable, and they would do the

15   splices.  So we would find the problems, and then they would

16   pull in new cable and splice it.

17   Q.  How is that a change?

18   A.  That they had a rodding crew.  They had a crew just doing

19   that.  And because Ed and the guys that came with him, came

20   from power, they did more rodding and stuff than we did.  And

21   the level of our equipment went up after that.  We got big

22   rodders and things after that.

23   Q.  What role did Ed play in that?

24   A.  He was instrumental because he would take Phil Berger -- he

25   took Phil Berger who was the person who use to get our

O1MBPIT1                          Seabrook - Direct

1   materials and equipment, and he took him to the transit yard

2   and say we need this truck.  We need this.  We didn't have a

3   person that was doing that until Ed and Adams got there.  Those

4   guys knew all of that stuff.

5   Q.  You said Ed and --

6   A.  Ed and Ismael Ortiz and Joe Adams, all of those guys were

7   transit guys.  You just had to have an electrical background to

8   work with us.  You didn't have to have a specific background

9   for underground.  You would learn that on the job, but you had

10  to have an electrical background.

11  Q.  In what way, if any, did those changes effect the

12  efficiency of the COM's division?

13              MS. ALEXANDER:  Objection.

14              THE COURT:  Sustained.

15  Q.  Who is Mr. Correa, can you remind us?

16  A.  That's the Manhattan foreman.  He was Ed Pitre's foreman.

17  Q.  What, if any, relationship did you have with Mr. Correa?

18  A.  We were cordial.  I didn't know him that long.  I didn't

19  know him that long.  He came later ever.

20  Q.  When, if ever, did you see Mr. Correa interact with

21  Mr. Pitre?

22  A.  Any time we all worked together because we would work from

23  whatever role we needed to work in, so any time they were

24  working together.  And also Manhattan's shop moved.  They were

25  in Manhattan, then they lost their spot in Manhattan, and they

O1MBPIT1                        Seabrook - Direct

1    were working out of Brooklyn, so I would see them often.

2    Q.  What, if anything, do you remember about a fiber optics

3    training?

4    A.  We had a class out in Queens Borough College to familiarize

5    ourselves with fiber optic cable, with the physics of it and

6    how to splice it and things like that.  Because we didn't work

7    with that originally, we were doing copper.  And we started

8    working with fiber optic later, and we had a class in Queens

9    Borough College.

10   Q.  When was that if you remember?

11   A.  Probably 2015.

12   Q.  Do you remember what month or season that was in?

13   A.  I think kit was the fall semester.  It wasn't cold yet.  I

14   think it was the fall semester.  I don't remember.  It was like

15   10 years ago.

16   Q.  Who else was in the class with you if you remember?

17   A.  Half of the shops.  Ed was in my class.  John Fiorentino

18   was in my class.  Nick Varone and other people.  It was about

19   20, 25 people.

20          THE COURT:  All communication electricians?

21          THE WITNESS:  The exception was John Fiorentino.  He

22   was a senior supervisor.

23   Q.  Who in the communications division had to take that class

24   if anybody?

25   A.  Everybody that was either a C/E communications electrician

O1MBPIT1                          Seabrook - Direct

1   or the foreman.  They all took it.

2              THE COURT:  You mean the foremen were also C/Es,

3   weren't they, at least at some point?

4              THE WITNESS:  Yes.

5   Q.  What do you remember about Ed and John in that class if

6   anything?

7   A.  Well, when Ed came, he was hurt already.  He had a brace on

8   his hand and he needed to go to the surgeon so he could look at

9   his hand.

10  Q.  How did you know that?

11  A.  It was obvious.  You could see it.  He has a brace on, and

12  our group wasn't big.  So generally if anybody got hurt, we all

13  knew it.  It was five boroughs.  The foremen talk to each

14  other.  We all knew when somebody got hurt.

15  Q.  What, if anything, did you see Ed do related to his injury

16  in that class?

17  A.  I know that he had to leave to go to the doctor.

18             THE COURT:  The question was what did you see.

19             THE WITNESS:  In regards to what?

20             THE COURT:  In regard to what we're talking about, did

21  you see anything during the class with respect to Ed's injury?

22             THE WITNESS:  His injury.  He needed to get out of the

23  class.  I don't know.  I can't say that he spoke to his

24  foreman, but normally you would speak to your foreman to find

25  out.

O1MBPIT1                      Seabrook - Direct

1              MS. ALEXANDER:  Objection.

2              THE COURT:  Sustained.  The question is did you see

3    him have a conversation with anyone in the class?  Did you

4    overhear the conversation?  Did you see him leave at some

5    point?

6              THE WITNESS:  I saw Ed leave.  I spoke to John and Ed

7    spoke to John.  Ed ask me to speak to John because I'm closer

8    to John than he is, and Ed spoke to John.

9    BY MR. BARRETT:

10   Q.  What, if anything, did you hear John say about the

11   situation?

12   A.  He said he couldn't leave.

13   Q.  What did Ed do?

14   A.  He left.  He went to the doctor.  Generally we would have

15   --

16             THE COURT:  Well, Ed left?

17             THE WITNESS:  Yes, Ed left.

18             THE COURT:  You actually don't know where he went.

19             THE WITNESS:  You're right.  He left.

20   Q.  How did John respond after that happened?

21   A.  He was looking for Ed after that.  He was asking people did

22   you see Ed.  Did he go?  He knew Ed left.

23   Q.  And what, if anything, did he say about Ed leaving?

24   A.  That he wasn't going to pay him for that time.

25   Q.  What text messages, if any, did you see between Mr. Correa

1    and Mr. Pitre?

2    A.  I didn't see.

3    Q.  You mention a moment ago that you saw a brace on

4    Mr. Pitre's hand, did you see any equipment on him?

5    A.  I seen him with a sling on too because he had a torn

6    rotator cuff, and he had something wrong with his hand.  I

7    don't know what was wrong with his hand.

8    Q.  When, if ever, did you see C/E's granted reasonable

9    accommodation?

10   A.  All the time.  An example of that would be Tom Schwabacher.

11   I don't know if I'm pronouncing his name right.  He was new.

12   He was there maybe a couple of months.  He had cancer.  He was

13   out for a couple of weeks.  He came back, and he was assigned

14   to the central office, basically transferring, cleaning up

15   wires in the central office.  And we made up a board to teach

16   people how to troubleshoot circuits, and he was working on

17   that.

18   Q.  For how long?

19   A.  Several months, probably like six months.

20   Q.  How would you characterize the nature of the work you

21   described Tom doing?

22   A.  It would be light duty work, no manhole covers, no

23   jackhammering, no installing fire alarm boxes, basically

24   screwdriver and wires and strippers.

25   Q.  What, if any, heavy lifting was involved in that type of

O1MBPIT1                          Seabrook - Direct

1   work?

2   A.   None.

3   Q.   Aside from Tom, who else, if anyone, did you see granted

4   reasonable accommodations?

5   A.   Bob Bager had a bad knee and his partner was Mike Alan.  So

6   mike rode with him so they could make the work lighter.  If

7   your partner was hurt, if we were working together, if your

8   partner was hurt, we would carry the extra weight, so that's

9   basically what we would do.

10  Q.   And how long did you witness Bob Bager being afforded this

11  accommodation?

12  A.   Couple of months, two or three months.

13  Q.   Anyone else who you saw being granted reasonable --

14  A.   Nick Varone.  Nick had bypass surgery, quadruple bypass

15  surgery, and his whole job was light duty.  He never did

16  anything.  All he did was the computer, and he was a C/E like

17  all of us, but he didn't shoot circuits or open manholes or

18  install posts.

19  Q.   When, if ever, did you see Ed be allowed to do computer

20  work at any time?

21  A.   Never.

22  Q.   Can you describe the nature of that work on the computer?

23  Do you know anything about it?

24  A.   We had diagrams.  We had maps for all of the -- as the

25  wires run through the streets, like a map of the circuits,

O1MBPIT1                        Seabrook - Direct

1   right.  So we'd have all of the wires, where they run, what

2   manholes they're in.  We also had the circuits.  You had to

3   print the circuits up, things like that.  That's basically the

4   computer work.

5   Q.  In what way, if any, were you able to do that type of work?

6   A.  I was not given the opportunity.

7   Q.  What, if anything, do you know about that type of work?

8          MS. ALEXANDER:  Objection.

9          THE COURT:  Overruled.

10  A.  Actually, I was a computer major since high school.  I went

11  to Wesson House High School in Brooklyn.  I was a computer

12  major there.  I went to the College of Staten Island.  I

13  programmed.  That's what I did.  I'm pretty sure I can use a

14  computer.

15  Q.  What, if any, ability did you have to do that type of work

16  that you're talking about with Nick?

17         MS. ALEXANDER:  Objection.

18         THE COURT:  Sustained.

19  Q.  How did you know Mr. Varone had a quadruple bypass?

20  A.  Because John Fiorentino was his best friend and he told me.

21  Q.  John told you?

22  A.  John told me.

23  Q.  Who else, if anyone?  So far you mention Tom Schwabacher,

24  Bob Bager, Nick Varone, was anyone else granted --

25  A.  Chris Geressy. He had a broken foot.

O1MBPIT1                        Seabrook - Direct

1    Q.  And what, if anything, do you know about how long

2    Mr. Geressy had been on the job before he hurt his foot?

3    A.  Probably five years.  He was doing central office stuff

4    too.  He was working in the central office.  He was doing the

5    wires and things while he was recovering.

6    Q.  How many years, if you know, was Ed on the job before he

7    got injured?

8    A.  About 15 years, 14.

9    Q.  What, if anything, do you know about Mr. Pitre's ability to

10   do the work that you just described Mr. Geressy of doing?

11   A.  He's capable of doing that.

12   Q.  So we have four people we heard about so far that you just

13   testified.  Is there anybody else that was granted reasonable

14   accommodation?

15   A.  Ed Dobbins.  Ed Dobbins leg was messed up.

16   Q.  When was that you?

17   A.  He came in like that.  He had a motorcycle accident when he

18   was a kid.  His leg was always messed up.

19   Q.  He was hired onto the job?

20   A.  Yep.

21   Q.  And do you remember approximately what year if at all?

22   A.  I think he was there before Ed.  I don't recall.  I don't

23   recall when he got there.

24   Q.  How did his disability or his legs, his messed up leg

25   affect what he was allowed to do at work?

1          MS. ALEXANDER:  Objection.

2          THE COURT:  Overruled.  You can testify to what you

3    saw.

4    A.  For the most part he could do the job, but if he was having

5    problems, then he couldn't pull up a cover.  It would be hard.

6    His leg would flare up from time to time.

7    Q.  How was that handled?

8    A.  Somebody else would open the cover.  We would help each

9    other.

10   Q.  So after Ed Dobbins and Chris Geressy, Nick Varone, Bob

11   Bager, Tom Schwabacher, who else, if any, can you remember that

12   was also granted accommodation?

13   A.  I was granted accommodation, but not like they got it.  I

14   had to --

15          MS. ALEXANDER:  Objection.

16          THE COURT:  Well, the question was who else got one.

17   You said you were granted an accommodation?

18          THE WITNESS:  Yes.

19          THE COURT:  Okay.  Next question.

20   Q.  How did you get that accommodation?

21          MS. ALEXANDER:  Objection.

22          THE COURT:  Sustained.  What kind of an accommodation

23   were you granted?

24          THE WITNESS:  Reasonable accommodation.  I had gastric

25   bypass surgery, and I couldn't lift anything over 10 pounds and

O1MBPIT1                        Seabrook - Direct

1    I had to be close to a bathroom.

2    Q.  How long was that accommodation granted?

3    A.  I stayed out of work about six weeks, a month.  I had the

4    surgery in August of 2016.  I came back in September.  I was

5    given accommodation.

6            I was working in the storehouse headquarters in Long

7    Island City for three months, then I went back to a Union

8    Street, and basically I didn't do any manhole work for about

9    six months.  And it was a couple of guys that needed to learn

10   how to correct and find problems in a circuit, and I had done

11   that for 10 years by myself at night.  I was a trouble hunter

12   for about 10 or 12 years, and basically all I did was trouble

13   shoot so I'm pretty good at that.

14   Q.  What ability, if any, do you know that Ed had to do that

15   same work you just described?

16   A.  Ed could do that.

17   Q.  What was the process by which you obtained the

18   accommodation?

19           MS. ALEXANDER:  Objection.

20           THE COURT:  Sustained, except that you can ask whether

21   he asked for an accommodation.

22   Q.  Did you ask for one?

23   A.  I asked for an accommodation and I spoke with John

24   Fiorentino.

25           MS. ALEXANDER:  Objection.

O1MBPIT1                              Seabrook - Direct

1         THE COURT:  You asked for an accommodation and you

2    spoke to Mr. John Fiorentino.  Enough.  Next.

3    Q.  What did John Fiorentino tell you about what you asked?

4         MS. ALEXANDER:  Objection, same objection.

5         THE COURT:  If I know where this is going, I think

6    it's more of a relevancy objection.

7         MS. ALEXANDER:  Right.

8         THE COURT:  Sustained.

9    Q.  How many times did you need to request an accommodation

10   before you got one?

11        MS. ALEXANDER:  Objection, same one.

12        THE COURT:  Sustained.

13   Q.  Where were you assigned when you had light duty?

14   A.  Long Island City, the headquarters for buildings in the

15   store room.

16   Q.  And how long were you there?

17   A.  Three months.

18   Q.  Where did you go after that?

19   A.  I went back to Union Street.

20   Q.  When you went back, what, if any, restrictions on your

21   physical activity were there?

22        MS. ALEXANDER:  Objection.

23        THE COURT:  Asked and answered.  Next question.

24   Q.  How long after you went back to Union Street were you on

25   the job?

O1MBPIT1                          Seabrook - Cross

1   A.   I worked like another year and a half.

2              MR. BARRETT:   No further questions at this time.

3              MS. ALEXANDER:   Yes.   One moment, your Honor.

4   CROSS-EXAMINATION

5   BY MS. ALEXANDER:

6   Q.   Good morning, Mr. Seabrook.

7   A.   Good morning.

8   Q.   You were also a plaintiff in the 2011 lawsuit, right?

9   A.   Yes.

10  Q.   And on Friday you said in that lawsuit you sued the fire

11  department?

12  A.   Yes.

13  Q.   And you also sued Mayor Bloomberg too, right?

14  A.   Probably, he's the Mayor.

15  Q.   Do you remember if you sued mister --

16  A.   I don't remember.   That's 13, 14 years ago.   I don't

17  remember.

18  Q.   You don't really remember things that happened 13, 14 years

19  ago?

20             MR. BARRETT:   Objection.

21  A.   Some things.

22             THE COURT:   Overruled.   He answered.

23  Q.   You remember things like the details you came to testify

24  for your friend the plaintiff, right?

25  A.   For the most part.

O1MBPIT1                         Seabrook - Cross

1    Q.  Because that's your friend of 25 years?

2    A.  24.

3    Q.  So you were talking to plaintiff about your testimony for

4    today, right?

5    A.  I have spoken to him about the things that happened.

6    Q.  And you spoken to him even up to this morning, right?

7    A.  I just spoke to him.  That's my friend.

8    Q.  In the hallway, right?

9    A.  Yes.

10   Q.  And you've still been under oath this entire weekend,

11   right?

12   A.  Yes.

13   Q.  You also spoke -- withdrawn.

14        You stated that you worked in Union Street from 1994

15   to 2018, right?

16   A.  Correct.

17   Q.  Now, after plaintiff returned to work from his injury that

18   we're here for today, plaintiff was assigned to the Manhattan

19   office, right?

20   A.  Ed you're talking about?

21   Q.  Yeah, plaintiff, your friend.

22   A.  Yeah, he was assigned to Manhattan, yes.

23   Q.  That's not Union Street, right?

24   A.  Sometimes it is, and sometimes it's not.

25   Q.  Listen carefully to my question.

O1MBPIT1                          Seabrook - Cross

```
 1   A.  I heard your question.

 2   Q.  So Manhattan is not Union Street, is it?

 3   A.  It is not, but they reported there.

 4   Q.  I did not ask about reporting.

 5          THE COURT:  Just answer the question.

 6   Q.  At that same timeframe John Fiorentino also did not work --

 7   was not assigned to Union Street, was he?

 8   A.  Fort Totten.

 9   Q.  And that's not Union Street, is it?

10   A.  No.

11   Q.  But you told this jury on Friday that you would see the

12   plaintiff every single day?

13   A.  I saw him everyday when he was working out of Brooklyn.

14   Q.  So not everyday that he worked?

15   A.  No.

16   Q.  Now, you testified at length just now about different

17   people who you observed get an accommodation, right?

18   A.  Yes.

19   Q.  Now, those were accommodations granted through the EEO

20   office, right?

21   A.  No.

22   Q.  Do you work in EEO?

23   A.  No.

24   Q.  Have you ever worked in EEO?

25   A.  No.
```

O1MBPIT1                          Seabrook - Cross

1   Q.   So you don't know what request have gone to EEO, do you?

2   A.   Pretty much I do know.

3   Q.   You know what people tell you, right?

4   A.   Yes.

5   Q.   But you don't know what request have actually gone there,

6   right?

7   A.   No.

8   Q.   On Friday you told this jury that you never lost your

9   driving privileges, right?

10  A.   I don't think I was asked that question.

11  Q.   Would seeing the transcript from Friday refresh your

12  recollection?

13  A.   Okay.

14          MS. ALEXANDER:   I have a physical copy.

15          THE COURT:   You can show it to him.  Give the page and

16  line number.

17          MS. ALEXANDER:   This is from Friday's transcript page

18  376, lines 13 to 14 in.

19          THE COURT:   You can show it to him or you can ask him.

20  Q.   Can you take a look at this page, only lines 13 to 14.

21  Read it to yourself and let me know when you're done reading

22  those lines.

23  A.   Okay.

24  Q.   Does that refresh your recollection --

25  A.   Yes.

O1MBPIT1                          Seabrook - Cross

1    Q.  Let me finish the question.  Does that refresh your

2    recollection that you were asked -- that you said you never

3    lost your driving privileges Friday?

4    A.  Correct.

5    Q.  And that's not true, is it?

6    A.  That's not true.

7    Q.  Because you did lose your driving privileges, right?

8    A.  Yes.

9    Q.  After your drunk driving arrest, right?

10   A.  Correct.

11   Q.  And that was on August 16, 2017, right?

12   A.  Correct.

13   Q.  And you never fully got a resolution from that case, right?

14   Let me withdraw.

15           BITS charged you for getting that arrest, right?

16   A.  Yes.

17   Q.  And BITS was never able to complete their investigation of

18   that charge, correct?

19   A.  I don't know what BITS did.

20   Q.  Well, you know that next day after your arrest you applied

21   for retirement?

22   A.  It wasn't the next day.

23   Q.  Would seeing your retirement form refresh your recollection

24   that you applied for retirement the very next day after your

25   arrest?

O1MBPIT1                          Seabrook – Cross

1   A.  You can show me, but I know I didn't.

2              MS. ALEXANDER:  I have a hard copy here.

3              THE COURT:  State it for the record.  You're just

4   using it to refresh his recollection?

5              MS. ALEXANDER:  Yes.  I'm showing, not the jury, just

6   the witness to refresh his recollection.  I'm showing a

7   document on the screen.

8              THE COURT:  What's the number?

9              MS. ALEXANDER:  This should be Defendant's DDD.

10             MR. BARRETT:  May we have a copy?

11             MS. ALEXANDER:  I don't have a hard copy.  This will

12  be Defendant's EEE.

13             THE COURT:  You just showed DDD, but now you're going

14  to show EEE?

15             MS. ALEXANDER:  Yes.

16             (Continued on next page)

17

18

19

20

21

22

23

24

25

O1MAPIT2                          Seabrook-Cross

 1  BY MS. ALEXANDER:

 2  Q.  Now, Mr. Seabrook, up on the screen there should be a form

 3  that I'm showing solely to refresh your recollection.  So

 4  please take a look at this form.  Read it solely to yourself,

 5  and specifically you can read the title, the signature line

 6  here, and the date to let me know if this refreshes your

 7  recollection as to whether or not you filed your retirement

 8  form the very next day after your August 16th arrest?

 9  A.  I see the date, but my recollection, I did not go to retire

10  the next day because I was pretty shook up.  I don't think I

11  would have went that next day.

12  Q.  So seeing the August 17 date doesn't refresh your

13  recollection?

14  A.  I see what it says.

15          MR. BARRETT:  Your Honor, the document is not in

16  evidence.

17  A.  I'm reading the things --

18          THE COURT:  This is not your witness.  That's the way

19  it works.  If there's an objection, Mr. Barrett should make it,

20  but his answer is his recollection is not refreshed.

21          MS. ALEXANDER:  Okay.

22          THE COURT:  So next question.

23          MS. ALEXANDER:  I will need to remove this.  So

24  removing it now from the screen.

25  Q.  That was not the only time your driving privileges were

1    revoked, were they?

2    A.   No.

3    Q.   They were also revoked for -- revoked after you were

4    charged with criminally negligent homicide for driving under

5    the influence, right?

6    A.   1992.

7              MS. ALEXANDER:  One moment to confer, your Honor.

8              THE COURT:  Yes.

9              MS. ALEXANDER:  I have nothing further.

10             THE COURT:  Any redirect?

11   REDIRECT EXAMINATION

12   BY MR. BARRETT:

13   Q.   When if ever did you permanently lose your driving

14   privileges?

15   A.   Never.  I got my license back.

16   Q.   Who had their privileges permanently removed?

17   A.   Ed, he lost his truck permanently.

18   Q.   For what, if you know?

19   A.   I know what I was told.  I know he lost --

20             MS. SILVER:  Objection.

21             THE COURT:  Sustained.

22   Q.   Did you ever -- what if any documents did you see, if any?

23             MS. SILVER:  Objection.

24             THE COURT:  Sustained.

25   Q.   Okay.  She showed you a document and you discussed the date

O1MAPIT2                          Seabrook—Redirect

of October 7th, 2017.  Was that your actual retirement day?

A.  No, my actual retirement day was January 26, 2018.

            MR. BARRETT:  Okay.  So that's all.

            THE COURT:  Anything further?

            MS. ALEXANDER:  Nothing further for this witness.

            THE COURT:  All right.  Mr. Seabrook, thank you.  You
may step down.

            Your next witness.

            MR. BARRETT:  Your Honor, we wanted to call Mr. Pitre.

            THE COURT:  Okay.  Mr. Pitre, if you would step up.

            MR. BARRETT:  Mr. Pitre is requesting if he can use
the restroom before he goes on the stand.

            THE COURT:  Okay.  Well, we have this time so that
there are refreshments, but let's take a short break.  Let's
take a five-minute break.

            Ladies and gentlemen, we'll take a short recess.

            (Recess)

            (Continued on the next page)

O1MAPIT2                      Pitre-Direct

1              (Jury not present)

2              THE COURT:  We'll take a recess.  Who else do you have

3    after Mr. Pitre?

4              MR. HOLZBERG:  We have one more witness.  His name is

5    Joseph Adams.

6              THE COURT:  Joseph Adams, okay.

7              MR. HOLZBERG:  And I don't know if he's here yet.

8    I'll go check.

9              (Recess)

10             (Continued on the next page)

O1MAPIT2                    Pitre-Direct

1           THE COURT:  Mr. Pitre, why don't you come step up.

2           (Jury present)

3           THE COURT:  Mr. Pitre, please remain standing.

4    Everyone can sit.  Mr. Pitre, we will administer the oath.

5    EDWARD PITRE,

6         the Plaintiff called as a witness, in his own behalf,

7         having been duly sworn, testified as follows:

8           THE DEPUTY CLERK:  Please be seated.  State your full

9    name and spell it for the record.

10          THE WITNESS:  Edward Pitre, E-D-W-A-R-D.  Last name is

11   P-I-T-R-E.

12          THE COURT:  Go ahead.

13   DIRECT EXAMINATION

14   BY MR. BARRETT:

15   Q.  Good morning, Ed.

16   A.  Good morning.

17   Q.  Where do you currently reside?

18   A.  Sacramento, California.

19   Q.  How long have you lived there?

20   A.  After '15.

21   Q.  Okay.  Who do you live with?

22   A.  Wife.

23   Q.  How long have you guys been married?

24   A.  Twelve years.

25   Q.  Where did you live before Sacramento?

O1MAPIT2                          Pitre-Direct

1    A.   Queens, New York.

2    Q.   Where did you grow up?

3    A.   Brooklyn, New York.

4    Q.   What neighborhood?

5    A.   Crown Heights.

6    Q.   Where did you go to high school?

7    A.   William E. Grady.

8    Q.   Is that the full name?

9            MS. SILVER:  Objection.

10           THE COURT:  Overruled.

11   A.   Vocational Technical High School.

12   Q.   Did they teach specific trades, technical trades there?

13   A.   Yes.

14   Q.   Did you attend one of those?

15   A.   Electrical program.

16   Q.   Did you go to college?

17   A.   Yes.

18   Q.   Where?

19   A.   John Jay College.

20   Q.   Let me back up.

21           What if any specialization did you graduate from high

22   school with?

23   A.   I graduated with electrical endorse diploma.

24           THE COURT:  Electrical what?

25           THE WITNESS:  Endorse diploma.

O1MAPIT2                    Pitre-Direct

1    Q.  And you mentioned you went to John Jay; is that right?

2    A.  Correct.  That's correct.

3    Q.  What year?

4    A.  I went there when I was working in the MTA going to the

5    fire department.  So it was late.  So from I think 2000, 2001.

6    Q.  What year did you graduate from high school?

7    A.  '89.

8    Q.  What year did you start working for the City of New York?

9    A.  I started working for the MTA in October of '89.  Retired

10   --

11   Q.  How old were you when you first --

12   A.  Eighteen.

13   Q.  What job were you hired for when you were eighteen?

14   A.  I was a helper, electrician's helper.

15   Q.  And then what?

16   A.  Then I was promoted to a power cable maintainer.

17   Q.  I'm sorry?

18   A.  The official title was a power cable maintainer.

19   Electrician.

20   Q.  Try to speak slowly and clearly so the court reporter can

21   hear you and I can hear you, please.

22   A.  Sure.

23   Q.  Please describe the position that you had after the one you

24   just mentioned.

25   A.  I was hired for the FDNY in 2000, October I believe.

O1MAPIT2                        Pitre-Direct

1    Q.  What was your title back then?

2    A.  Communication electrician.

3    Q.  I'm sorry, you said October what year?

4    A.  2000.

5    Q.  Was anyone else hired around that same time when you were

6    hired?

7    A.  It was Ismael Ortiz, Joseph Adams, Troy Blake and myself.

8    We all were in the same MTA.

9    Q.  I'm sorry --

10   A.  Same unit.

11   Q.  You went through that too fast.  You said -- who did you

12   say after Troy Blake?

13   A.  Troy Blake, Ismael Ortiz, Joe Adams, and myself.

14   Q.  And did all you guys come from transportation?

15   A.  The MTA, that's correct.  Power division.

16   Q.  And all you guys were also electricians?

17   A.  That is correct.

18   Q.  Did you guys know each other from MTA?

19   A.  Correct.

20   Q.  How did you hear about the job at fire department?

21            MS. SILVER:  Objection.

22   A.  I saw on The Chief --

23            MR. BARRETT:  Hang on.

24            THE COURT:  Did I hear objection?

25            MR. BARRETT:  She objected.

O1MAPIT2                    Pitre-Direct

1              THE COURT:  To how he heard about the job, go ahead,

2     you can answer.

3     A.  I saw in The Chief, which is the civil service newspaper.

4     Q.  Is that a newspaper for like city employees?

5     A.  That is correct.

6     Q.  Where do you work now?

7     A.  I'm retired.

8     Q.  How long did you work for the fire department?

9     A.  My last day on the job was early September '15.

10             THE COURT:  Early September of 2015?

11             THE WITNESS:  Yes.

12    Q.  When you say last day on the job, does that mean that you

13    were technically employed longer and you just weren't there?

14    A.  Correct.  So technically I was still on the job for a year,

15    an extra year.

16             THE COURT:  You were on the payroll for another year?

17             THE WITNESS:  Yes.

18    Q.  Was there a difference in pay from the time when you were

19    on the job physically present and when you were not?

20    A.  I was considered -- from the date of surgery, I was

21    considered Workers' Comp from the date of surgery.

22    Q.  Slow.

23             THE COURT:  Maybe push the microphone away.

24             THE WITNESS:  I'll go back.

25             THE COURT:  It's just not coming across clearly.

O1MAPIT2                         Pitre-Direct

1    Q.  And, Ed, just speak more slowly because there's a court

2    reporter.  Really, she has to take everything down and the

3    Judge and I and defense counsel, we all need to be able to hear

4    exactly every word that you're saying.  Let me ask that

5    question again.

6              Was there a difference in pay between when you were on

7    the job physically present and when you were still technically

8    employed, but not actually present on the job?

9    A.  There was a difference in pay.

10   Q.  Okay.  How much?  What was the difference?

11   A.  I believe when you're Workers' Comp, you get one-third of

12   your salary.

13   Q.  Okay.  That -- the time you were on Workers' Comp, was that

14   from when you mentioned early 2015 you were on Workers' Comp

15   through when you were actually technically retired?

16   A.  That is correct.

17   Q.  When were you technically retired?

18   A.  I was retired on '16 think.  The month, I'm not too sure.

19   Q.  Okay.

20             THE COURT:  When you say 16?

21             THE WITNESS:  2016.

22             THE COURT:  2016?

23             THE WITNESS:  Right.

24             THE COURT:  Not sure which month?

25             THE WITNESS:  No.

O1MAPIT2                     Pitre-Direct

1   Q.  Is there a document that might refresh your recollection?

2   A.  Yes, there should be a letter from pension with the date on

3   it.

4        MR. BARRETT:  I'd like to introduce that document.

5   This will be Plaintiff's Exhibit 7.

6        THE COURT:  You offered it?

7        MR. BARRETT:  I am offering it, your Honor.

8        MS. SILVER:  No objection.  We have no objection.

9        THE DEPUTY CLERK:  Stipulated.

10        THE COURT:  Oh, it's already in evidence.  Plaintiff's

11   Exhibit already received.  You can show it to everyone.

12   Q.  Ed, can you see that document?

13   A.  Yes.

14        THE COURT:  Just show the sticker so we can see.  Does

15   it have a sticker on it?  All right.

16   Q.  So, do you recognize this document?  Is that the one you

17   were just talking about?

18   A.  That is correct.

19        THE COURT:  Okay.  You can now zoom in.

20        MR. BARRETT:  Can I ask to just confirm the jury sees.

21        THE COURT:  The jury can see it, yes.

22   Q.  Okay.  Ed, is that zoomed in enough where you can read the

23   top part?

24   A.  Yes.

25   Q.  All right.  Take a moment just to read this first paragraph

O1MAPIT2                          Pitre-Direct

1    and let me know when you're done.

2    A.  Yes.

3    Q.  Does that first paragraph show the actual retirement date

4    when you were -- left Workers' Comp and were technically

5    retired?

6    A.  That is correct.

7           THE COURT:  And just for the record, the date is March

8    30, 2016.

9           MR. BARRETT:  Correct, your Honor.

10          THE COURT:  Okay.

11          (Pause)

12   Q.  And, yeah, just to confirm for the record, Mr. Pitre, right

13   there it says March 30, 2016; that is your actual technical

14   retirement date, correct?

15   A.  That is correct.

16          MR. BARRETT:  So, one moment please, if that's okay.

17          THE COURT:  Yes.

18          (Pause)

19   Q.  All right.  Mr. Pitre, what if anything do you remember

20   about Ms. Alexander's opening statement referencing your

21   retirement?

22   A.  She mentioned --

23          MS. SILVER:  Objection.

24          THE COURT:  Sustained.

25   Q.  Who gave you this pension that you -- that was referenced

O1MAPIT2                    Pitre-Direct

1   in here --

2            THE COURT:  I'm not sure I understand the question.

3   Q.  Did the city give you any pension?

4   A.  Yes, they did.

5   Q.  They gave it to you?

6            THE COURT:  I'm sorry.  This is a New York City

7   pension; is that right?

8            THE WITNESS:  That is correct.

9            THE COURT:  Okay.

10           THE WITNESS:  Originally the pension was very

11   difficult to --

12           MS. SILVER:  Objection.

13           THE COURT:  Sustained.

14           MR. BARRETT:  Yeah.

15   Q.  So is the pension given or earned?

16           MS. SILVER:  Objection.

17           THE COURT:  Sustained.

18           How old were you when you started receiving the

19   pensions on or about March 30, 2016?

20           THE WITNESS:  I believe 46.

21           THE COURT:  Forty six.  Thank you.

22   Q.  When were you planning to retire?

23   A.  I was planning to retire later on in life.  Maybe 62, 60.

24           (Pause)

25           THE COURT:  I can't have this hut every question.

O1MAPIT2                    Pitre-Direct

1   Q.  You just testified that you retired when you were 41, but

2   you wanted to work --

3            THE COURT:  I thought he said 46.

4            MR. BARRETT:  Oh, okay.

5            THE COURT:  Did you say 46 or 41?

6            THE WITNESS:  Forty six.  I believe it was 45.  I'm

7   sorry.  I guessed on the age.

8            THE COURT:  So you -- on or about March 30 of 2016,

9   how old were you?

10           THE WITNESS:  Forty five.

11           THE COURT:  Okay.  45.

12  Q.  And you just testified that you wanted to work until you

13  were older into your 60s.  Why did you take it when you were

14  45?

15  A.  I was forced to retire.

16  Q.  How so?

17  A.  I wasn't given the accommodations, reasonable accommodation

18  from the day of my injury.

19  Q.  Please elaborate.  What do you mean?

20  A.  From the date of the injury, if I would have gotten light

21  duty, I probably -- my injury wouldn't be so severe.

22           MS. SILVER:  Objection.

23           THE COURT:  Overruled.  You can answer.

24  A.  My injuries wouldn't be so severe.

25           MS. SILVER:  Objection.

O1MAPIT2                    Pitre-Direct

1              THE COURT:  Overruled.

2              He answered the question.  Next question.

3              MR. BARRETT:  Okay.

4    Q.  So you said you were forced, why do you use that word

5    forced?

6    A.  Civil service law says that if I'm not able to come back at

7    full -- within one year, I'll be fired.

8    Q.  Why weren't you able to come back?

9    A.  I was expected to have -- the department wanted me to have

10   -- to be back 100 percent of duty, which, which was impossible

11   because I was injured.

12   Q.  Did you understand that to be an actual rule?

13   A.  No.  Because I'm shocked because I know guys in the

14   department.  I personally know that they literally got hurt on

15   the job and retired, you know, with accommodation, and worked

16   out their career and retired that way.

17   Q.  They were still physically present at the job at that time?

18   A.  Absolutely.  Absolutely.

19   Q.  But that -- did that happen to you or not?

20   A.  No.

21   Q.  Why not?

22              MS. SILVER:  Objection.

23              THE COURT:  Sustained.

24   Q.  Who was your supervisor back then?

25   A.  Miguel Correa.

O1MAPIT2                          Pitre-Direct

1   Q.   And who was his boss?

2   A.   John Fiorentino.

3   Q.   What was the last full year that you were on the job

4   present?

5   A.   2014.

6   Q.   What was your salary for that last full year?

7   A.   A little over 134,000.

8   Q.   All right.

9            THE COURT:  And just so we're clear, by last full year

10  do you mean a 12-month period, or do you mean a calendar year?

11  Just so I know.

12           THE WITNESS:  Twelve-month period.

13           THE COURT:  Okay.

14  Q.   Okay.  Sorry.  Please describe the jobs that you did during

15  the, you know, the span of your time there as a communications

16  electrician?

17  A.   We were responsible for all the aerial, underground, voice

18  alarm, telegram.  Anything that has to do with communication

19  with the fire department, we did it all.  We troubleshooting,

20  splicing, schematic drawings, we had to update them constantly.

21  Pretty much any and everything that had to do with the fire

22  department.  Anywhere where that cable went, we were there.

23  Q.   So there's more than just those things you just mentioned?

24  A.   Oh, yeah, absolutely.

25  Q.   And of all those tasks that you just mentioned, you knew

O1MAPIT2                    Pitre-Direct

1   how to do every single one of those, right?

2   A.   Absolutely.

3           MS. SILVER:  Objection.

4           THE COURT:  Leading.  Sustained.

5   Q.   What, if any, was the level of skill that you possessed to

6   perform that work?

7           MS. SILVER:  Objection.

8           THE COURT:  Overruled.

9   A.   Because of my background in the MTA as an electrician, we

10  did every aspect of the job.  Instead of just Verizon, they

11  were just splicers, guys that pulled cables, they were separate

12  units --

13          THE COURT:  The question was about you.  What was your

14  level of skill?  Were you able to do these things?

15          THE WITNESS:  Right.  So I can -- I was trained to do

16  every aspect of the job.  In the MTA, every single aspect.  Not

17  one part of the job, the whole entire, from beginning to end.

18  Q.   When, if ever, did you take an exam to show that you were

19  able to do that?

20  A.   Excuse me, I didn't hear the question.  Repeat it.

21  Q.   Was there an exam that you took?

22  A.   Absolutely.

23  Q.   When was that?

24  A.   You talking about the MTA test, right?  Or the --

25  Q.   I'm asking you.

O1MAPIT2                      Pitre-Direct

1   A.  I've took it when I was young.

2          THE COURT:  Was there an exam that you took when you

3   were at the fire department?

4          THE WITNESS:  Yes, I did.

5   Q.  Please describe that.

6   A.  It was communication electricians exam.

7   Q.  When did you take that test?

8   A.  I don't recall honestly.  Somewhere in I think maybe 2002.

9   I'm not sure.

10          THE COURT:  Early on in your career?

11          THE WITNESS:  Yeah, early on in my career.

12          MS. SILVER:  Your Honor, we're just having a little

13   trouble hearing back here.

14          THE COURT:  Well, try coming back forward.  Yeah, just

15   try closer and just slow down.

16          THE WITNESS:  Okay.  Yes, sir.  Yes, your Honor.

17   Q.  Please, Ed, pace your speech.  So I want everyone to be

18   able to hear you and they want to hear you too.  Okay?

19          Do you remember what your score was on that exam?

20          MS. SILVER:  Objection.

21          THE COURT:  Overruled.

22   A.  I believe in the 80s, somewhere, 85 -- don't recall exactly

23   but --

24   Q.  Out of how many?

25   A.  Out of 100.

O1MAPIT2                    Pitre-Direct

1    Q.  Does that mean you passed or failed?

2    A.  Passed.

3    Q.  Okay.  When if ever did you have performance reviews in

4    that early part of your employment as a fire -- as a

5    communications electrician for the fire department?

6    A.  Yearly.  Every year.

7    Q.  Between your employment, when it started and up until 2011,

8    what if any disciplinary actions were ever taken against you?

9    A.  My disciplinary action happened after the original lawsuit.

10   Q.  I'm asking about before that.  Were you ever --

11   A.  Oh, none.  Sorry.  None.

12   Q.  Okay.  So then after were you written up, after?

13   A.  That is correct.

14   Q.  How many times?

15         THE COURT:  Well, we're talking about from 2000 --

16   after 2014?

17         MR. BARRETT:  That's correct.

18   Q.  So after 2014, how many write-ups did you get?

19   A.  Quite a few.

20   Q.  From who?

21   A.  John Fiorentino, one from Jan Borodo.

22   Q.  You're referencing the defendant over here?

23   A.  That is correct.

24   Q.  Did that lawsuit have anything to do with Fiorentino also?

25         MS. SILVER:  Objection.

O1MAPIT2                      Pitre-Direct

1          THE COURT:  What's --

2          MR. BARRETT:  I'll rephrase it.

3  Q.  What if any involvement did Mr. Fiorentino --

4          THE COURT:  No, no.  Was Mr. Fiorentino a defendant in

5  that case?

6          THE WITNESS:  Yes.

7          THE COURT:  Okay.

8  Q.  Who else, if you can recall, was sued in that case?

9  A.  The mayor at the time, right.

10 Q.  Was there any corporate entity that was a defendant in that

11 lawsuit?

12 A.  The City of New York, right.

13 Q.  Was your employer a defendant in that lawsuit?

14 A.  The -- it was the -- I guess it was the fire commissioner

15 at the time.  I don't remember who it was.

16         THE COURT:  I'm having trouble hearing.

17         MR. BARRETT:  Okay.

18         THE COURT:  Did you say you're guessing?

19         THE WITNESS:  The fire commissioner at the time.

20         THE COURT:  Well, if you're guessing, then that should

21 be stricken.  You can't guess.

22         THE WITNESS:  Okay.

23         THE COURT:  To your best recollection, who were the

24 defendants named in the lawsuit?  You said Mr. Bloomberg,

25 Mr. Fiorentino, the City of New York.  Any other defendants

O1MAPIT2                     Pitre-Direct

1    named in the lawsuit?

2              There were, and you just don't remember who?

3              THE WITNESS:  That is correct.  I just don't remember.

4              THE COURT:  Okay.  Was Mr. Borodo named as a defendant

5    in that lawsuit?

6              THE WITNESS:  No.

7              THE COURT:  Was Mr. Mastropietro a defendant named in

8    that lawsuit?

9              THE WITNESS:  I don't think he was there.

10             THE COURT:  Okay.

11             THE WITNESS:  I'm not sure.  Yeah.

12             THE COURT:  Go ahead.

13   Q.  When if ever did that lawsuit resolve or end?

14   A.  October 2014.

15   Q.  Did you ever see Mr. Fiorentino's demeanor or attitude

16   towards you change, if ever?

17   A.  Right after the lawsuit, he was very upset with me.

18             MS. SILVER:  Objection.

19             THE COURT:  Yes, sustained.  This answer is stricken.

20   Ask again regarding after 2014.

21   Q.  How, if in any way, after 2014 did Mr. Fiorentino's

22   attitude towards you change as opposed to before at any time?

23   A.  Any time I would ask for anything from him, the answer

24   would definitely be no.  Denying without hesitation.

25   Q.  What kind of things were you asking for?

O1MAPIT2                         Pitre-Direct

1   A.  Leave accommodation, you know, anything I would ask him.

2   Park my vehicle a certain -- the answer was always no.

3   Regarding medical, no.  Doctor's appointment, no.

4   Q.  Who if anyone was subject to that same type of treatment

5   that you were from Mr. Fiorentino?

6           MS. SILVER:  Objection.

7           THE COURT:  Overruled.  You can answer based on what

8   you saw.

9           THE WITNESS:  Based on what I saw, none.

10  Q.  Okay.  Are there rules for write-ups?  When you're issued a

11  write-up, do you know of any rules?

12  A.  Correct.  Any -- through the local 3 collective bargaining

13  agreement, if anyone is going to be write -- is going to be

14  written up -- that's what we call it, written up -- you have to

15  notify the union, a representative of the union.  Then that

16  union is there while the write-up is going to happen.  And then

17  there's actually the actual document itself, it's an official

18  document.  There's signatures for the union as well as witness

19  to it happen, and, you know.  And every time I asked for

20  representation, it was denied.

21          MS. SILVER:  Objection.

22          MR. BARRETT:  Let me.  I'll just ask.

23  Q.  Who was allowed to be --

24          THE COURT:  Hold on a second.  There's a pending

25  objection.

1              MR. BARRETT:  Sorry.

2              THE COURT:  The objection is overruled.  Go ahead.

3    Next question.

4    Q.  Who was there when you were written up?

5    A.  Miguel Correa.

6    Q.  And he was who?

7    A.  He was my immediate supervisor in Manhattan, right.

8    Q.  Who else was there?

9    A.  Another time it was Jan Borodo, right, Jan.  But there was

10   no union representation at all.

11   Q.  Okay.  There was no union representation.  How is that a

12   violation of the rules?

13             MS. SILVER:  Objection.

14             THE COURT:  Sustained as to form.

15   Q.  How, if in any way, was the absence of a union rep there on

16   your behalf a violation of the rules?

17             MS. SILVER:  Objection.

18             THE COURT:  Overruled.  You can answer.

19   A.  For an example, there was -- it was an incident, two dates

20   were actually wrong.  Two dates --

21             THE COURT:  Stop.  Yeah.  Ask another question,

22   please.

23             MR. BARRETT:  Okay.

24   Q.  Who if anyone decided that you couldn't have union

25   representation?

O1MAPIT2                    Pitre-Direct

1              MS. SILVER:  Objection.

2              THE COURT:  Well, did you ask for a union rep to be

3      present?

4              THE WITNESS:  That is correct.

5              THE COURT:  And who did you ask?  When?

6              THE WITNESS:  I asked Miguel and John.

7              MR. BARRETT:  What was their answer?

8              THE COURT:  When did you ask?

9              THE WITNESS:  The day of -- that morning when they

10     presented me the documents.

11             THE COURT:  So this happened once or more than once?

12             THE WITNESS:  More than once.

13             THE COURT:  How many times did you ask for a union rep

14     to be present and one was not present?

15             THE WITNESS:  Every single time.

16             THE COURT:  How many times?

17             THE WITNESS:  Three times.

18             THE COURT:  And what -- did either Mr. Correa or

19     Mr. Fiorentino tell you why you couldn't have a union rep?

20             THE WITNESS:  No.

21             THE COURT:  Okay.  Go ahead.

22             MR. BARRETT:  Thank you.

23     Q.  What was the conduct that you were accused of in these

24     write-ups?

25     A.  One was the vehicle, for example, misuse of department

O1MAPIT2                    Pitre-Direct

1  vehicle, FDNY.  Properly storing them was one of them.  It was

2  time, clock outs, you know, punch in late or on weekends.

3  Q.  Why was it important -- or why was -- if you know, why was

4  there that rule in place that you needed to have a union

5  representation?

6           MS. SILVER:  Objection.

7           THE COURT:  Sustained.

8  A.  Because --

9  Q.  No, you can't answer.

10  A.  Oh, I'm sorry.

11  Q.  What if any role did you have in the union?

12  A.  I was a vice-chairman of the union.

13  Q.  How did you get that position?

14  A.  I was elected through the communication electricians.

15  Q.  Who elected you?

16  A.  The men from my unit.

17  Q.  Do you remember when that was?

18  A.  '14.

19  Q.  Can you describe the circumstances around surrounding how

20  you got elected?

21           MS. SILVER:  Objection.

22           THE COURT:  Sustained.

23  Q.  So in that role as a union vice-chairman, what type of

24  understanding did you have about the rules of -- that we were

25  just discussing?

O1MAPIT2                    Pitre-Direct

1   A.  They're very vital under the --

2            MS. SILVER:  Objection.

3            THE COURT:  Overruled.

4   A.  Under the Weingarten Rights, we have the ability to

5   question even the document itself.  Say, for example, the

6   document itself, and if we disagree, then I can go to the

7   arbitrator before they even agree to go to my file.  So we can,

8   you know, an arbitrator can come in, they'll start an

9   investigation, what I'm alleging, what the city is alleging,

10  and then it'll be confirmed and then it will be permanently put

11  in my folder.

12  Q.  Do you know why they're called Weingarten Rights?

13           MS. SILVER:  Objection.

14           THE COURT:  Sustained.

15           MR. BARRETT:  Okay.

16  Q.  How do those rights protect someone like you in that

17  position, if you know?

18           MS. SILVER:  Objection.

19           THE COURT:  Sustained.

20  Q.  All right.  You mentioned a write-up about time and about

21  the driving and parking.  Were there any other write-ups that

22  you received?

23  A.  Not that I remember.

24  Q.  Okay.  How many write-ups did you receive about time?

25  A.  The incident?  A few.

O1MAPIT2                        Pitre-Direct

1   Q.  What if anything changed about how you clocked in and how

2   you clocked out after 2014 as opposed to before 2014?

3   A.  It definitely changed.  Definitely changed.  I know they

4   gave testimony of flex time and straight time --

5          MS. SILVER:  Objection.

6   Q.  That's not what I'm asking.

7          THE COURT:  Yeah.  Sustained.

8   Q.  I'm asking if -- how if at all your pattern, your pattern,

9   you, clocked in and clocked out.  Did that change between or

10  from before 2014 to after?

11  A.  Correct.  Prior to the lawsuit, I didn't have any

12  write-ups.  And then after the lawsuit --

13         MS. SILVER:  Objection.

14  Q.  Ed, please listen to the question that I'm asking you.

15  Okay.

16         How, if in any way, did your, you, your conduct, not

17  them, your conduct change, if at all, between, you know, before

18  2014 and after?

19         MS. SILVER:  Objection.

20         THE COURT:  Overruled.  It's been asked, but we

21  haven't gotten an answer.  You can answer.

22  A.  It seemed like every --

23  Q.  Go ahead.

24  A.  It seemed -- you know, I don't understand the question.

25         THE COURT:  Next question.

O1MAPIT2                    Pitre-Direct

1                MR. BARRETT:  That's fair.

2                THE COURT:  Let's take a recess.  Ladies and

3     gentlemen, we'll take a 15-minute break.

4                (Continued on next page)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

O1MAPIT2                          Pitre-Direct

1              (Jury not present)

2              THE COURT:  Mr. Pitre, you can step down.  Please be

3      seated.  I let the questions regarding the union rep go for a

4      little bit, but then I sustained it because there isn't a claim

5      in the case regarding a breach of the collective bargaining

6      agreement or a violation of the rules.

7              Mr. Holzberg, you want to address your mistrial

8      motion?

9              MR. HOLZBERG:  Yes, your Honor.  Your Honor had

10     indicated prior to the witness' testimony that you had

11     contemplated something pertaining to motion practice.  I wasn't

12     sure --

13             MS. ALEXANDER:  I'm sorry, can you speak up.

14             THE COURT:  Yeah.

15             MR. HOLZBERG:  Sure.

16             THE COURT:  You don't have to bend down, but speak up

17     so they can hear you behind.

18             MR. HOLZBERG:  Sure.  Prior to the witness' testimony,

19     your Honor had indicated some interest in motion practice

20     related to --

21             THE COURT:  I wasn't making any decision.  I was just

22     saying that if I were to grant a mistrial, I would consider

23     motion practice.  Because as I have said before, it seems to me

24     there were some fair issues that should have been addressed by

25     motion practice.  And so whatever happened in the -- before I

O1MAPIT2                    Pitre-Direct

1   got the case, you know, that would only be -- that would be a

2   possibility.  I'm not making any rulings.  But are you

3   withdrawing your mistrial motion or do you want to go ahead and

4   make it?  You can go ahead and make it if you like.  I haven't

5   made any rulings.  I was just throwing that out as a

6   possibility.

7            MR. HOLZBERG:  Your Honor, we'll reserve the right at

8   this time.  Thank you.

9            THE COURT:  All right.  So you're withdrawing the

10  motion for a mistrial without prejudice to reasserting it at

11  some point?

12           MR. HOLZBERG:  Correct.

13           THE COURT:  Okay.  We'll take a 15-minute break.

14           (Recess)

15           (Continued on next page)

16

17

18

19

20

21

22

23

24

25

O1MBPIT3                    Pitre – Direct

1           (Jury not present)

2           MR. HOLZBERG:  Your Honor, before the jury returns, we

3    would like to renew our request for the mistrial.

4           THE COURT:  I'm not going to discuss it now.  We'll

5    wait till the lunch break.  We'll bring out the jury.

6           (Continued on next page)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

O1MBPIT3                    Pitre - Direct

 1              (Jury present)

 2              THE COURT:  Please be seated.  Mr. Barrett, you can

 3    proceed.

 4    BY MR. BARRETT:

 5    Q.  I'd like to go back to the beginning of your career.

 6    Earlier you said that you've been a professional electrician

 7    since 18-years old.  So describe the, if you can, the state of

 8    affairs of the coms division when you joined the fire

 9    department?

10              MS. SILVER:  Objection.

11    Q.  So that's not when you're 18.  I'm sorry.  Let me clarify.

12    In 2000 --

13              THE COURT:  Sustained.

14    Q.  In what way, if any, did the department change from the

15    period of 2000 until 2011?

16              MS. SILVER:  Objection.

17              THE COURT:  Sustained.

18    Q.  Over the course of your employment from 2000 to 2011, did

19    your job change significantly?

20    A.  Yes, after the lawsuit.

21              THE COURT:  Sustained.

22    Q.  Ed, I'm asking -- please just listen.  2000 to 2011, this

23    is before the lawsuit, during that period did your job change

24    significantly?

25              MS. SILVER:  Objection.

O1MBPIT3                    Pitre - Direct

1    Q.  If so how?

2            THE COURT:  Overruled.  You can answer.

3    A.  In 2000 to 2011?

4    Q.  Yes.

5    A.  The plant changed overall, the amount of work, the

6    production.

7            THE COURT:  Let's move on.  Next question.

8    Q.  We're going to jump ahead to 2015.  Do you remember a fiber

9    optics training around that time?

10   A.  Yes.

11   Q.  Where was that?

12   A.  Queens Borough Community College.

13   Q.  Who went to that?

14   A.  All the electricians were mandated to the course.

15   Q.  Who was in your class?

16   A.  Greg Seabrook, Joe Adams, Fred Cuevas.

17           THE COURT:  How many electricians were in that class,

18   in your class roughly?

19           THE WITNESS:  About 12 maybe.

20   Q.  Were there any supervisors there too?

21   A.  And John Fiorentino.

22   Q.  And what was his title again?

23   A.  Senior supervisor.

24           THE COURT:  Just so it's clear, all the electricians

25   had to attend a class, but they broke it up?

O1MBPIT3                    Pitre - Direct

1            THE WITNESS:  Right, two days per week.

2            THE COURT:  It was ongoing?

3            THE WITNESS:  Yes.

4            THE COURT:  So my first question was simply did they

5    break it up in half.  So half the electricians went to one

6    class and the other half went to the other class.  Is that how

7    it worked?

8            THE WITNESS:  Right.

9            THE COURT:  And how many sessions were there?

10           THE WITNESS:  Twice a week.

11           THE COURT:  For how many weeks?

12           THE WITNESS:  Two months, two and a half months.

13   BY MR. BARRETT:

14   Q.  During the course of this fiber optics training, what, if

15   any, medical situations happened to you?

16   A.  I was hurt on the job on February 27, 2015.

17   Q.  Please tell us what happened?  How did you get hurt?

18   A.  I was on the passenger side of the utility vehicle.  As I

19   was exiting out, it had a big pile of snow.  There's actually

20   two steps.  I was stepping out, and I slipped and I fell onto

21   the sidewalk.

22   Q.  And what part of your body hit the ground?

23   A.  Left hand, left shoulder was my injury.

24   Q.  Was there other fire department employees around?

25   A.  Yes, my partner the driver Felix Garcia.

O1MBPIT3                    Pitre - Direct

1   Q.  Was it one of the commuter type vehicles that we've been

2   talking about, was that the type of truck?

3   A.  That is correct.

4   Q.  And I missed the names.  Who was there?

5   A.  Felix Garcia.

6   Q.  Who else?

7   A.  That's it.

8   Q.  One other guy was there?

9           MS. SILVER:  Objection.

10          THE COURT:  Overruled.

11  A.  Myself.

12  Q.  How did he respond when he saw you fall down?

13          MS. DECASTRO:  Objection.

14          THE COURT:  Meaning what did he do?  Not how he

15  responded in his head.  After you fell, what, if anything, did

16  Mr. Garcia do?

17          THE WITNESS:  He helped me up.  He ask me if I was

18  okay.  I got up.  He ask me if I was going to call a bus, an

19  ambulance.  And I said, wait, let me get up.  Let me shake it

20  off.  We fall all the time.  We get hurt on the job.  I was

21  just trying to -- I had a lot of pain, but I was -- it was

22  really cold outside, so I was trying to shake it out.

23  Q.  Kind of suffer through to keep it going?

24          MS. SILVER:  Objection.

25          THE COURT:  Sustained.

O1MBPIT3                    Pitre - Direct

1   Q.  When, if ever, after that did you receive medical

2   treatment, how soon after?

3   A.  I think a couple of days.  Because when you get hurt on the

4   job, you need --

5          THE COURT:  The question is -- answer the question.

6   You go get medical treatment?

7          THE WITNESS:  Yes.

8          THE COURT:  When was that?

9          THE WITNESS:  Like two to three days after that.

10  Q.  Did you take any leave around that time?

11  A.  Yes.

12  Q.  How long?

13  A.  Three days.

14  Q.  Where did you seek medical treatment from?

15  A.  I went to the University of Orthopedic in Queens.

16  Q.  How long were you out of work in total in that period

17  around your injury?

18  A.  I was in and out from work because I was missing --

19         THE COURT:  The question was how many days were you

20  out?  Before you said you took three days leave.  Did you take

21  more than three days leave?

22         THE WITNESS:  I came to work.  I worked for a while,

23  went back to work, then took off again.  I was getting all

24  these appointments as well.

25  Q.  When you came back to work, who was your supervisor?

O1MBPIT3                    Pitre - Direct

1   A.  Miguel Correa.

2   Q.  Did he make you do heavy lifting when you came back?

3   A.  He schedule me to do more light duty work, troubleshooting.

4          MS. SILVER:  Objection.

5          THE COURT:  Overruled.  You can answer.

6   A.  Process 401 complaints, really easy work.

7   Q.  When you say easy work, please describe what you mean?

8   A.  No heavy lifting, the same work except without the heavy

9   lifting.

10  Q.  How long did Mr. Correa allow you to work like that without

11  heavy lifting?

12  A.  He scheduled me, but --

13         MS. SILVER:  Objection.

14         THE COURT:  Sustained.  The question was how long.

15  How long did he let you work in that way?

16         THE WITNESS:  Not too long.

17         THE COURT:  What does that mean not too long?  How

18  many days, months?

19         THE WITNESS:  Days.

20  Q.  What did you understand the reason to be why weren't

21  allowed to continue without heavy living?

22         MS. SILVER:  Objection.

23         THE COURT:  Sustained.

24  Q.  Did you ever go back to having to do full duty while you

25  were still hurt?

O1MBPIT3                    Pitre - Direct

1    A.  Yes.

2    Q.  Why?

3              MS. SILVER:  Objection.

4              THE COURT:  When did you go back to full duty?

5              THE WITNESS:  Days after the injury.

6              THE COURT:  Days after the injury, how many days?

7              THE WITNESS:  I'd say four days, five days.

8              MR. BARRETT:  I think there's some confusion, so let

9    me try to clarify.

10             THE COURT:  Just ask questions.

11   Q.  Was it three days after your injury that you lifted your

12   next manhole?

13             MS. SILVER:  Objection.

14             THE COURT:  Sustained to the leading.

15   Q.  How long after the injury if you can recall until you had

16   to lift your next manhole at work?

17   A.  Less than a week.

18   Q.  Who gave you that assignment?

19   A.  Miguel Correa gave me the assignment, but he --

20             MS. SILVER:  Objection to anything else.

21             THE COURT:  Sustained to anything else.

22   Q.  Were those assignments reviewed by anyone?

23             MS. SILVER:  Objection.

24   A.  Yes.

25             THE COURT:  Sustained, and the last answer is

O1MBPIT3                    Pitre - Direct

1   stricken.

2   Q.  Who, if anyone, had the authority to review Miguel's

3   assignments for you?

4            MS. SILVER:  Objection.

5            THE COURT:  Overruled.  You can answer that.

6   A.  John Fiorentino.

7   Q.  How, if in anyway, were Miguel's assignments overruled?

8            MS. SILVER:  Objection.

9            THE COURT:  Sustained.

10  Q.  What, if any, continuing medical treatment did you have

11  after that injury when you fell on the ice and hurt your hand

12  and shoulder?

13  A.  MRI.  I was asked to do physical therapy, to start physical

14  therapy, but I was denied that accommodation.

15  Q.  You made an accommodation request?

16  A.  Yes.

17  Q.  To be able to -- hang on.  To be able to go to physical

18  therapy?

19           THE COURT:  That's leading.  Go ahead.

20  Q.  What, if any, request did you make to the job to be allowed

21  to go for medical treatment?

22  A.  After seeing the orthopedic surgeon and hand surgeon, they

23  requested that I start physical therapy.  So I got a doctors

24  note and a letter showing the capabilities, like no heavy

25  lifting.  It was a huge note.  It was two pages.

O1MBPIT3                    Pitre - Direct

1          When I got back to work, I ask Miguel Correa for a

2  transfer.  And the reason why I worked in Manhattan, to go to

3  the physical therapist which was in Queens, I would never make

4  it in time.  It would be closed, so that's the reason why.  I

5  ask for the transfer.  And in the bottom they ask for reasons.

6  In those lines I wrote, due to my accident 2015.  I need a

7  transfer to get physical therapy as per my doctor.  And I

8  handed in the doctors notes for the light duty and physical

9  therapy.

10  Q.  When, if ever, were you granted that request?

11  A.  Never.

12  Q.  Who, if anyone, working in Queens had less seniority than

13  you?

14  A.  Many people.

15  Q.  How many to the best of your recollection?

16  A.  Four or five.

17  Q.  What were their names if you can recall?

18  A.  They were new guys.  They were brand new guys.  I didn't

19  really know them.  I'm a Manhattan guy.  So even though I work

20  within boroughs, it's hi and bye.

21          THE COURT:  The question is, do you recall the names

22  of the four or five you just referred to?

23          THE WITNESS:  I know they were hired from Verizon.

24  It's the last that were hired.

25          THE COURT:  Next question.  You have to answer the

O1MBPIT3                    Pitre - Direct

1    question.  If you don't know, say you don't know.

2    Q.  Who, if anyone, did you tell -- who, if anyone, did Correa

3    present your request to?

4            MS. SILVER:  Objection.

5    Q.  If you know?

6            THE COURT:  Do you know if Mr. Correa passed on your

7    request to anyone?

8            THE WITNESS:  Yes.

9            THE COURT:  How do you know that?

10           THE WITNESS:  It was the procedure.  He said that he

11   send it to John Fiorentino, the senior supervisor.

12   Q.  Did you ever hear back from Miguel on that?

13   A.  I asked him and he said they haven't responded.

14           MS. SILVER:  Objection.

15           THE COURT:  The question was did you ever hear back

16   from Mr. Correa.

17           THE WITNESS:  The answer is yes.

18           MR. BARRETT:  I thought you were going to rule on the

19   objection.

20           THE COURT:  I rephrased the question.  You did hear

21   from him.  What did he say?

22           THE WITNESS:  He said he never got an answer back.

23   Q.  How many times did you follow-up with Mr. Correa about

24   that?

25   A.  Many times.

O1MBPIT3                    Pitre - Direct

1    Q.  And was the response always the same?

2    A.  Yes.

3    Q.  What did you have to do in order to go get this physical

4    therapy?

5    A.  I never went.

6    Q.  So the request was in writing?

7    A.  Yes.

8    Q.  When, if ever, did you see the document?

9            THE COURT:  It was his request, right?  Did you

10   write-up a form making a request?

11           THE WITNESS:  That is correct.

12           MR. BARRETT:  I would like to introduce into evidence

13   Plaintiff's Exhibit 17.  It's an excerpt from a previous piece

14   of evidence.  I don't believe this one was stipulated to.

15           THE COURT:  Show it to counsel.  It's one page?

16           MR. BARRETT:  Yes.

17           THE COURT:  Any objection?

18           MS. SILVER:  We have no objection to this page.

19           THE COURT:  You're only being asked about this page.

20   Plaintiff Exhibit 17 is a one-page document.  Is there a Bates

21   number?

22           MR. BARRETT:  This is P00001.

23           THE COURT:  Plaintiff's Exhibit 17 is received.

24           (Plaintiff's Exhibit 17 received in evidence)

25           THE COURT:  You can publish it for everyone.

O1MBPIT3                    Pitre – Direct

1          MR. BARRETT:  Can the jury see that?

2          THE COURT:  Yes.

3   Q.  Do you see the sticker where I marked it on the bottom

4   there?

5   A.  Yes.

6   Q.  Can you see what's contained on this page right now?

7   A.  Yes.

8   Q.  Is this the document that you were just referring to?

9   A.  Yes.

10         THE COURT:  I'm having a little trouble reading the

11  handwriting under reasons.

12  Q.  Ed, can you read what it says there pointing under reason.

13  Please read that aloud.

14  A.  Due to my injuries suffered on the job on February 27,

15  2015, I need to be close to my doctor so I can receive physical

16  therapy.

17  Q.  Is this the request you were just talking about that was

18  never granted?

19  A.  Yes.

20  Q.  Did you ever follow-up with anyone besides Miguel regarding

21  this request?

22  A.  I ask Jan one day.

23  Q.  When was that if you recall?

24  A.  Couple of weeks after that request.

25  Q.  What was his response?

O1MBPIT3                    Pitre - Direct

1   A.  I saw him on Union Street and he just shrug his shoulder.

2   Q.  He didn't say anything about it?

3   A.  Correct.  He just shrug his shoulder.

4   Q.  How did that make you feel?

5           MS. SILVER:  Objection.

6           THE COURT:  Sustained.

7   Q.  Aside from that time with Jan and then the one you just

8   previously mentioned with Miguel, did you ever follow-up with

9   anyone else at FDNY to see if you could get this request

10  granted?

11  A.  I followed up with Miguel again through text message, phone

12  calls and asked him.

13  Q.  Anyone else?

14  A.  It was one time I asked -- I was in Union Street, cause

15  like I said, I was going between boroughs, and I saw Joe Adams.

16  And I said, hey, when we're done, can you -- can we stop real

17  quick.  Can I ask you a question downtown.  I just need to have

18  an answer.

19          MS. SILVER:  Objection.

20          THE COURT:  Overruled.

21  Q.  Go ahead.

22  A.  So we went to headquarters and I went to ask that question

23  to see if that transfer was -- that reasonable accommodation,

24  if I could have gotten light duty because of that.

25          THE COURT:  Who did you go to at headquarters?

O1MBPIT3                        Pitre - Direct

1     THE WITNESS:  At headquarters that was EEO.

2   Q.  What did they respond?  What was the response?

3   A.  They ask me what unit I worked.  I said communication.

4   They said, oh, you work for John Fiorentino.  They said, that's

5   within their scope to grant you a reasonable accommodation.  I

6   said, okay, thank you, and we left.

7   Q.  Was it ever granted?

8   A.  No.

9   Q.  Were any forms filled out at EEO?  Did they present a form

10  for you to fill out at EEO?

11  A.  No.

12  Q.  Did you go back and follow-up with John like they

13  instructed you to?

14          MS. SILVER:  Objection.

15          THE COURT:  Sustained.

16  Q.  What did you do after that visit to EEO when they didn't

17  grant it?

18  A.  I spoke to my shop steward.  Shawn Bustacher (phonetic)

19  she's a business agent.  I told her about me getting light duty

20  or my transfer.  And their response was always -- no one had an

21  answer.  I ask also what was my status.

22          MS. SILVER:  Objection.

23          THE COURT:  Sustained.

24  Q.  Who else besides Miguel, Fiorentino, Jan and the FDNY EEO

25  office, who else besides those people did you ask for this

O1MBPIT3                    Pitre - Direct

1   accommodation?

2   A.  That was it.

3   Q.  What was your medical situation during that period from May

4   to August 2015?  What was going on with your hand and shoulder?

5   A.  Lots of pain.  I was getting a lot of pain killers.  I was

6   on a lot of pain killers, muscle relaxers.

7   Q.  Was Miguel still on occasion trying to take it easy on you?

8   A.  Yes.

9   Q.  What happened when Miguel would give you those -- when he

10  would take it easy on you?

11         MS. SILVER:  Objection.

12         THE COURT:  Overruled.

13  A.  He was overridden.

14         MS. SILVER:  Objection.

15         THE COURT:  Sustained as to form.

16  Q.  Were you given light duty by Miguel after those initial

17  times when he was providing light duty to you?

18  A.  Yes.

19         MS. SILVER:  Objection.

20         THE COURT:  The objection is overruled.

21  Q.  Were you always able to go and do those assignments that

22  Miguel had given you?

23  A.  Absolutely, yes.

24  Q.  You were physically capable of doing that?

25  A.  Yes.

O1MBPIT3                    Pitre - Direct

1    Q.  How, if in any way, did your assignments change after

2    Miguel gave you those light duty assignments?

3    A.  Repeat the question.

4              MS. SILVER:  Objection.

5              THE COURT:  Sustained as to form.

6    Q.  In what way were those assignments changed if they were?

7              MS. SILVER:  Objection.

8              THE COURT:  You said that after those initial few days

9    Mr. Correa gave you some light duty task.  Just describe what

10   he gave you.

11   A.  Box change, go to the central office and make circuits.  I

12   would run them.  I would test them.  I'm checking for grounds.

13   I can test for distance, how long.  I could almost speculate,

14   okay, within 500 feet looks like an opening.  I could literally

15   tell them where to go.  Looking at a map, looking on the

16   schematic tell them, across 55th Street there should be -- I

17   could literally almost pinpoint just using a meter.

18   Q.  When Miguel gave you those, did you actually go do those

19   lighter duty --

20   A.  Absolutely.

21   Q.  Who, if anyone, was able to review what your assignments

22   were besides Miguel?

23   A.  Every morning there's a crew assignment and those crew

24   assignments are sent to John Fiorentino.

25   Q.  So John could see what you were assigned to?

O1MBPIT3                    Pitre - Direct

1           MS. SILVER:  Objection.

2           THE COURT:  Sustained.

3  Q.  So you knew that those assignments were forwarded to John?

4           MS. SILVER:  Objection.

5           THE COURT:  I think it's already been answered, but go

6  ahead.  You can answer.

7  A.  Yes.

8  Q.  How, if at all, were those assignments changed once they

9  were forwarded?

10          MS. SILVER:  Objection.

11          THE COURT:  Would you see the crew assignments in the

12  morning?  This is a sheet of paper?

13          THE WITNESS:  Right.

14          THE COURT:  You would look at it and it would tell you

15  what you were supposed to do that day?

16          THE WITNESS:  Correct.

17          THE COURT:  And were there days when your assignments

18  for the day changed from what was on the sheets?

19          THE WITNESS:  Absolutely, yes.

20          THE COURT:  Go ahead.  Take it from there.

21  Q.  How were they changed?

22  A.  If I was in the central office, for example, and so you're

23  going on the computer.  I'm printing out where I'm going to be

24  operating, where that circuit run.  He'll come to me let's say

25  10 minutes later and say, Ed, I'm sorry, change of assignment.

O1MBPIT3                        Pitre - Direct

1           MS. SILVER:  Objection.

2           THE COURT:  Overruled.  He meaning Mr. Correa?

3           THE WITNESS:  Right.  He'll say now you're on locating

4    clear which is more physical.  Now I have to open manholes.

5    That's how it changed.

6    Q.  How often were those assignments changed like you just

7    described?

8    A.  Constantly.

9    Q.  Every shift?

10   A.  At least three times a week.

11   Q.  And to the best of your knowledge who changed the

12   assignments?

13          MS. SILVER:  Objection.

14          THE COURT:  Sustained.

15   Q.  To the best of your knowledge who had authority to override

16   Miguel?

17          MS. SILVER:  Objection.

18          THE COURT:  You can answer that.

19   A.  It was three people.

20   Q.  Who?

21   A.  John Fiorentino, Jan, and Mastropietro.

22   Q.  So you're referencing the former senior supervisor

23   Mr. Fiorentino --

24          THE COURT:  Next question.

25   Q.  And these two defendants?

O1MBPIT3                    Pitre - Direct

1          THE COURT:  Next question.

2   Q.  Earlier you mentioned in September of that year you needed

3   to have surgery.  You remember saying that?

4   A.  That's correct.

5          THE COURT:  Just to be clear, September of which year?

6          THE WITNESS:  2015.

7   Q.  What, if anything, did you do to notify the fire department

8   that you had that surgery upcoming?

9   A.  When I follow-up with the surgeon, that's when my wife saw

10  I had a massive --

11         THE COURT:  The question is did you notify the fire

12  department that you needed surgery?

13         THE WITNESS:  Yes.

14         THE COURT:  And how did you do that?

15         THE WITNESS:  It was a form from the surgeon from the

16  doctors office.

17  Q.  You submitted a form from the doctors office?

18  A.  That's correct.  It's two-week notice I gave as well.

19  Q.  Those two weeks, that two-week notice is a requirement?

20  A.  I thought it was.

21  Q.  As far as you know you complied?

22         MS. SILVER:  Objection.

23         THE COURT:  Overruled.

24  A.  I did comply.

25  Q.  What happened on the date of your surgery?

O1MBPIT3                    Pitre - Direct

1   A.   The day of my surgery, after the surgery, my wife informed

2   me that when she went to pick up the prescription, antibiotics,

3   she said to me that --

4              MS. SILVER:  Objection.

5              THE COURT:  Sustained.

6   Q.   What happened?

7   A.   I lost my medical that day, the day of surgery.

8   Q.   How did you respond when you found out?

9   A.   I was shocked.  That's almost impossible.

10  Q.   Were you still an employee at that time?

11  A.   Yes.

12  Q.   How did you lose it?

13             MS. SILVER:  Objection.

14             THE COURT:  Sustained as to that question.  You said

15  you lost your medical?

16             THE WITNESS:  Correct.

17             THE COURT:  What do you mean by that?

18             THE WITNESS:  My medical, Emblem Health.

19             THE COURT:  You lost your insurance coverage?

20             THE WITNESS:  My insurance coverage was lost.

21             THE COURT:  Did you see a written communication

22  advising you of that, or I guess what you were saying is that

23  you found out from your wife?

24             THE WITNESS:  Right, cause she told me.  And I called

25  the union immediately.

O1MBPIT3                     Pitre - Direct

1          THE COURT:  You called the union?

2          THE WITNESS:  Right, the next day.  We found out at

3   night, and I called them the next day.  They said we will get

4   back to you.  We went all the way to the business agent which

5   is a high level in the union.  I told them what happened.

6          MS. SILVER:  Your Honor, I'm just going to object.

7          THE COURT:  Overruled.  You called the union and said

8   it appeared that your medical coverage had been terminated?

9          THE WITNESS:  Correct.

10          THE COURT:  Was it ever reinstated?

11          THE WITNESS:  It reinstated like --

12          THE COURT:  Did you get your medical coverage back?

13   You were still an employee of FDNY?

14          THE WITNESS:  No.

15          THE COURT:  Stop.  Stop.  You were still an employee

16   at the time, right?

17          THE WITNESS:  Correct.

18          THE COURT:  You never got your insurance coverage

19   back?

20          THE WITNESS:  I think it was a two-weeks period like a

21   year later.

22          THE COURT:  So the answer is yes you got your coverage

23   back, but it was a year later?

24          THE WITNESS:  For like a week, and then I lost it

25   again.

O1MBPIT3                    Pitre - Direct

1         THE COURT:  Okay.  Go ahead.

2   Q.  How did you pay for your medical bills when your coverage

3   was gone?

4   A.  It was injury on the job, so it's a workers' comp claim.

5   Q.  So you submitted it to workers' comp?

6   A.  Correct.

7         THE COURT:  So your bills were being covered by

8   workers' comp?

9         THE WITNESS:  Yes.

10  Q.  When, if ever, prior to that had you lost benefits

11  mysteriously?

12        MS. SILVER:  Objection.

13        THE COURT:  Sustained.  Sustained.  The jury should

14  disregard the question.

15  Q.  Was there a time ever that any benefits that you had earned

16  suddenly were gone?

17        MS. SILVER:  Objection.

18        THE COURT:  Sustained.

19  Q.  I want to go back to the 2011 lawsuit you mentioned the

20  names of the people in that lawsuit.  Was it resolved with all

21  of you guys at the same time?

22        MS. SILVER:  Objection.

23        THE COURT:  Sustained.

24  Q.  Were you able to take paid time off to get physical

25  therapy?

O1MBPIT3                    Pitre - Direct

1   A.  No.

2   Q.  Why not?

3   A.  It was never approved.

4   Q.  Didn't you have days banked?

5   A.  I had days banked.  One of my argument was --

6           THE COURT:  Sustained.

7   Q.  I'm just asking, did you have days banked?

8   A.  Yes.

9   Q.  How did you know about that?

10  A.  It's on the paystub.  You look on the paystub, look on City

11  Time.

12          THE COURT:  The question was did you have time banked?

13          THE WITNESS:  Yes.

14          THE COURT:  Next question.

15  Q.  How did you know that you had time banked?

16  A.  Miguel showed me on City Time on the computer screen.

17  Q.  Why weren't you able to use that banked City Time to take

18  leave for your physical therapy?

19  A.  I would lose it.  Like one day I have it, and then the

20  second day it was gone.  And even Miguel called down --

21          MS. SILVER:  Objection.

22          THE COURT:  Sustained as to what Miguel did.

23  Q.  Explain what you mean?  You said it was there one day and

24  the next day it was gone.  Please tell us what you mean by

25  that?

O1MBPIT3                     Pitre - Direct

1   A.  He show me I have the time, and he's like, Ed, it's not

2   there anymore.

3   Q.  And he showed you that --

4   A.  On the screen.

5   Q.  -- in response to what?

6   A.  To go see a doctors appointment or anything.

7   Q.  Did you ever show anyone else this, that it was there one

8   day and not there the next?  Hang on.  Let me back up.  Let me

9   rephrase.

10          MS. SILVER:  Objection.

11          THE COURT:  Sustained.

12  Q.  Was there any other documentation that you saw reflecting

13  what you were just talking about how it was there at one point

14  and then it was gone the next?  Did you ever see anything aside

15  from City Time?

16  A.  I saw it.  I saw my check.  I seen it, my check.

17  Q.  On your paystub?

18  A.  On my paystub, right.

19          THE COURT:  You're saying there was time on a paystub

20  and then in the next paystub the time was gone?

21          THE WITNESS:  Right.  It was reset.  I didn't notice

22  until Miguel showed it to me on the screen itself.

23          THE COURT:  I was asking you about the paystub.

24          THE WITNESS:  On the paystub, yes.

25  Q.  Did you show anyone that paystub, the two paystubs, did you

O1MBPIT3                     Pitre - Direct

1    show anyone that comparison?

2              MS. SILVER:  Objection.

3              THE COURT:  Did you have two paystubs in hand that

4    showed time was gone?

5              THE WITNESS:  Yes.

6              THE COURT:  Did you show those two paystubs to anyone?

7              THE WITNESS:  Other than Miguel Correa, I showed Joe

8    Adams.

9    Q.  Who's Joe Adams?

10   A.  Com electrician.

11   Q.  He was one of the guys who you mentioned that got hired at

12   the same time, right?

13   A.  That is correct.

14   Q.  And where did he work when you showed him?

15   A.  He worked in Manhattan.

16   Q.  Is that where you worked too?

17   A.  Correct.

18   Q.  What's your relationship with Joe?

19   A.  Friends.

20   Q.  Is there anyone else aside from Greg who you mentioned

21   earlier that you're friends with?

22             THE COURT:  Let's move on.

23   Q.  I want to go now and talk about this incident where you

24   lost your driving privileges.

25             Who was the one who issued you that write-up?

O1MBPIT3                    Pitre - Direct

1    A.   John Fiorentino.

2    Q.   Do you remember what it said on that write-up?  It's a yes

3    or no question.

4    A.   It was misuse of parking.

5    Q.   As a result of this write-up, what was the duration of time

6    that your driving privileges were removed?

7    A.   Indefinitely.

8    Q.   Do you remember when that was?

9    A.   No.

10   Q.   Did you ever get your driving privileges back?

11   A.   No.

12        MR. BARRETT:  If I may have a moment, I would like to

13   bring in an exhibit.

14   Q.   Tell us what happened leading up to that removal you just

15   talked about?

16        MS. SILVER:  Objection.

17        THE COURT:  Overruled.  We're talking about the --

18        MR. BARRETT:  -- removal of the driving privileges.

19   A.   At that particular time I got a phone call from my wife and

20   she had to go for emergency surgery, so which I told Correa.

21   And my wife was at the time, she wasn't in New York.  She was

22   in California.  So I parked the vehicle and I caught a plane

23   for my wife cause she had this emergency.  And I understand a

24   phone call came.  I wasn't even in the state anymore.  A phone

25   call came that a vehicle -- they were talking about a vehicle

O1MBPIT3                     Pitre - Direct

1   that had to be moved because of a --

2              MS. SILVER:  Objection.

3              THE COURT:  Who did you get the phone call from?

4              THE WITNESS:  No, I said there was a phone call.  I

5   was gone already.  They was telling me.

6              THE COURT:  You can't tell us what they are telling

7   you.

8              THE WITNESS:  All I can testify --

9              THE COURT:  Stop.  Stop.  Stop.  You parked the

10  vehicle?

11             THE WITNESS:  Yes.

12             THE COURT:  When was this first of all approximately?

13             THE WITNESS:  I don't remember the date.

14             THE COURT:  What year was this?  Was it before or

15  after the accident?

16             THE WITNESS:  After the accident.

17             THE COURT:  After the accident?

18             THE WITNESS:  After the accident.

19             THE COURT:  And this was a fire department vehicle?

20             THE WITNESS:  That's correct.

21             THE COURT:  And you parked it where?

22             THE WITNESS:  Up the street from -- up the block from

23  engine 308.

24  Q.  Where is that?

25  A.  That's Lefferts Boulevard between 111 -- I don't remember

O1MBPIT3                    Pitre - Direct

1   the cross streets.

2   Q.  Did anyone ever give you permission to park somewhere that

3   you were written up for?

4           MS. SILVER:  Objection.

5           THE COURT:  I'm not sure if we're talking about --

6   which incident we're talking about.  Let me ask you this.  How

7   many times did you lose your driving privileges?

8           THE WITNESS:  One time.

9           THE COURT:  Only one time?

10           THE WITNESS:  One time.

11   Q.  How many times were you cited for violations in that

12   write-up where you lost it?

13   A.  Several times.

14           THE COURT:  How many times?

15           THE WITNESS:  Five.

16           THE COURT:  Ask another question.

17   Q.  Then there was a final time that resulted in the write-up.

18   Is that right?

19   A.  Correct.

20   Q.  When if you can recall was that?

21           THE COURT:  We have the memo, right?

22           MR. BARRETT:  Yes.  I think it was actually a defense

23   exhibit.

24           THE COURT:  I want to make sure we're talking about

25   the same incident.

O1MBPIT3                    Pitre - Direct

 1           MS. SILVER:  I think it's Defendant's K, your Honor.

 2           THE COURT:  Defendant's Exhibit K.

 3   Q.  I'm going to show Defendant's Exhibit K which is already in

 4   evidence.  Is this the write-up that we -- can you see that,

 5   Ed, on the screen?

 6   A.  Yes.

 7   Q.  Is this the write-up that we were just talking about?

 8   A.  No, cause it says North Conduit.

 9           THE COURT:  You said you been cited for parking

10   violations.  You were cited for parking violations about five

11   times and you lost your driving privileges indefinitely the

12   final time.  And do you see this Exhibit K, is this exhibit

13   about that final time or is this something different?

14           MR. BARRETT:  Your Honor --

15           THE COURT:  I asked him a question.

16           THE WITNESS:  Yeah, it's written right there.

17           THE COURT:  This is it?

18           THE WITNESS:  Yes.

19           THE COURT:  So now this says that the vehicle was

20   parked at the intersection of 150th Avenue and North Conduit

21   Avenue.  Is that where the car was parked?

22           THE WITNESS:  No.

23           THE COURT:  The car was not parked there?

24           THE WITNESS:  It says this is the revoked one.  That's

25   when it was --

O1MBPIT3                    Pitre - Direct

1          THE COURT:  What are you saying?  You need to speak

2     up.

3          THE WITNESS:  I'm reading it, it says on the third

4     paragraph November 5th.

5          THE COURT:  You were testifying about the final time

6     when your driving privileges were suspended indefinitely.  Is

7     this exhibit K about that incident or is it about some other

8     incident?

9          THE WITNESS:  Can you put it further up.

10          THE COURT:  Take a look at it.

11          MR. BARRETT:  Take a moment, Ed, read this write-up as

12     fast as you can.

13          THE COURT:  I asked him a question.  He can read it.

14     Tell me when you're finished reading it to yourself.

15          THE WITNESS:  Okay.

16          THE COURT:  Is this the write-up you've been

17     testifying about for the last few minutes?

18          THE WITNESS:  I don't see the incident in this

19     particular --

20          THE COURT:  This memo exhibit K is not about the

21     incident that you were just testifying about?

22          THE WITNESS:  Correct.

23          THE COURT:  Okay.  I don't know where we are.  Go

24     ahead.

25     Q.  I want to show Defendant's Exhibit J.  I think this has

O1MBPIT3                    Pitre - Direct

1   been put in also.

2            THE COURT:  It's in evidence?

3            MR. BARRETT:  Yes, Defendant's J.

4            THE COURT:  If it's in evidence, you may show it to

5   him.

6   Q.  Can you read that, Ed?

7   A.  Yes.

8   Q.  So you see the date on the top there?

9   A.  Yes.

10  Q.  Is that the date that you received this write-up?

11  A.  Yes.

12  Q.  Is this the write-up that you were just testifying about?

13  A.  Yes.

14           THE COURT:  This refers to the car being parked at

15  150th Avenue and North Conduit Avenue, but you said a few

16  minutes ago that your car was parked at Lefferts Boulevard.  Is

17  that the same thing as this or what?

18           THE WITNESS:  No.  It wasn't North Conduit.  It was by

19  engine 308 the incident.

20  BY MR. BARRETT:

21  Q.  I'm going to take this down.  Ed, please explain to us the

22  circumstances under which you received the final write-up where

23  you lost your privileges?  Is that when you were talking about

24  when you were out of town?

25           MS. SILVER:  Objection.

O1MBPIT3                    Pitre - Direct

1       THE COURT:  Sustained as to the leading.

2   Q.  Please tell us describe the circumstances under which you

3   got that final write-up where your car was taken away

4   permanently?

5   A.  I get a phone call.  I parked the vehicle above up the

6   block from engine 308.

7       THE COURT:  Who did you get a phone call from?

8       THE WITNESS:  Queens CO.

9       THE COURT:  Queens --

10      THE WITNESS:  Central office, that's where all the

11  9-1-1 calls come from.

12      THE COURT:  You got a call from Queens central office,

13  then what?

14      THE WITNESS:  They ask me about the vehicle, right,

15  about the vehicle.

16  Q.  Where were you when you got that call?

17  A.  I was about to go catch a flight.

18  Q.  Did you park the vehicle in the location that was reflected

19  in the write-up?

20  A.  It was parked.

21      THE COURT:  Which write-up are you referring to.

22      MR. BARRETT:  The last one, the final write-up.

23      THE COURT:  I'm not sure we've seen a write-up for the

24  one he says is the final.

25      MR. BARRETT:  I'm going to put it back up here then.

O1MBPIT3                    Pitre - Direct

1          THE COURT:  The final write-up, where was the car

2    parked?

3          THE WITNESS:  It was parked on Lefferts Boulevard.

4          THE COURT:  And you got a write-up saying you should

5    not have been parked on Lefferts Boulevard?

6          THE WITNESS:  No.  The truck was parked on a bus stop.

7          THE COURT:  On Lefferts Boulevard?

8          THE WITNESS:  On Lefferts Boulevard at the corner.

9          THE COURT:  So the final write-up was about the truck

10   being parked on Lefferts Boulevard, yes?

11         THE WITNESS:  Yes, on the bus stop.

12         THE COURT:  Do we have such a write-up?

13         MR. BARRETT:  Yeah.  That was the one that was shown

14   to us by defendants.

15         THE COURT:  Ladies and gentlemen, let's break for

16   lunch.  We'll break now.  We'll resume at 1:45.  We'll break

17   for lunch now.  We'll try to sort out these exhibits.  Have a

18   good lunch.  We'll see you at 1:45.

19              (Continued on next page)

20

21

22

23

24

25

O1MBPIT3                    Pitre - Direct

1              (Jury not present)

2              THE COURT:  Mr. Pitre, you can step down.  Please be

3      seated.  Is there a write-up about a car being parked on

4      Lefferts Boulevard?  Defense counsel, are you aware of any such

5      memo?

6              MS. SILVER:  We're not aware of any such report

7      existing.

8              THE COURT:  All right.  You better straighten it out.

9      There is a mistrial motion.

10             MR. HOLZBERG:  That's correct, your Honor.

11             THE COURT:  What are the grounds?

12             MR. HOLZBERG:  The grounds is the basis of

13     Mr. Barrett's conduct up to this point.  As your Honor is

14     aware, your Honor has admonished him on numerous occasions, and

15     that's the basis for the mistrial request.

16             THE COURT:  The basis for the mistrial request is

17     Mr. Barrett's conduct?

18             MR. HOLZBERG:  That's correct. Your Honor even

19     commented it at one point that this was the worst tried case in

20     30 years.

21             THE COURT:  I think he's doing better today, but I

22     believe that, and I've tried a lot of cases.  I don't know if

23     that's a proper basis.  What do defense counsel have to say?

24             MS. DECASTRO:  Your Honor, I've never heard that as a

25     basis for moving for a mistrial.  This is his own attorney's

O1MBPIT3                          Pitre - Direct

1    conduct.  If he has an issue with his attorney's conduct, he is

2    free to file a malpractice lawsuit later.  But this is his own

3    attorney's conduct.  This is not opposing counsel's conduct.

4    If anything, defendants have been prejudiced by all of this

5    conduct.  We have been very lenient, and we did not move for a

6    mistrial last week when they introduced testimony they knew was

7    part of a general release.

8            THE COURT:  I don't know that defendants have been

9    lenient.  The defendants have been very aggressive.  I think

10   that that could have been a basis for a mistrial motion because

11   that was highly prejudicial evidence.  I struck it, and

12   hopefully the jury will abide by my ruling.  Mr. Holzberg, you

13   were starting to say earlier about the October 22nd general

14   release.  Is there any authority that says that adverse

15   conduct, adverse action that occurred before the date of the

16   release can come in to show retaliation?

17           MR. HOLZBERG:  Well, I think we're talking about two

18   separate things, your Honor, I just want to clarify.

19               (Continued on next page)

20

21

22

23

24

25

O1MAPIT4

1            THE COURT:  My whole thing was the protective activity

2      was the lawsuit.  But what the plaintiff could not rely on was

3      adverse decisions, adverse actions that took place before

4      October 22, 2014, because of the general release.  And if a

5      plaintiff were permitted to rely on conduct that occurred

6      before a release, that would undermine completely the point of

7      the release.  I said specifically that if the plaintiff could

8      show adverse conduct, adverse action occurring after the

9      release, and they could tie that up to retaliation for the

10     October 11 lawsuit, I would allow that.

11            Now, is there any law to support the proposition, that

12     I was wrong in making that ruling?

13            MR. HOLZBERG:  Well, with respect to that ruling in

14     particular, your Honor, it's our position --

15            THE COURT:  Is there any law that suggests that I was

16     wrong?  When I asked Mr. Barrett the other day, he said he

17     hadn't been able to look for law during the lunch break.

18     You've now had all weekend.  Is there any law to suggest that

19     that ruling is wrong?

20            MR. HOLZBERG:  I don't have a specific citation for

21     your Honor.

22            THE COURT:  Do you have a principle that would suggest

23     that I'm wrong?

24            MR. HOLZBERG:  Yes, your Honor.

25            THE COURT:  What's the principle?

O1MAPIT4

1          MR. HOLZBERG:  The principle is the underlying actions

2    serve as the basis for the further retaliatory acts.  We're not

3    asking for those instances that occurred prior to the

4    settlement agreement being signed as a basis for damages in

5    this lawsuit, but it certainly paints the entire picture in

6    totality of the circumstances as to what Mr. Pitre was dealing

7    with.

8          THE COURT:  The argument is that pre-release actions

9    and conduct can serve as background evidence?

10          MR. HOLZBERG:  Correct.

11          THE COURT:  Is there any law to support that argument?

12    Because it doesn't make sense to me.  You know, applying common

13    sense, it does not make sense to me because it would undercut

14    -- did you look for law over the weekend?

15          MR. BARRETT:  Yes.

16          THE COURT:  Did you find any law?

17          MR. BARRETT:  Yes.

18          THE COURT:  What did you find?

19          MR. BARRETT:  The law that we found said that a

20    settlement is considered protected activity.

21          THE COURT:  That's a different issue.  I never said, I

22    never said that the resolution was not protected activity.  I

23    didn't say that.  You know, the lawsuit, and I think fairly, I

24    think I would agree including the resolution of the lawsuit,

25    that would be protected activity.  What I'm asking is, is there

O1MAPIT4

1    any law that says I can look at adverse action that occurred

2    before the release?  Any law that says that that is admissible,

3    notwithstanding the general release.  Did you look for any such

4    law?

5              MR. BARRETT:  We did.  I was not able to find any.

6              THE COURT:  All right.  Look, I'm hearing that the

7    basis of the mistrial motion is Mr. Barrett's lawyering in the

8    case.  That motion is denied.  Anything else at the moment?

9              MR. HOLZBERG:  Aside from that, your Honor, I do agree

10   I think that there is a basis as well for the testimony that

11   came in that was prior to 2014.

12             THE COURT:  You're arguing that that's a basis for the

13   mistrial motion?

14             MR. HOLZBERG:  Correct, in addition.

15             THE COURT:  I'm not hearing -- I'm not hearing that

16   there's any case law that supports that.  I don't know that

17   there's any that goes the other way.  Because, frankly, I think

18   it's an argument that I would be surprised that anyone would

19   make because it undermines the point of a general release.  So

20   to the extent that you are moving for a mistrial based on that

21   ruling, the request is also denied.

22             Did defense counsel want to say something?  I don't

23   want to preclude you.

24             MS. DECASTRO:  Yes, your Honor.  I just wanted to make

25   the record, they keep conflating adverse employment actions

O1MAPIT4

1    with the concept of engaging in protective activity.

2              THE COURT:  I agree.  And there's a difference and I

3    think I've said that three times.

4              MS. DECASTRO:  Yes.

5              THE COURT:  There's a difference between the protected

6    activity and the adverse action that would constitute

7    retaliatory or discriminatory activity.

8              Okay.  We'll see you at 1:45.

9              (Recess)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

O1MAPIT4                    Pitre-Direct

 1                    AFTERNOON SESSION

 2                         1:51 p.m.

 3          THE COURT:  The record should reflect that the

 4   plaintiff and his lawyers are late.  The jury was here.  We

 5   were ready to go at 1:45.  This keeps happening.  We'll bring

 6   the jury out.

 7          (Continued on next page)

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1      (Jury present)

2          THE COURT:  Mr. Pitre, you are reminded you are still

3   under oath.  Ladies and gentlemen, thank you again for being on

4   time.

5          Mr. Barrett.

6          MR. BARRETT:  Thank you.

7   BY MR. BARRETT:

8   Q.  Okay.  Mr. Pitre, we were discussing the write-up regarding

9   your commuter vehicle privileges being taken away before, so

10  I'm going to continue with that.

11         The write-up -- where did you park when you were

12  issued that write-up, the last write-up we were just looking

13  at?

14  A.  I parked off the block, on Lefferts Boulevard from engine

15  308.

16  Q.  Okay.  And was that the location that you were written up

17  for parking in?

18  A.  No.

19  Q.  What was the location that you were actually written up

20  for?

21  A.  I don't recall because I -- where they found the vehicle, I

22  didn't move it.  Someone else moved the vehicle.

23  Q.  And was that when you were testifying earlier that you were

24  at the airport going to visit your wife who's having surgery or

25  something?

O1MAPIT4                          Pitre-Direct

1   A.  That is correct.

2           THE COURT:  Sustained to the leading.

3   Q.  Okay.  What were you doing when they said you parked at the

4   location contained in the write-up?

5   A.  I was in California because my wife had to go for emergency

6   surgery.

7           THE COURT:  You were already in California or you were

8   on your way to California or what?

9           THE WITNESS:  I believe the time they saw the vehicle,

10  I was already in California.

11  Q.  Okay.  So who, if you know, was the person who moved the

12  vehicle from where you parked it to the place that was listed

13  in the write-up?

14          MS. SILVER:  Objection.

15          THE COURT:  Well, do you know that your vehicle was

16  moved?

17          MR. BARRETT:  Okay.

18          THE COURT:  That's the question.  Do you know?

19          THE WITNESS:  Yes.

20          THE COURT:  And how do you know that?

21          THE WITNESS:  When I came back to work, Miguel Correa

22  asked me, was your truck parked -- and of course he said Jan

23  already spoke to him -- at a certain place, but even Miguel --

24          THE COURT:  My --

25          THE WITNESS:  Okay.  Yes.

O1MAPIT4                        Pitre-Direct

1          THE COURT:  Just you need to answer the question.

2          And how do you know that the vehicle was moved?

3          THE WITNESS:  There was a phone call about if there

4    was a spare vehicle -- a spare key to move the vehicle.

5    Q.  Did you receive that phone call?

6    A.  No, the vice-chairman of the union received that phone

7    call.

8          MS. SILVER:  Objection.

9          THE COURT:  Sustained.  And the last answer is

10   stricken.

11   Q.  At any --

12         THE COURT:  Just to be clear, you did not get a phone

13   call about the vehicle being moved?

14         THE WITNESS:  Correct.

15         THE COURT:  Okay.

16   Q.  How did you find out that the vehicle had been moved from

17   where you parked it?

18   A.  When I came back.  Because I had no clue where the vehicle

19   was parked.

20   Q.  How did you find out that it -- that it had been moved,

21   that it was no longer where you left it?

22   A.  I knew in California.  I was told the particulars of the

23   matter.

24         MS. SILVER:  Objection.

25         THE COURT:  Sustained.

O1MAPIT4                          Pitre-Direct

1               When did you go to California?

2               THE WITNESS:  I don't know the specific date.  I just

3      know --

4               THE COURT:  How long were you in California?

5               THE WITNESS:  I think two, three days.  It wasn't that

6      long.

7      Q.  Was the car where you left it when you came back?

8      A.  No.

9      Q.  Do you know where the car was?

10     A.  I'm not sure.  I don't recall.

11     Q.  How did you find out about the write-up?

12     A.  Miguel Correa told me.

13     Q.  Did he show a copy of it to you?

14     A.  No.  He just told me about it originally, yeah.

15              THE COURT:  Did you at some point see the write-up?

16              THE WITNESS:  Yes.

17              THE COURT:  When did you see it?

18              THE WITNESS:  I don't recall the date.

19     Q.  Where were you when you saw it?  Do you remember that?

20     A.  In Manhattan.  In the Manhattan quad.

21     Q.  What are the rules for parking?

22     A.  The rules of the parking an official vehicle is you're

23     supposed to park by a facility, FDNY facility.  And if there is

24     any space available, you're supposed to find any place that --

25     as long as the vehicle is secure and safe, you can leave it

1   there.

2   Q.  When you parked it, was it in a secure and safe location?

3   A.  Yes.

4   Q.  Was the place that it had been moved to secure and safe, or

5   do you know if the place that it had been moved to was secure

6   and safe?

7               MS. SILVER:  Objection.

8               THE COURT:  Sustained.

9               It was moved, but you don't know to where, right?

10              THE WITNESS:  Correct.

11              THE COURT:  Okay.  Sustained.

12  Q.  Have you ever seen --

13              THE COURT:  Just so I'm clear, this was a vehicle that

14  was assigned to you at the time?

15              THE WITNESS:  Right.

16              THE COURT:  And you drove that vehicle every day when

17  you were working?

18              THE WITNESS:  That's correct.

19              THE COURT:  All right.  Did anyone else drive that

20  vehicle during that time when it was assigned to you?

21              THE WITNESS:  If -- yes, people can use the vehicle,

22  absolutely.

23  BY MR. BARRETT:

24  Q.  Was there a spare key for that vehicle?

25  A.  Yes.

O1MAPIT4                    Pitre-Direct

1    Q.  Where was that spare key located?

2    A.  There was -- because I parked in the CO.  So there was one

3    in the CO.  There was one -- there's multiple spares and --

4           THE COURT:  The question was about the spare key.

5    Where was the spare key kept?

6           THE WITNESS:  The three places.

7           THE COURT:  In three places.

8           THE WITNESS:  Right.  Queens CO, Miguel had a copy,

9    and I had a spare copy in my home.

10   Q.  So there are four total copies of the key that you knew

11   about?

12   A.  Yes.

13   Q.  And one was your copy that you used regularly.  Second one

14   --

15          MS. SILVER:  Objection.

16          THE COURT:  Overruled.  It's leading, but overruled.

17   Go ahead.

18          MR. BARRETT:  I was just trying to clarify his

19   previous testimony.

20   Q.  One was Miguel, one was your spare, and another one was

21   where?

22   A.  In the CO, central office.

23   Q.  Okay.  Okay.  Were the vehicles equipped with any location

24   devices?

25   A.  Yes.

O1MAPIT4                    Pitre-Direct

1    Q.  What kind?  Like GPS?

2    A.  GPS.

3    Q.  Do you know if that's how they were able to find your

4    vehicle?

5            MS. SILVER:  Objection.

6            THE COURT:  Well, yeah, sustained.

7            MR. BARRETT:  Okay.

8            THE COURT:  He didn't know that it was moved.

9            MR. BARRETT:  I'll move on.

10           THE COURT:  Yeah.

11           When you came back from California, when was the next

12   time you went to use the car?

13           THE WITNESS:  I was -- already knew about the vehicle

14   --

15           THE COURT:  When you came -- answer the question.

16           THE WITNESS:  Okay.

17           THE COURT:  Please.  When you came back from

18   California, when was the next time that you wanted to use the

19   car?  The next day, three days later?

20           THE WITNESS:  Three days later.

21           THE COURT:  And where did you go to find the car?

22           THE WITNESS:  It was already parked at the Manhattan

23   garage.

24           THE COURT:  Go ahead.

25   Q.  Do you know who moved it from where you parked it to the

O1MAPIT4                         Pitre-Direct

 1  Manhattan garage?

 2              MS. SILVER:  Objection.

 3              THE COURT:  Asked and answered.  Not answered, but

 4  asked.

 5              MR. BARRETT:  All right.

 6  Q.  So I'm going to move onto another area that we've touched

 7  on.

 8              The written request for the transfer to Queens, aside

 9  from John Fiorentino, who we've talked about, was there anyone

10  else who could have granted that request?

11              MS. SILVER:  Objection.

12              THE COURT:  You can answer.

13  A.  It was Jan and Mastropietro.

14  Q.  When you were back from your injury after those three days

15  that you were out that you testified to, like three to five

16  days, I can't remember exactly, but that short amount of days

17  that you were out, what types, if any, of jobs did you handle

18  after your shoulder was --

19              THE COURT:  We did this already.  We spent quite a bit

20  of time.

21              MR. BARRETT:  Okay.  There's some clarification I

22  wanted to get about that that I wanted to lay foundation.

23              THE COURT:  Well, ask the question, but we did that

24  exact thing.

25              MR. BARRETT:  Okay.

1   Q.  Let me move on.

2           So before the break we were also talking about an

3   issue where your banked hours went from over 40 to zero.  So

4   the question I have related --

5           MS. SILVER:  Objection.

6           THE COURT:  Sustained.  There was not -- there wasn't

7   that -- the question is stricken.

8           MR. BARRETT:  Okay.

9           THE COURT:  I don't think that ever came out.  I don't

10  think the 40 to zero ever came out.

11          MR. BARRETT:  Okay.

12  Q.  At one point you were talking about your pay stub.  So and

13  you said that the pay stub had a portion that showed your

14  banked hours.  Do you remember that earlier today?

15  A.  Yes.

16  Q.  So I want to ask you about that now.  Who, if anyone, did

17  you show the pay stubs to?

18          MS. SILVER:  Objection.  Asked --

19          THE COURT:  Sustained.

20  Q.  Was there anyone else besides Joe Adams that you showed

21  them to?

22          MS. SILVER:  Objection.

23          THE COURT:  Sustained.

24  Q.  All right.  So we've talked -- when you were out after your

25  surgery in 2015, did you receive any correspondence from the

1   City of New York?

2   A.  Just a letter from the city on the -- stating that coming

3   up to the year and I was going to be terminated.

4   Q.  Okay.  Was there any other letters?

5   A.  Right after the surgery -- or no I think before --

6               MS. SILVER:  Objection.

7               THE COURT:  Hold on.

8               THE WITNESS:  Yes.

9               THE COURT:  Any other letters received from the Fire

10  Department or the City of New York regarding employment?  You

11  can answer.

12              MR. BARRETT:  Yeah.

13  A.  I get a letter from the DOI, Department of Investigation.

14  Q.  What was that DOI letter about?

15              MS. SILVER:  Objection.

16              THE COURT:  Yeah.  I mean --

17              MR. BARRETT:  Okay.  I'll rephrase that.

18  Q.  When if you recall did you receive a letter from the DOI?

19  A.  It was a typo on the letter between dates.

20  Q.  I'm just asking if you remember when.

21  A.  Yeah.  It was somewhere in June, yeah, I got the letter

22  somewhere I believe in June.

23              THE COURT:  When did you get a letter from DOI?

24  A.  June, July, August, I forgot when.

25  Q.  Of what year?

O1MAPIT4                    Pitre-Direct

1   A.  Six -- '15 or '16.

2            THE COURT:  And tell us what DOI is.

3            THE WITNESS:  Department of Investigation.

4            THE COURT:  Of the City of New York?

5            THE WITNESS:  City of New York.

6            THE COURT:  Okay.  Is that part of the fire

7   department?

8            THE WITNESS:  No.

9            THE COURT:  Next question.

10  Q.  What does DOI have to do with the fire department, if

11  anything?

12           MS. SILVER:  Objection.

13           THE COURT:  Sustained.

14  Q.  What does DOI do?

15  A.  They investigate any wrongdoing.  They have the power to

16  fire, arrest.

17  Q.  Did you ever find out what they were investigating related

18  to the letter you received or if they were investigating

19  anything?

20           MS. SILVER:  Objection.

21           THE COURT:  Sustained.

22           MR. BARRETT:  Let me rephrase.

23  Q.  What did that letter inform you of?

24           THE COURT:  Do we have the letter?  Are you putting it

25  in?

1              MR. BARRETT:  Yeah.  Okay.

2              THE COURT:  Is it marked?

3              MR. BARRETT:  No, I'm going to put it in right now.

4              THE COURT:  What's it marked as?

5              MR. BARRETT:  This is Plaintiff's 18.

6              THE COURT:  Any objection?

7              (Pause)

8              THE COURT:  By the way, I would like a complete set,

9    hard copies of all the exhibits that have been received and

10   that are being received.  All right.  Whenever you can, get

11   them to me as soon as you can.

12             MR. BARRETT:  Okay.

13             MS. SILVER:  Yes, your Honor, we do object.

14             THE COURT:  Okay.  Then let me take a look at it, or

15   put it on the screen, not for the jury.

16             MR. BARRETT:  I'll just give you a copy.

17             THE COURT:  Okay.

18             MS. ALEXANDER:  Mr. Barrett, Plaintiff's 18?

19             MR. BARRETT:  That's correct.

20             THE COURT:  Well, show it to him and then ask a

21   foundation question and then I'll see.

22             MR. BARRETT:  Show this to him?

23             THE COURT:  Yeah.

24             MR. BARRETT:  I would just like to note for the record

25   that I just handed the witness what's been marked as

O1MAPIT4                         Pitre-Direct

 1   Plaintiff's Exhibit 18.

 2           THE COURT:  Yeah, his copy is not marked.

 3           MR. BARRETT:  Oh, I have it.  I gave him the wrong

 4   one.

 5           THE COURT:  The Bates Number ends 023 at the bottom of

 6   the page.

 7           Now, without telling us what this is, have you seen

 8   that document before?

 9           THE WITNESS:  Yes.

10           THE COURT:  And when did you see it?

11           THE WITNESS:  Somewhere in June.

12           THE COURT:  Of 2016?

13           THE WITNESS:  '16, yes.

14           THE COURT:  And was this a letter that you received on

15   or about June 3, 2016, from the New York City Department of

16   Investigation?

17           THE WITNESS:  That is correct.

18           THE COURT:  Okay.

19           MR. BARRETT:  May I publish that to the jury?

20           THE COURT:  You got to offer it first.  You offer it?

21           MR. BARRETT:  I'm offering this to be published for

22   the jury.

23           THE COURT:  You offering it --

24           MR. BARRETT:  Into evidence.

25           THE COURT:  Is there an objection?

O1MAPIT4                    Pitre-Direct

1              MS. SILVER:  No objection.

2              THE COURT:  Plaintiff's Exhibit 18 is received and now

3     you can publish it.

4              (Plaintiff's Exhibit 18 received in evidence)

5              MR. BARRETT:  Thank you.

6              Ask the Court to confirm that the jury can see it.

7              THE COURT:  I don't have it yet.  The jury has it.  I

8     have a hard copy.  It's fine.

9              MR. BARRETT:  Okay.

10    Q.  Mr. Pitre, is this the letter you were just testifying

11    about?

12    A.  That's correct.

13    Q.  All right.  So did you go to this address?  Actually what

14    did the letter say?

15    A.  You are hereby ordered to appear in the Office of the

16    Inspectors General, New York City Fire Department, 80 Maiden

17    Lane.

18              THE COURT:  No, no, no.  I'm sorry, I see.  It's

19    asking you to go to the -- okay.  Go ahead.  Keep reading.  I'm

20    sorry.  Just read again the first sentence.

21              THE WITNESS:  Okay.

22    A.  You are hereby ordered to appear at the Office of the

23    Inspectors General, New York City Fire Department, 80 Maiden

24    Lane, 7th floor, New York, New York, on Tuesday, June 7, 2015,

25    at 2:30 p.m.

O1MAPIT4                    Pitre-Direct

1   Q.  Okay.  So the letter is from 2016.  So this 2015, June 7,

2   that's the typo you were just referring to?

3   A.  Correct.

4          MS. SILVER:  Objection.

5          THE COURT:  Yeah.  Sustained.  You're telling him

6   which is the typo.  It could be either one, right?

7          MR. BARRETT:  Okay.

8   Q.  What day did you receive the letter?

9   A.  It was in 2016.

10          THE COURT:  All right.

11   Q.  Can you point out or tell us --

12          THE COURT:  So your recollection is you got this in

13   June of 2016?  Yes?

14          THE WITNESS:  Yes.

15          THE COURT:  Did you go to a meeting on June 7th, 2016?

16          THE WITNESS:  No.

17          THE COURT:  You didn't go.  Did you go to any meeting

18   in response to this letter?

19          THE WITNESS:  Yes.

20          THE COURT:  All right.  When did you go?

21          THE WITNESS:  I don't remember the exact date because

22   I gave this letter to the union and they provided an attorney

23   and they gave me -- they came up with a date when to show up,

24   the two attorneys.

25          THE COURT:  Well, just when was it roughly?

1          THE WITNESS:  July.

2          THE COURT:  Of 2016?

3          THE WITNESS:  Correct.

4          THE COURT:  And you went to the meeting with a union

5   representative?

6          THE WITNESS:  With a union lawyer.

7          THE COURT:  Okay.

8   Q.   Where was the meeting?

9   A.   Eighty Maiden Lane.  Eighty Maiden Lane.

10  Q.   Did you find out the purpose of the meeting when you were

11  there?

12  A.   Yes.

13  Q.   What was that purpose?

14  A.   They said they were -- they said it was padding the

15  payroll, I was AWOL for a year.  Pretty much that's it.

16  Q.   And when you say they were saying you padded the payroll,

17  what was the allegation?

18  A.   Padding the payroll, that's what they call it.

19  Q.   Explain what that means.

20  A.   I was off duty, on the payroll, but I wasn't at work.

21  Q.   Did you find out anything about why they were accusing you

22  of this?

23          MS. SILVER:  Objection.

24          THE COURT:  Overruled.

25  A.   My understanding was Mastropietro was -- send my sick forms

O1MAPIT4                        Pitre-Direct

1   to BITS and then BITS I guess must have forwarded it to DOI.

2   Q.  And you found out that this was related to the sick forms

3   you had provided up the chain of command, correct?

4   A.  That is correct.

5           THE COURT:  Sustained.

6           MS. SILVER:  Objection.

7           THE COURT:  Stricken.  Leading.  Very leading.

8           MR. BARRETT:  Sorry.

9           THE COURT:  Don't apologize.  Just ask proper

10   questions.

11   Q.  What was the basis for the allegations in this meeting that

12   you found out?

13           MS. SILVER:  Objection.

14           THE COURT:  Overruled.

15           At this meeting did they tell you what they were

16   looking at?

17           THE WITNESS:  They wanted to know my whereabouts.

18   They wanted to know --

19           THE COURT:  First of all, who was at the meeting

20   besides you and your union representative?

21           THE WITNESS:  Nicole J., the leading investigator.

22   She was there.  There was people from the city.  There was a

23   lot of people in the office, I mean, in that hearing, tons of

24   people.

25           MR. BARRETT:  I'm sorry, I didn't mean to interrupt.

O1MAPIT4                    Pitre-Direct

1   Q.   What was discussed at the meeting?

2   A.   AWOL, where was I, my whereabouts for that year, doctors,

3   surgery.

4   Q.   What was the result of this meeting?  What came out of

5   that, if anything?

6            MS. SILVER:  Objection.

7            THE COURT:  Overruled.  You can answer.

8   A.   It was found unfounded, and dismissed all the charges

9   against me.

10           THE COURT:  Were there actual charges?

11           THE WITNESS:  Yes.  That's why I needed an attorney.

12           THE COURT:  Was there a piece of paper setting forth

13  charges?

14           THE WITNESS:  My lawyer might have got it.  I, you

15  know, but that's --

16           THE COURT:  Your lawyer might have gotten it?

17           THE WITNESS:  He did that.

18           THE COURT:  Did you ever see a piece of paper with

19  charges on it?

20           THE WITNESS:  No, not particularly.  No.

21           THE COURT:  Go ahead.

22  Q.   Was there any investigation of you by DOI after this

23  meeting?

24  A.   No.

25           MS. SILVER:  Objection.

1            THE COURT:  Overruled.

2            After this meeting was there anything else that came

3     to your attention about the issues that were being discussed?

4            THE WITNESS:  No.

5            THE COURT:  Did you receive any follow-up

6     communications?

7            THE WITNESS:  No.

8            THE COURT:  Any follow-up inquiries?

9            THE WITNESS:  Nope.

10           THE COURT:  So as far as you knew, the matter was

11    over?

12           THE WITNESS:  Right.  The hearing was a couple hours

13    long and then they --

14           THE COURT:  Was it an actual hearing?

15           THE WITNESS:  Yes, it was.

16           THE COURT:  And did you testify at the hearing?

17           THE WITNESS:  Yes.

18           THE COURT:  Were there other witnesses who testified

19    at the hearing?

20           THE WITNESS:  No, just myself.

21           THE COURT:  Was there ever a written decision issued

22    --

23           THE WITNESS:  No.

24           THE COURT:  -- following the hearing?

25           THE WITNESS:  I never received it, so.

O1MAPIT4                     Pitre-Direct

1          THE COURT:  Okay.

2     BY MR. BARRETT:

3     Q.  Did you look at any documents in that hearing?

4     A.  No.

5          MR. BARRETT:  If I may approach and retrieve the copy.

6          THE COURT:  Yes, you may.

7     Q.  What is your understanding of what the DOI can do to people

8     they're investigating?

9          MS. SILVER:  Objection.

10         THE COURT:  Sustained.  Let's move on.

11         MR. BARRETT:  Yeah.  Okay.

12    Q.  Who if anyone has the power to initiate an investigation

13    such as the one that you were subject to, if you know?

14         MS. SILVER:  Objection.

15         THE COURT:  Sustained.

16    Q.  As the vice-chairman of the union, do you have any

17    understanding of the significance of seniority?

18    A.  I do.

19    Q.  Can you explain what seniority is?

20    A.  Seniority comes from the -- from exam, the score.  It also

21    comes from the time, how much time you have on the job.

22    Q.  Okay.  Is there a way that it's measured?  Can you just

23    explain more?  What do you mean?

24    A.  For example, if I can give an example.

25    Q.  Yeah.

01MAPIT4                    Pitre-Direct

1  A.  If I asked for an accommodation let's say to Queens, a

2  transfer, because of my seniority, they can literally go to

3  another borough, let's say Queens, for example, they'll look at

4  the junior man --

5           MS. SILVER:  Objection.

6           THE COURT:  Hold on.

7  A.  -- with the least amount of seniority.

8           THE COURT:  There's an objection.  You should just

9  wait for a moment.

10          Yeah, I think it's going beyond the question.

11  Sustained.

12  Q.  Okay.  Just if you can, just help me understand, what's the

13  significance of seniority?  And you can give me an example if

14  you want.

15  A.  A senior man can recommend for a medical reason or for an

16  emergency to move to a borough temporarily.  So you can

17  literally bump off the junior man temporarily to take that

18  spot.  But it's only temporary basis.

19  Q.  Are there any other kind of privileges like that related to

20  seniority?

21  A.  It also works when you're in the field as well, as you're

22  dictating jobs and pretty much you're responsible for that task

23  that you're doing that day so you can manipulate, you know, the

24  crew, where you want them.

25  Q.  So you are saying as senior man you can manipulate --

1          THE COURT:  Sustained.

2          MR. BARRETT:  Okay.

3          THE COURT:  "So you are saying," that's leading.

4          MR. BARRETT:  Sorry.

5     Q.  How in any way is a senior man allowed to instruct or

6     direct the work of junior men?

7     A.  As long as there's any supervisor in the field, the

8     individual that communicate -- the communication electrician

9     with the most amount of years would now pretty much run the

10    job.

11    Q.  Okay.  Well, then what happened -- or at any point did

12    something happen related to your seniority?

13    A.  Right.  When they -- during I think summer '15, early

14    summer '15 I believe, John Fiorentino shows up to the -- early

15    in the morning, he came about 6:30 in the morning.  He shows up

16    to Manhattan and he has a meeting.  And in this meeting he told

17    Mr. Miguel Correa, my supervisor, that no longer he --

18          MS. SILVER:  Objection.

19          THE COURT:  Overruled.  You can answer.

20    A.  No longer Ed Pitre will be the senior man in the field, and

21    he appointed another person.  COM electrician, his name was

22    James Murphy, which was way junior than me.

23    Q.  And why is that significant?

24          MS. SILVER:  Objection.

25    Q.  If at all?

1    THE COURT:  Overruled.  You can answer.

2  A.  It's unheard of.  In a civil servant, it's everything about

3  seniority.  And as you work in the field, you can also put in

4  let's say for a promotion.  I'm the senior man, I've been

5  running -- you can actually add that or say it as credentials.

6  Q.  Credentials for what?

7  A.  Promotions.

8  Q.  And just because he said it was taken away, what

9  significance was that?

10    MS. SILVER:  Objection.

11    THE COURT:  You can answer.  Overruled.

12  A.  It was standing.  It stood as.

13  Q.  I couldn't hear you.

14  A.  I said it happened.  So let's say Miguel was out, James

15  Murphy did it.  He took that role now.

16  Q.  Who is James Murphy?

17  A.  COM electrician in the Borough of Manhattan.

18  Q.  And what was your guys' seniority in relation to each

19  other?

20  A.  I think I had like maybe 10 years above him.

21  Q.  So what was the result of what John said about your

22  seniority?  Explain that, please.

23  A.  Can you rephrase the question.

24  Q.  Sure.  So you said the senior guy gets to dictate jobs.

25  Does that mean he was able to dictate your jobs?

01MAPIT4                          Pitre-Direct

1              MS. SILVER:  Objection.

2              THE COURT:  Sustained.

3    Q.  All right.  Can you --

4              THE COURT:  I think the point has been made.  Move

5    onto something else.

6              MR. BARRETT:  Okay.

7    Q.  Okay.  So prior to the 2011 lawsuit, had that ever happened

8    to you with your seniority?

9    A.  No.  Prior?

10   Q.  Prior.

11   A.  No.

12   Q.  And prior to the 2011 lawsuit, had you ever lost driving

13   privileges?

14   A.  No.

15   Q.  Prior to your 2011 lawsuit, had you ever experienced an

16   instance like you described where your bank of hours went from,

17   you know, a certain number with hours to no hours?

18             MS. SILVER:  Objection.

19             THE COURT:  Sustained as to form.

20   Q.  What if anything was -- what if anything was different

21   about how your hours were banked prior -- between before the

22   2011 lawsuit and after?

23             MS. SILVER:  Objection.

24             THE COURT:  Overruled.  You can answer.

25   A.  I've never, never really had a problem at all with payroll.

1   Q.  And prior to the 2011 lawsuit, what if any issues had you

2   -- did you have with your health insurance being discontinued?

3           MS. SILVER:  Objection.

4           THE COURT:  Overruled.

5   A.  I've never lost my medical until after the lawsuit.

6   Q.  So after John said you're not the senior man anymore, did

7   you ever regain seniority?

8   A.  Well, you work with all the men, so they already know who

9   you are.  They know, you know, everyone knows their, you know.

10  Q.  Did you ever regain seniority?

11  A.  No.

12  Q.  During the time that you were a COMs electrician, did you

13  personally witness anyone returning back to work after they had

14  surgery?

15  A.  Yes.

16  Q.  What happened after you had surgery?

17  A.  I -- once I got to the point that I can lift up my

18  shoulder, I reached out to Greg, to the union, to see if I can

19  go back.

20  Q.  Okay.  And did they let you?

21  A.  No.

22  Q.  What was the impact of them not allowing you to come back?

23          MS. SILVER:  Objection.

24          THE COURT:  Overruled.

25  A.  I was only getting one-third of my salary.

O1MAPIT4                         Pitre-Direct

1    Q.  And what else?

2    A.  Of course no medical.  I lost the medical as well.

3          THE COURT:  When you say loss of medical, do you mean

4    loss of medical insurance?

5          THE WITNESS:  Medical insurance coverage.

6          THE COURT:  Okay.

7    Q.  How did that make you feel?

8          MS. SILVER:  Objection.

9          THE COURT:  Overruled.

10   A.  That was betrayed, hurt, mentally anguished.  Because I

11   seen it, my friends can go back to work, I know so many people,

12   but I was treated a different way.

13   Q.  Did you ever try to seek mental health treatment?

14   A.  I saw a therapist.

15         MS. SILVER:  Objection.  May we have a side bar?

16         THE COURT:  Yeah, I think we need a side bar.  Let's

17   have a side bar.

18         (Continued on next page)

19

20

21

22

23

24

25

O1MAPIT4                    Pitre-Direct

1              (At sidebar)

2              THE COURT:  The objection is?

3              MS. SILVER:  Yes, your Honor.  We've never received a

4      single piece of paperwork regarding any -- him seeing a

5      therapist.  This was part of our discovery requests.  And it's

6      always just been garden-variety.  This was also part of our

7      motions in limine.

8              THE COURT:  Response?

9              MR. BARRETT:  It's right for cross-examination.  We

10     were asking if he ever sought medical treatment.  They can

11     cross-examine him about it.

12             THE COURT:  Did he seek treatment from a therapist?

13             MR. BARRETT:  Yes.

14             THE COURT:  You should have disclosed it in discovery.

15             MR. BARRETT:  We don't have records of it.  He didn't

16     -- what I'm going to get from him is that he tried to go, but

17     because his medical was gone, he couldn't get treatment.

18             THE COURT:  So he never actually got treatment?

19             MR. BARRETT:  He was treated.  He saw someone, but he

20     couldn't continue.

21             THE COURT:  Did you produce records for the -- how

22     many sessions did he have?

23             MR. BARRETT:  A handful, like three I think.

24             THE COURT:  The objection is sustained.  This area is

25     off limits based on the rulings pretrial and the failures of

1    the disclosures during discovery.

2              MR. BARRETT:  Okay.

3              THE COURT:  So objection is sustained to the area.

4              MR. BARRETT:  And so elicit testimony about his

5    feelings.

6              THE COURT:  You did already.  But you could ask some

7    more.  I was allowing it.  I overruled the objection.  He's

8    entitled to argue that.

9              MR. BARRETT:  Okay.

10             MS. SILVER:  Your Honor, we would also just ask if the

11   jury could be instructed to disregard that.

12             THE COURT:  The last answer, yes.

13             MS. SILVER:  Thank you.

14             (Continued on next page)

15

16

17

18

19

20

21

22

23

24

25

O1MAPIT4                        Pitre-Direct

1              (In open court)

2              THE COURT:  The objection is sustained.  The jury

3     should disregard the last answer and question.

4     BY MR. BARRETT:

5     Q.  So how did the situation we were just talking about affect

6     your mood?

7     A.  Depressed.  Angry.  Hurt.  Because all the years I put in

8     for the city and the things I've seen, and it's the opposite

9     for certain individuals.

10    Q.  How did this overall situation affect your career?

11    A.  I was forced to retire, because I didn't get any

12    accommodations.

13    Q.  All right.  I have one remaining area I want to ask you

14    about I think.  We touched on this a little while ago.

15              How often did you receive performance evaluations?

16    A.  Yearly.

17    Q.  Do you remember when your final performance evaluation was?

18    A.  '14 or '15.

19    Q.  What is contained in a performance evaluation for a

20    communications electrician?

21    A.  All the tasks that you're supposed to be able to do as a

22    communications electrician, and they -- and they'll give you

23    satisfactory, you know, conditional, conditional.

24    Q.  Okay.  Is there anything else in those aside from listing

25    the tasks?

1   A.  I don't recall.

2   Q.  Okay.  Would seeing one of those refresh your recollection?

3   A.  Yes.  Please.

4           MR. BARRETT:  Okay.  I'd like to show the witness what

5   I've marked as Plaintiff's Exhibit 19.  May I hand this to the

6   witness?

7           THE COURT:  Yes.

8           MR. BARRETT:  And I have one for the Court, too.

9           THE COURT:  Yes.

10  Q.  Ed, have you had a chance to look at the document I just

11  handed you?

12  A.  Yes.

13  Q.  Have you seen that document before?

14  A.  Yes.

15  Q.  What is it?  Without reading anything on it.

16  A.  It's a performance evaluation.

17  Q.  Okay.

18          THE COURT:  You offering it?

19          MR. BARRETT:  I'm offering this to the Court as

20  Exhibit 19.  And I'm requesting to publish it.

21          THE COURT:  Any objection to Plaintiff's 19?

22          MS. SILVER:  Yes, your Honor.

23          THE COURT:  You object?

24          MS. SILVER:  Yes.

25          THE COURT:  The objection is overruled.  Let me take a

1    quick look through it to make sure there's nothing in here.

2              MR. BARRETT:  Okay.

3              THE COURT:  I mean, ordinarily there wouldn't be an

4    issue with respect to a performance evaluation coming into

5    evidence.

6              The objection is overruled.  I'll receive Plaintiff's

7    19.

8              (Plaintiff's Exhibit 19 received in evidence)

9              MR. BARRETT:  Okay.  So I may publish it just to

10   clarify?

11             THE COURT:  Yes.  Once it's in evidence, yes.

12   BY MR. BARRETT:

13   Q.  Ed, you can just turn to the front cover page.  I'm going

14   to ask you about that first.  Do you see the dates on the front

15   page there?

16   A.  Yes.

17   Q.  Okay.  And tell me what the dates are, the range for this?

18   A.  April 1st to June 30, 2015.

19   Q.  Is this the last eval you received while you were at the

20   fire department?

21   A.  I believe so.

22   Q.  I'm going to just flip over to the next page and ask you if

23   you were -- ask you if you would read the task description

24   under the box where it says task number one.  You can read that

25   out loud into the record, if you would, please.

O1MAPIT4                    Pitre-Direct

1  A.  Sure.  Snake and install, maintain, and repair the copper

2  and fiber cable line network within buildings, overhead and

3  underground.  Locate, clear, and repair troubles in electrical

4  cable and fiber optic cable, and line network.

5          THE COURT:  Just read slowly.

6          THE WITNESS:  I'm sorry.

7          THE COURT:  That's okay.  Next question.

8  Q.  So these tasks right here, you were able to perform those

9  tasks after you fell down; is that correct?

10  A.  That is correct.

11  Q.  And let's go down and look at standards, circuit faults,

12  conduct installations, and which continues on under the

13  standards part.  If you don't mind, read through number one and

14  number two under standards, please.

15  A.  Sure.  Locate circuit faults, conduct installations,

16  repairs and restore circuits in a minimal amount of time.  Next

17  one, two is submits accurate, legible, and detailed daily work

18  orders at end of tour.

19  Q.  So from these task descriptions that you just read and

20  standards that you just read, before -- or actually let's just

21  go down to the bottom and finish this out.

22          Do you see your rating the rating you received at the

23  bottom?

24  A.  Yes.

25          (Continued on next page)

O1MBPIT5                      Pitre - Direct

1    BY MR. BARRETT:

2    Q.  And what's that?

3    A.  Very good.

4    Q.  What does this mean about what you could do related to

5    these tasks and standards in between April 1st and June 30th of

6    2015?

7    A.  I was more than capable of doing the task that was asked to

8    be performed.

9    Q.  And with your knowledge of these tasks, if you're able to

10   come back after 2011 or after 2011 after your surgery had

11   healed, what was your ability?

12             MS. SILVER:  Objection.

13             THE COURT:  Sustained.

14   Q.  Were you able to do any of these things at any point after

15   2016?

16   A.  Yes.

17   Q.  Which out of these things were you not able to do after

18   2016?

19   A.  On that standard one it says, locate circuit fault.  I

20   could do it with a meter, but I couldn't open the manhole

21   cover, but not every situation you need to open a manhole

22   cover.

23   Q.  Does it say opening manholes up here?

24   A.  No, just the language.  When you say locate and clear to a

25   communication electrician, we know what it details.

O1MBPIT5                        Pitre - Direct

1   Q.  So then after your injury in 2015, February of 2015, this

2   evaluation says it, gives you what your actual performance was.

3   I ask you to read that part right there, please?

4   A.  Mr. Pitre has shown the ability to efficiently troubleshoot

5   or repair open or grounded circuits, and he provides

6   informative work reports to help keep accurate records.

7   Q.  Is this an accurate assessment?

8   A.  Yes.

9   Q.  So let's move to task number two.  Actually, before we move

10  to task number two.  As we sit here today, is there anything

11  listed here aside from what -- I'm not asking about popping

12  manholes because it's not listed.  Is there anything listed

13  here as you sit here today are physically unable to do?

14  A.  I could do it.

15  Q.  I couldn't hear you?

16  A.  I could perform this.

17  Q.  So then now let's move to task number two.  Just please

18  again slowly and clearly read the task description under task

19  number two?

20  A.  Replaces and/or extends cable or aerial line plant,

21  maintains and replaces damaged fire alarm posts and poles

22  including excavating and replacing concrete as necessary.

23  Q.  What, if anything, in here were you not able to do in

24  between April 1st and June 30th of 2015?

25  A.  At that time I could do it, sure.

1  Q.  As you sit here -- actually, in 2016, what, if anything, in

2  here were you physically unable to do?

3  A.  I would probably have a problem with a jack hammer because

4  they would say that you need a jack hammer.

5  Q.  I'm asking about what's on here.  Just focus on what's on

6  here.  I don't want to hear about manholes or jack hammers

7  unless they're on here, please.

8         Looking at this, I'm asking about what's on the page?

9  A.  I would have problem replacing the fire alarm post.

10  Q.  Anything else?

11  A.  No.

12  Q.  Let's look at the next section below that standards.

13         THE COURT:  I think we've covered task number two.

14  Q.  As we sit here today, are you there any of these tasks

15  listed on the page that you wouldn't be able?

16         THE COURT:  You just did that.

17         MR. BARRETT:  That was for one.

18         THE COURT:  We just did it for two.  He said he could

19  do everything except the alarm posts and poles.

20  Q.  Please just slowly clearly read what it says under actual

21  performance under task two?

22  A.  Mr. Pitre has worked hard to complete assignments, has

23  shown an understanding of the specifications and the needs of

24  our operations.  He has displayed concern for the safety of the

25  public and pride for the task at hand.  He also submits detail

1    work order.

2    Q.  Is that an accurate evaluation of your work?

3    A.  Yes.

4    Q.  Do you agree with this task rating that you received?

5    A.  Yes.

6    Q.  Let's try to get through these.  Task number three.  If you

7    don't mind, I'll just read that.  When I'm done, tell me what

8    out of this list you were not able to do.

9             Operates compressor, pneumatic, hydraulic, and power

10   equipment as required in the work, operates motor vehicle.  Is

11   there anything in that list that you were not able to do in

12   April, between April and the end of June of 2015, anything on

13   here?

14   A.  No.

15   Q.  From that list I just read, was there anything in there

16   back in 2015, the period of this eval that you weren't able to

17   do?

18   A.  I could do it all.  I could perform all task there.

19   Q.  And then standards it says maintain valid license to

20   operate motor vehicle and operates vehicle?

21            THE COURT:  We don't need the standards.  Move to

22   actual performance.

23   Q.  There's one thing I wanted to ask him.  Did you have a

24   driver license?

25   A.  Yes.

1   Q.  Did you treat and maintain tools and equipment with proper

2   care?

3   A.  Yes.

4   Q.  And then were you able to document loaned department

5   equipment from warehouses?

6   A.  Yes.

7   Q.  So at the bottom of task number three you see your task

8   rating where it says very good?

9   A.  Yes.

10   Q.  Is this an accurate assessment for you on task number

11   three?

12   A.  Yes.

13   Q.  As you sit here today, all of these things that you could

14   do back before September 2015, can you do them today?

15   A.  Yes.

16   Q.  Could you do them in 2016?

17   A.  Yes.

18   Q.  Just go through this, try to do it efficiently.  I'm going

19   to read the basic pieces here.  Task number four is task

20   description.  Keeps accurate and legible records of work order

21   assignment, provides overtime availability notification to

22   supervisor and preparation of application for leave request as

23   per department performance and procedures within schedule

24   deadlines.

25          So this one we see an exception to the previously

1    second to top --

2            MS. SILVER:  Objection.

3            THE COURT:  Sustained.

4    Q.  Sorry.  Under actual performance we see here that it says,

5    due to unforeseen family issues is used LWOP on various

6    occasions, but has kept me abreast of these situations.

7            Do you know who wrote this?

8    A.  Miguel Correa.

9    Q.  Did you keep him abreast of your personal situations?

10   A.  Yes.

11   Q.  Let's move on to task number five.  So this is I think the

12   last task listed on the eval.

13           Arrives to work and to scheduled job sites prepared

14   with proper tools and gear within scheduled time by the

15   supervisor, completes all repairs in a safe and professional

16   manner and in accordance with industry standards.  Notifies

17   supervisor of field conditions, problems and

18   progress/completion of work.

19           In 2016 after you healed from your surgery, were you

20   able to do all of these tasks?

21   A.  Yes.

22   Q.  All right.  And then go onto the next page.  I'm going to

23   point your attention to where it says other factors where it

24   reads as follows:  Mr. Pitre has shown the ability to be a very

25   good electrician.  He has made great progress in his efforts to

O1MBPIT5                         Pitre - Direct

1   excel through adversity.  He's also made progress in motivating

2   others around him.  Is that an accurate statement?

3   A.  Yes.

4   Q.  Do you agree with the overall rating that you received

5   right here where it says good?

6   A.  No.

7   Q.  What don't you agree with about that?

8           MS. SILVER:  Objection.

9           THE COURT:  Overruled.  You can answer.

10  A.  I think it should have been very good.

11  Q.  Why do you say that?

12  A.  Miguel, if you turn to the next page.

13  Q.  We can't hear you.  Start your answer over, please, clearly

14  so we can hear you.

15  A.  I disagree with the evaluation.  As an electrician, as

16  communication electrician, as all, and the task that I did for

17  the plant, and I thought I should have gotten very good, not

18  good.

19  Q.  Well, sorry.  Right here it says, you made great progress

20  and efforts to excel through adversity.  What adversity did you

21  face during this period?

22          MS. SILVER:  Objection.

23          THE COURT:  Overruled.

24  A.  My injury on the job.

25  Q.  Let's move on.  Just to the section that reads

1   justification for overall rating.

2          Mr. Pitre has shown the ability to work well with

3   co-workers.  He has shown a willingness to teach new employees.

4   He has assisted other employees if asked upon.  He has taken on

5   a leadership role when necessary, and he has shown a good work

6   etiquette to ensure proper quality of work.

7          Do you agree generally with what that description

8   right there?

9   A.  Yes.

10  Q.  Looking at this evaluation up to this point is this

11  evaluation different in any way from previous evaluations that

12  you can recall?

13  A.  Before the accident, I would have -- I mean before the

14  lawsuits, I had very good across the board throughout the whole

15  performance.

16  Q.  I'm going to go to the very last page.  It says page four

17  of four down there at the bottom, and this top box with the

18  heading, plans and recommendations to capitalize upon

19  employee's strengths.

20         Mr. Pitre exhibits good ability to troubleshoot,

21  install, repair the underground cable plant and also to rebuild

22  circuitry when necessary.  He has shown the ability to be a

23  good leader.  You see that on the page?

24  A.  Yes.

25  Q.  Do you agree with everything that's written down there?

1   A.  Yes.

2   Q.  And so this is accurate assessment of your work?

3   A.  Yes.

4   Q.  Now I want to ask you about these employee comments.  Is

5   this your handwriting?

6   A.  That is my handwriting.

7   Q.  Is this your signature down here at the bottom?

8   A.  That is correct.

9   Q.  And then you write under employee's comments is this -- if

10  I'm not saying it right, please let me know.

11          Is this evaluation going to affect my promotion.  Are

12  you asking that as a question right here?

13  A.  I was asking them a question, yeah.

14  Q.  Did you ever get an answer to that question?

15          MS. SILVER:  Objection.

16          THE COURT:  Sustained.

17  Q.  So number two it says, what about all of my missing time.

18  Do you see that part?

19  A.  Yes.

20  Q.  What are you referring to right there?

21  A.  The hours that I was -- the 40 hours and other hours that I

22  wasn't paid, and I still didn't have an answer, and look at the

23  date that we're at.

24  Q.  Did you ever get an answer?

25          MS. SILVER:  Objection.

1            THE COURT:  Overruled.

2  A.  No.

3            THE COURT:  Next question.

4  Q.  So then similar question about number three here, where it

5  reads, non-payment of holiday, and in parenthesis still

6  waiting.  Please explain what you mean by that?

7  A.  I got paid on, I don't remember what holiday, and I didn't

8  get paid for the holiday.  And I told Miguel, this is a

9  contract agreement.  Why is it that I'm not getting paid for

10  the holiday.

11            MS. SILVER:  Objection.

12            THE COURT:  Overruled.  You can answer.

13  A.  It's a holiday that past and I didn't get paid for it.  And

14  I asked him and he said, they're working on it to get me paid

15  for the holiday.

16            THE COURT:  Who did you ask?

17            THE WITNESS:  Miguel.

18            THE COURT:  Okay.  Next.

19  Q.  Prior to the 2011 lawsuit, did you ever not get paid for a

20  holiday?

21  A.  No.

22  Q.  And then number five reads, constantly training people.

23  Does that say --

24  A.  Who's suppose to be.

25  Q.  Without --

O1MBPIT5                          Pitre – Direct

1   A.   Who's suppose to be.

2   Q.   I see it now.

3        THE COURT:   Constantly training people who suppose to

4   be electricians.

5   Q.   Is what the judge said accurate reflection of that piece?

6   A.   That's correct.

7   Q.   What do you mean by that?

8        MS. SILVER:   Objection.

9        THE COURT:   Overruled.

10  A.   Many people they hired that suppose to be electrician and

11  they're not.  I had to literally stop and show them how to read

12  the meter, how to troubleshoot, constantly teaching people how

13  to do the job.

14  Q.   Were you able to do that in 2016?

15       MS. SILVER:   Objection.

16       THE COURT:   Sustained.

17  Q.   We've talked about the surgery that you had in 2015,

18  September 2015.  After that, what other, if any, surgeries did

19  you have?

20  A.   About a year later I believe in August '16, a hand surgery.

21  Then the year after that which I think it was July of '17, I

22  know it was a year, they went back in my shoulder again.

23  Q.   All of the jobs that we've just described looking at this

24  document, what was your ability to perform those jobs between

25  these surgeries?

1   A.   I could have performed every job, but when it came to

2   picking up manholes or anything extremely heavy.

3   Q.   That was the only thing you couldn't do?

4   A.   Right, nothing heavy.

5   Q.   But I mean in this document we just looked at there were --

6   there were no task listed that said picking up manholes or

7   using a jack hammer, right?

8            MS. SILVER:  Objection.

9            THE COURT:  Overruled.  You can answer.

10  A.   That's correct.  Nothing was written on there.

11  Q.   But shooting circuits, things like that, teaching guys how

12  to be an electrician is something that -- or is that something

13  that you're able to do today?

14  A.   Yes.

15  Q.   What's the reason as you understand it that you were not

16  allowed to come back?

17           MS. SILVER:  Objection.

18           THE COURT:  Sustained.

19           MR. BARRETT:  I think that's it.  Thank you,

20  Mr. Pitre.

21           THE COURT:  Cross.

22           MS. SILVER:  Can we have a brief recess?

23           THE COURT:  We'll do the break now.  Ladies and

24  gentlemen, we'll break for 15 minutes and then we'll do cross.

25           (Continued on next page)

1            (Jury not present).

2            THE COURT:  All right.  We'll take a recess.

3            MR. HOLZBERG:  Your Honor, we have an issue that we

4    wanted to address with you.  Would you prefer that we do it now

5    or when we return?

6            THE COURT:  About cross?

7            MR. HOLZBERG:  No, about what were we discussing

8    previously with respect to background evidence.

9            THE COURT:  We'll do it at the end of the day.

10           MR. HOLZBERG:  Understood.  Thank you.

11           (Recess)

12           THE COURT:  Plaintiff counsel wanted to say something?

13           MR. BARRETT:  I wanted to make a record and actually

14   go back to one of the questions you ask me earlier if we found

15   case law to the point about facts prior to the waiver.  We have

16   found case law supporting our position that those facts should

17   be admissible.  And if I may, I'd like to make a record.

18           THE COURT:  Go ahead.  Although what am I supposed to

19   do with it now?  I got a jury waiting.  You had all weekend to

20   do this.  Go ahead.  Tell me what the cites are, and we'll take

21   a look.  But for now my rulings stand.  This is not the right

22   way to do it.  Make a record.

23           MR. BARRETT:  This is a case --

24           THE COURT:  Just give us the citations, please.

25           MR. BARRETT:  *Davis v. Urban Outfitters, Inc.*, 921

O1MBPIT5                        Pitre - Direct

1    F.3d 30, 2009 U.S. Lexis 10210, 103 Employment --

2              THE COURT:  I just need the main citation.

3              MR. BARRETT:  That was it.  And then we have another

4    one.  *Twyman v. Dilks*, 2000 U.S. Disc. Lexis 12942.  This is a

5    Second Circuit case.  The next one I'm going to read *Mackenzie*

6    *v. New York City Department of Education*, 2003 U.S. Disc, Lexis

7    55773 2023, WL2711848.  And *Twyman*, it's spelled T-W-Y-M-A-N,

8    v. *Dilks*, D-I-L-K-S, 2000 U.S. Disc, Lexis 12942.  And these

9    are the citations.

10             THE COURT:  Have you read these cases?

11             MR. BARRETT:  I've read the excerpts of the pieces

12   that go to the point, the proposition that we're trying to

13   provide for the Court right now which is that the --

14             THE COURT:  I can't --

15             MR. BARRETT:  I'll make it quick.

16             THE COURT:  No.  No.  No.  The jury is waiting.  You

17   were late coming back from lunch.  The jury is waiting.  you're

18   giving me research now.  What am I supposed to do with those

19   cases now?  Am I going to hold a recess and go up and read

20   those cases?  This is not the way to do it.  I let you put the

21   cites on the record.  That's it.  We're going to start.  We'll

22   bring out the jury.

23             (Continued on next page)

24

25

1          (Jury present)

2          THE COURT:  Please be seated.  Ms. Silver, you may

3    cross-examine.

4    CROSS-EXAMINATION

5    BY MS. SILVER:

6    Q.  Good afternoon, Mr. Pitre.

7    A.  Good afternoon.

8    Q.  You took the witness stand -- well, let me go back.

9          The witnesses that we've already heard from Placide,

10   he's your friend, right?

11   A.  Right.

12   Q.  And Ismael Ortiz is your friend, right?

13   A.  Yes.

14   Q.  And Joe Adams is your friend, correct?

15   A.  Right.

16   Q.  And Gregory Seabrook is your friend, correct?

17   A.  Correct.

18   Q.  And Miguel Correa is your friend, correct?

19   A.  Correct.

20   Q.  And Ismael Ortiz is your friend, correct?

21   A.  Correct.

22   Q.  These are all your friends, correct?

23   A.  Correct.

24   Q.  And you heard Mr. Seabrook testify yesterday, correct?

25   A.  That's correct.

O1MBPIT5                          Pitre - Cross

1   Q.  And he was here this morning, correct?

2   A.  Right.

3   Q.  And you spoke to him about your testimony, didn't you?

4   A.  Say that again.

5   Q.  You spoke to him about your testimony, didn't you?

6   A.  About my testimony?

7   Q.  Yes.

8   A.  Not about my testimony.

9   Q.  In the hallway this morning at the break didn't you confer

10  with Mr. Seabrook and ask his advice for your testimony?

11  A.  I didn't ask him for any advice.

12  Q.  You didn't talk about arbitration and the union in the

13  hallway during the morning break?  You're saying that's not

14  true?

15  A.  I wasn't talking about the case, absolutely not.

16  Q.  So we're here today, Mr. Pitre, because you're asking the

17  jury for economic damages; isn't that correct?

18  A.  Correct.

19  Q.  And what we heard in your direct was that in 2014 you made

20  about $135,000; isn't that correct?

21  A.  Correct.

22  Q.  And so are you seeking economic damages, $135,000 from when

23  you left the fire department until today?

24  A.  I'm seeking economic damages.

25  Q.  Are those the economic damages that you're going to be

O1MBPIT5                          Pitre - Cross

1    asking the jury for?

2    A.  Correct.

3    Q.  So you believe that you're entitled to $135,000 from 2015

4    until today?

5    A.  No, that's not what I'm saying.  I don't understand what

6    you're asking me.

7    Q.  You don't believe that you're entitled to that?

8    A.  I think more.

9    Q.  You're entitled to more than $135,000 times whatever, eight

10   years?

11   A.  Correct.

12   Q.  Now, after you left your employment, you never received any

13   other money after you left the fire department; is that your

14   testimony?

15   A.  My testimony was that I was getting one-third on workers'

16   comp.

17   Q.  So how much money did you receive from workers'

18   compensation?

19   A.  I got two checks, and then I didn't receive any check for,

20   I think it was about eight -- it was months, seven, eight

21   months.

22   Q.  So approximately how much?

23   A.  And then that lump sum was about, I think it was like

24   26,000.

25   Q.  So in total how much according to you did you receive from

O1MBPIT5                          Pitre – Cross

1  workers' compensation?

2  A.  I can't tell you.

3  Q.  Other than the money that you're not even sure that you

4  received from workers' compensation, you haven't received any

5  other money, correct?

6          MR. BARRETT:  Objection, collateral source.

7          THE COURT:  Overruled.

8  Q.  Have you received any other money other than what you just

9  mentioned from workers' comp?

10  A.  As of today?

11  Q.  Yeah.  Do you have any other income?

12  A.  Yes, social security disability.

13  Q.  Social security disability.  And how much do you receive --

14  you receive about $3,000 a month in social security disability?

15  A.  Correct.

16          MR. BARRETT:  Objection, collateral source.

17          THE COURT:  Let's have a sidebar.

18          (Continued on next page)

19

20

21

22

23

24

25

1          (In robing room)

2          THE COURT:  We've had multiple discussions about

3     damages.  I believe this is the first time you've raised the

4     collateral source rule.

5          MR. BARRETT:  Yeah, I'm objecting to the line of

6     questioning.

7          THE COURT:  What I'm saying is, we've had multiple

8     conversations about damages calculations, including whether the

9     payments he received in the interim could be deducted.  And

10    this is the first time I'm hearing an objection based on the

11    collateral source rule.  And I haven't looked at this question

12    in a long time, but I think that applies if the other source is

13    going to come after the plaintiff for the money or something

14    like that. What's the collateral source rule?

15         MR. BARRETT:  So it's that he would have been

16    receiving that money at a point later on in life, his

17    retirement.

18         THE COURT:  That's not the collateral source rule.  In

19    other words, if indeed he's claiming $134,000 times eight, I

20    been saying all along I think it's a fair argument that

21    deducted from that should be the income he actually received,

22    which would be social security and pension and workers' comp.

23    And so I'm not sure what you mean by the collateral source

24    rule.

25         My recollection is that in some types of cases if

O1MBPIT5                      Pitre - Cross

1    there may be a lien or if there have been payments in the

2    interim and there's a chance that that entity would come after

3    the plaintiff for reimbursement if there's an award, that maybe

4    then it comes in, but I don't know that that's the case here.

5            MR. BARRETT:  So this is a disability pension where he

6    had to -- he was required otherwise he risked losing.  So the

7    pension would go away if he didn't retire on full disability

8    benefit.

9            THE COURT:  If he recovers in this case would -- the

10   pension's coming from the fire department, from the city, from

11   NYCERS. Is that where it comes from?

12           MS. SILVER:  Yes.

13           THE COURT:  Would NYCERS be entitled to go after him

14   to recover payments that they made?

15           MS. SILVER:  No, your Honor.

16           THE COURT:  The objection is overruled.  You can

17   cross-examine on this.

18           (Continued on next page)

19

20

21

22

23

24

25

1              (In open court)

2              THE COURT:  Please be seated.  The objection is

3    overruled.

4              MS. SILVER:  Your Honor, may I have the last question

5    and answer read back.

6              (Record read)

7    Q.  So other than the disability social security money that you

8    just testified and the workers' compensation money that you

9    just testified to, have you received any other income since

10   you've left the fire department?

11   A.  When I got hurt I applied through Local 3, my union, they

12   had longterm disability.

13   Q.  How much do you receive in longterm disability?

14   A.  I didn't have that long I think.  I had six months to wait

15   while they investigate.  It was 2,000 a month I think it was

16   until I got a pension then it stopped.

17   Q.  So you mention a pension.  You receive a check every month

18   from the pension, correct?

19   A.  I didn't receive my pension until like the document show.

20   Q.  Just answer my question yes or no?

21   A.  In '17 was my first pension check.

22   Q.  They actually backdated your pension to 2016, March 30,

23   2016?

24   A.  That is correct.

25   Q.  And you received money backdating til March of 2016,

1    correct?

2    A.   The pension, right?

3    Q.   Yes.

4    A.   Yes.

5    Q.   So you've been receiving money from the pension since March

6    of 2016, correct?

7    A.   Mm hm.

8             THE COURT:   You need to say yes or no.

9    A.   Yes.

10   Q.   And in fact you only applied for the disability pension in

11   February of 2016, correct?

12   A.   I applied in '16, correct.

13   Q.   And you've been receiving payments even if they were

14   backdated from March of 2016, correct?

15   A.   My first check was in '17.  They back paid, correct, to

16   '16.

17   Q.   So you've been paid from March 30 of 2016, correct?

18   A.   My social security never started until -- I just want to

19   verify that.

20            MR. BARRETT:   Objection.

21            THE COURT:   No.  Stop.  The objection is overruled.

22   Just answer the question that is put to you.

23   Q.   I'm asking you about your disability pension.  You have

24   received your disability pension backdated to March of 2016

25   yes?

1    A.  Correct.

2    Q.  So other than the longterm disability that you were

3    receiving before you got the disability pension, your pension,

4    which by the way, how much money do you receive in your pension

5    yearly?  You don't know, Mr. Pitre?

6    A.  I don't know.

7    Q.  You're asking this jury to award you economic damages, but

8    you don't know how much you make?

9              MR. BARRETT:  Objection.

10             THE COURT:  Hold on a second.  The objection is

11   sustained.  Ask another question.

12   Q.  Do you have any idea how much money that you make every

13   month in your disability pension?

14   A.  4000 and change, 42, 44.

15   Q.  You make anywhere and it's ranged between 50 to $60,000 a

16   year, correct, in disability pension?

17   A.  Correct, not 60, below that.

18             THE COURT:  How much do you make a year -- when a

19   question is being asked just wait until the question is

20   complete so we have a clean record.  How much are you

21   collecting in your disability pension a year?

22             THE WITNESS:  I'm not positive.  I believe it's 56.

23             THE COURT:  Has that amount changed since you left the

24   fire department?

25             THE WITNESS:  It was one quota raise.  It was very

O1MBPIT5                          Pitre - Cross

1   minimal.

2          THE COURT:  All right.

3   Q.  Again, do you recall about how much money you received in

4   workers' compensation approximately?

5   A.  When I was receiving workers' comp?

6   Q.  Yeah, in total.

7   A.  I don't know the total.

8          MR. BARRETT:  I'm going to object on the same basis,

9   collateral source.

10          THE COURT:  I already overruled your objection. You

11   don't need to make it again.

12          MR. BARRETT:  I would request a sidebar.

13          THE COURT:  Overruled.  No.  How much money did you

14   collect from workers' compensation approximately?

15          THE WITNESS:  50,000.

16          THE COURT:  All right.

17   Q.  Mr. Pitre, isn't it correct you actually collected almost

18   $170,000 from workers' compensation?

19          MR. BARRETT:  Objection.

20          THE COURT:  Overruled.  Is that correct?

21          THE WITNESS:  In what?

22          THE COURT:  Workers' compensation.

23   A.  You're talking about a certain year or years?

24   Q.  I asked you in total?

25   A.  I couldn't tell.  I wouldn't know that information.  I

O1MBPIT5                          Pitre – Cross

1    guess so.

2                THE COURT:  When you said about $50,000, what were you

3    referring to?

4                THE WITNESS:  The workers' comp.

5                THE COURT:  Total?

6                THE WITNESS:  No, I thought she was asking me every

7    year, about one specific year.

8                THE COURT:  Go ahead.

9                MS. SILVER:  Your Honor, I'm marking this as

10   Defendant's LL.

11   Q.  Mr. Pitre, you hired a lawyer to deal with your workers'

12   compensation, correct?

13   A.  Correct.

14   Q.  You submitted all your medical documents, correct?

15   A.  Yes.

16   Q.  And eventually they made a decision as to how much money to

17   award you, correct?

18                THE COURT:  They being.

19   Q.  The workers compensation board made a determination,

20   correct?

21   A.  Correct.

22   Q.  And what I'm showing you, this is the decision of the

23   workers' compensation board.  Would you agree with me?

24   A.  Yes.

25   Q.  Now I'm turning to the third to last page.  Does this

O1MBPIT5                        Pitre - Cross

1    refresh your recollection of how much money you received from

2    workers' compensation?

3    A.  That's what it says.

4           THE COURT:  Does it help you remember what you

5    received?

6           THE WITNESS:  Yes.

7    Q.  So you received 169,897 --

8           MR. BARRETT:  Objection.  This is not in evidence.

9           THE COURT:  Sustained.  He said his recollection has

10   been refreshed.  You can ask him what his recollection is now.

11   Q.  What is your recollection as to what you received?

12   A.  This these numbers run from --

13          THE COURT:  Don't tell us what the document says.

14   Ms. Silver ask you if looking at this document whether your

15   recollection is refreshed, meaning do you now remember what

16   workers' compensation paid you altogether.  Do you now

17   remember?

18          THE WITNESS:  Yes.

19          THE COURT:  What did it pay you?

20          THE WITNESS:  According to the document it's 169,000.

21          MR. BARRETT:  This is not in evidence.  Objection.

22          THE COURT:  It's not counsel reading from the

23   document.  It's your client.  Do you remember that you were

24   paid around $169,000 by workers' compensation?

25          THE WITNESS:  Yes.

O1MBPIT5                        Pitre - Cross

1              THE COURT:  Okay.

2   Q.  And, Mr. Pitre, that is not taxed money, right?  That's not

3   taxed?

4   A.  Correct.

5   Q.  That's almost $170,000 in untaxed money, correct?

6   A.  Correct.

7   Q.  That would be equivalent to making about $300,000, right?

8              MR. BARRETT:  Objection.

9              THE COURT:  Overruled.  It's cross-examination.

10  A.  I guess so, yeah.

11             THE COURT:  Is that fair?

12             THE WITNESS:  That's a fair assessment.

13  Q.  Other than the workers' compensation money, your pension,

14  and the disability that you received before getting your

15  pension, have you received any other income with respect to

16  your injury?

17  A.  Social security.

18             THE COURT:  You did that already.

19  Q.  Beside social scrutiny, any other income?

20  A.  No.

21  Q.  Do you work?  Do you have any supplemental income?

22  A.  No.

23  Q.  Other than the ones we just mentioned, you received no

24  other money, right?

25  A.  Right.

O1MBPIT5                    Pitre - Cross

1   Q.  You currently live in California, correct?

2   A.  Correct.

3   Q.  And prior to living in California, you lived in Queens?

4   A.  Correct.

5   Q.  And you lived at 130-59, 115th Street in Jamaica.  Is that

6   correct?

7   A.  Correct.

8   Q.  And your current address now is 84-08 Tawny Road in

9   Sacramento, California, right?

10  A.  Wrong.

11  Q.  Tell me one more time?

12  A.  84-08 Tawny Court.

13  Q.  And you live there with your wife?

14  A.  Correct.

15  Q.  And you've been living there for quite sometime, right?

16  A.  Correct.

17  Q.  And you married your wife in 2012, correct?

18  A.  '11 or '12.

19  Q.  And your wife owned this home in California prior to you

20  marrying her, correct?

21          MR. BARRETT:  Objection.

22          THE COURT:  Overruled.

23  A.  Correct.

24  Q.  And in fact she bought this house in 2009, correct?

25  A.  Correct.

1    Q.  And you were dating your wife before you married her,

2    right?

3    A.  Not in 2009.

4            MR. BARRETT:  Objection, relevance.

5            THE COURT:  Overruled for now.

6    A.  I didn't know her in 2009.

7    Q.  But before you married her, you were dating her?

8            MR. BARRETT:  Same objection.

9            THE COURT:  Overruled.

10   A.  My wife major hub --

11           THE COURT:  No.  No.  I don't see it as a big deal.

12   Usually you don't meet someone and get married right away.

13   Were you dating your wife before you married her?

14           THE WITNESS:  Yes.

15   Q.  And your wife's own this house since 2009?

16   A.  Correct.

17           MR. BARRETT:  Objection.

18           THE COURT:  Overruled.

19   Q.  And your wife is a flight attendant, right?

20   A.  Correct.

21   Q.  And you would go back and forth to California, correct?

22   A.  Correct.

23   Q.  You went back and forth all the time, right?

24   A.  Not all the time.

25   Q.  Not all the time.  You would fly out of JFK on Jet Blue for

1   free, right?

2   A.   Correct.

3   Q.   And eventually according to you, you moved to California,

4   correct?

5   A.   Right.

6   Q.   And you moved there in 2015?

7   A.   Sometime in 2015.

8   Q.   And you were actually doing physical therapy in California,

9   weren't you?

10   A.   That's correct.

11   Q.   And you were doing physical therapy in California in 2015,

12   right?

13   A.   Correct.

14   Q.   And the physical therapy was because of your injury on

15   February 27 of 2015, correct?

16   A.   Correct.

17   Q.   And according to you this was a severe injury, right?

18   A.   Correct.

19   Q.   And this was according to you a very painful injury, right?

20   A.   Correct.

21   Q.   And according to you because the fire department didn't

22   give you light duty, you had to file for disability retirement,

23   right?

24   A.   Correct.

25   Q.   And the day you were injured, you told your supervisor

O1MAPIT6                          Pitre-Cross

1    Miguel Correa, correct?

2    A.   Correct.

3              (Continued on next page)

O1MAPIT6                     Pitre-Cross

1    BY MS. SILVER:

2    Q.  And you filled out some Workers' Comp paperwork, correct?

3    A.  Right.

4    Q.  And this was, your fall and this injury, is the impetus for

5    the disability that we're discussing here today, correct?

6    A.  Correct.

7    Q.  You heard your attorney say that you went to the hospital,

8    correct, in opening statement; did you hear that?

9    A.  I believe I did.

10   Q.  Okay.  You didn't go to the hospital that day, did you?

11   A.  No.

12   Q.  You went several weeks later, right?

13   A.  No, I went to the University of Orthopedic, what I said

14   earlier today.

15   Q.  And that was several weeks later, correct, that's when you

16   had your MRI?

17   A.  No, I went to the doctor first.

18   Q.  Okay.  And but that -- you didn't go to the doctor right

19   away that day?

20   A.  You need a Workers' Comp number to see a doctor.

21           THE COURT:  Did you go see the doctor that day?

22           THE WITNESS:  Not that day, no.

23           THE COURT:  When did you go see a doctor?

24           THE WITNESS:  When Miguel Correa gave me my case

25   number.

1              THE COURT:  When?  When?  Like how --

2              THE WITNESS:  Maybe a week later.

3              THE COURT:  A week after the accident?

4              THE WITNESS:  Yeah, maybe a week and a half.

5              THE COURT:  A week and a half after the accident?

6              THE WITNESS:  Correct.

7    BY MS. SILVER:

8    Q.  And you were injured at about 12:00, 12:30 in the

9    afternoon?

10   A.  I don't recall the time anymore.

11             THE COURT:  Do you recall roughly what time of day it

12   was that you fell?  Morning, afternoon?

13             THE WITNESS:  Morning, the morning.

14             THE COURT:  Morning, all right.

15   Q.  And you continued to work the rest of your shift, correct?

16   A.  Correct.

17   Q.  You worked the full day?

18   A.  Mm-hmm, correct.

19   Q.  And then you didn't go to the doctor that day.  Instead,

20   you got on a flight to California; isn't that correct?

21   A.  I don't recall.

22   Q.  You flew back and forth from New York to California for

23   your doctors' appointments, correct?

24   A.  Doctor's appointment?

25   Q.  Yeah.

O1MAPIT6                     Pitre-Cross

1   A.   I didn't have doctor's appointment in California.  I had

2   physical therapy in California.

3   Q.   I'm sorry, let me rephrase.

4          You would fly to California and then you would fly

5   home to New York for your doctor's appointment, right, at the

6   orthopedic appointments, for example?

7   A.   At the surgeon's appointment, I asked permission if I could

8   --

9          THE COURT:  The question simply was --

10          THE WITNESS:  Yes.

11          THE COURT:  -- did you fly back and forth to

12   California for your physical therapy?

13          MS. SILVER:  For your doctors' appointments.

14          THE WITNESS:  I didn't have --

15          THE COURT:  Hold on a second.

16          MR. BARRETT:  Objection.  Relevance.

17          THE COURT:  It is entirely relevant.  Your objection

18   is overruled.

19          You better ask the question again because I thought I

20   heard something differently.

21          MS. SILVER:  I apologize, your Honor.

22   Q.   So you already testified previously that you had physical

23   therapy in California, correct?

24   A.   Correct.

25   Q.   Now I'm asking after you were injured you flew to

O1MAPIT6                    Pitre-Cross

1   California that night, correct?

2   A.  I don't recall.

3   Q.  Well, your wife is living in California, right?  You flew

4   back and forth all the time, correct?

5   A.  My wife also lived with me in New York.

6   Q.  My question is did you fly back and forth all the time?

7              MR. BARRETT:  Objection.  Asked and answered.

8              THE COURT:  Overruled.

9              The question that wasn't answered is you had your

10  accident sometime in the morning.  You said you completed the

11  shift.  Did you fly to California that night?

12             THE WITNESS:  I don't recall.

13             THE COURT:  Okay.

14  Q.  You would fly from California back to New York for your

15  doctors' appointments in New York; isn't that correct?

16             THE COURT:  At what time period?

17             MS. SILVER:  After you were injured.

18             THE COURT:  Okay.

19  A.  No.  The only time I was flying back and forth was after I

20  was injured and I asked permission to do physical therapy in --

21             THE COURT:  No, the question was after you were

22  injured there were times when you were in California?

23             THE WITNESS:  There was time.

24             THE COURT:  Yeah.  And did you come back to New York

25  for doctors' appointments while you were in California?

O1MAPIT6                    Pitre-Cross

1              That's the question, right?

2              MS. SILVER:  Yes, thank you.

3   A.  Right --

4   Q.  I'm sorry?

5   A.  I'm thinking of the answer --

6              THE COURT:  He's thinking.

7   A.  -- of what you said.

8              It wasn't off from work to go fly to doctor's, no.

9              THE COURT:  That's not the question.  The question

10  simply was:  After the accident there were times when you were

11  in California.  Did you fly back to New York for doctors'

12  appointments?

13             THE WITNESS:  When I was on Workers' Comp, yes.

14  Q.  All right.  And you were on Workers' Compensation after you

15  were injured, right?

16  A.  You're saying as of February 27?

17  Q.  Between February and September you were -- part of that

18  time you were on Workers' Compensation, correct?

19  A.  Workers' Comp didn't start -- start for me until the date

20  of surgery.

21  Q.  You filed a Workers' Compensation claim the day that you

22  were injured, correct?

23  A.  That's correct.

24  Q.  And isn't it true that your workers -- you were compensated

25  for Workers' Compensation time between your injury and the

O1MAPIT6                        Pitre-Cross

1    surgery?

2    A.  No.  You're saying that I was getting paid Workers' Comp

3    while still on duty, that's not correct.

4    Q.  Well, there were days that you -- that you didn't -- that

5    you took off that Workers' Compensation reimbursed you for your

6    time, correct?

7    A.  I don't remember that.

8              THE COURT:  I'm sorry, the answer is what?

9              THE WITNESS:  I said I don't recall that, that

10   statement that she made.

11             THE COURT:  When was the first Workers' Compensation

12   payment that you got?

13             THE WITNESS:  After the surgery.

14             THE COURT:  Well, I know.  How far after the surgery?

15             THE WITNESS:  I think it took I believe it took a

16   month, but I received two payments.  Then I got a notification

17   to see the New York City orthopedic -- some orthopedic surgeon

18   for the City of New York after he saw me --

19             THE COURT:  Stop.  Stop.  Stop.  You said you received

20   two payments about a month after the injury?  Of Workers'

21   Compensation.

22             THE WITNESS:  No, after the surgery.

23             THE COURT:  After the surgery, did you receive any --

24   was that the first time you received Workers' Compensation was

25   after the surgery?

O1MAPIT6                    Pitre-Cross

1          THE WITNESS:  That's correct.

2          THE COURT:  Okay.

3   Q.  But, in fact, some of those payments were actually

4   backdated to before the surgery; isn't that correct?

5   A.  I couldn't tell you that.

6   Q.  Now, again, you claim that you were basically alleging to

7   this jury that you are disabled because of the fire department;

8   isn't that correct?

9   A.  That's correct.

10  Q.  Because you're saying according to you that your injuries

11  got worse, right?

12  A.  Correct.

13  Q.  And you claim that that's the reason that you had to have

14  surgery on your shoulder and your wrist, correct?

15  A.  Correct.

16  Q.  Because you fell off your truck and slipped, correct?

17  A.  Correct.

18  Q.  Isn't it true that on that day, February 27, 2015, you

19  actually fell while walking at a premises called J & F Meat

20  Market?

21  A.  That's incorrect.

22  Q.  That's incorrect?

23  A.  Mm-hmm.

24  Q.  Well, in 2015, you filed a lawsuit against J & F Meat

25  Market; isn't that correct?

01MAPIT6                          Pitre-Cross

1   A.   That is correct, third-party.

2   Q.   And part of that lawsuit contains a complaint where you

3   stated that you were walking at the premises and slipped and

4   tripped and fell; isn't that correct?

5   A.   My report was -- you said I filed that.  My report was I

6   came off the vehicle --

7   Q.   I'm asking you if part of your lawsuit -- that's contained

8   in part of your lawsuit; is that correct?

9             THE COURT:  Could I see a copy of it?

10            MS. SILVER:  Sure.  I'm going to mark this as

11  Defendant's LL.

12            MS. ALEXANDER:  No, MM.

13            MS. SILVER:  MM.

14            Point the Court to paragraph 27.

15            THE COURT:  Thank you.

16            Let's have a side bar.

17            (Continued on the next page)

18

19

20

21

22

23

24

25

O1MAPIT6                         Pitre-Cross

1          (At sidebar)

2          THE COURT:  I'm looking at Defendant's Exhibit MM.

3     The first page is a summons with notice from the New York

4     County Clerk's Office in a lawsuit *Edward Pitre vs. Morningside*

5     *Heights, LLC, and J & F Meat Market Corporation*.  And it

6     alleges that in paragraph 27:  On February 27, 2015, plaintiff

7     was walking at the premises -- the premises being the meat

8     market.  Let me double check that.

9          The premises are located at 1975 Amsterdam Avenue,

10    Manhattan, New York.  And that on that date, the plaintiff was

11    walking at the premises and slipped, tripped, and fell due to

12    an icy, black icy, snowy, wet, dirty, hazardous, defective, and

13    unsafe premises.

14         Are you aware of this complaint?

15         MR. BARRETT:  No.

16         THE COURT:  I suggest we take a recess and you talk to

17    your client about what's going on here.

18         MR. BARRETT:  Yes.

19         THE COURT:  This is signed by James Hofmann, his

20    lawyer.  I'm going to have the jury take a recess and you can

21    talk to your client.

22         MR. BARRETT:  Okay.

23         THE COURT:  Yeah, you want to say something?

24         MS. DECASTRO:  Yes, your Honor.  At this point we

25    believe that there is some fraudulent court committed by the

O1MAPIT6                         Pitre-Cross

1    plaintiff in this case.  We move for bad case sanctions for the

2    --

3                THE COURT:  I just said he should talk to his client

4    first.

5                MS. DECASTRO:  I apologize.

6                THE COURT:  Too much aggression on the part of the

7    city.  I understand where you're coming from.  Just wait and

8    let's see.  I want to give him a chance to talk to his client.

9    You might want to ask him whether he wants to withdraw the

10   lawsuit.  But let's go out.  I'm going to have the jury take a

11   break.

12               (Continued on next page)

O1MAPIT6                        Pitre-Cross

1                  (In open court)

2                  THE COURT:  Ladies and gentlemen, we're going to take

3    a ten-minute recess.

4                  (Continued on next page)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

O1MAPIT6                        Pitre-Cross

1              (Jury not present)

2              THE COURT:  Please be seated for a moment.  Mr. Pitre.

3              THE WITNESS:  Yes.

4              THE COURT:  I'm going to show you what's been marked

5    as Defendant's MM and ask you to take a moment -- do you have a

6    copy?  Here it is.  Take a moment to look at it, and look at

7    paragraph 27, please, in particular.

8              All right.  Would you give it back to me, please.

9              THE WITNESS:  Yes.

10             THE COURT:  Have you seen that document before?

11             THE WITNESS:  I have never seen that document, but I

12   know the incident.

13             THE COURT:  Did you bring a lawsuit based on a slip

14   and fall in Morningside Heights on February 27, 2015?

15             THE WITNESS:  That is correct.

16             THE COURT:  And is that the same day as your purported

17   accident in this case?

18             THE WITNESS:  That's '15, right?

19             THE COURT:  Yeah.

20             THE WITNESS:  Yes.

21             THE COURT:  We're going to take a break.  Have a

22   conversation with your lawyers.  Is there some explanation?

23   Did you have two falls that day?

24             THE WITNESS:  No.

25             THE COURT:  So what's your explanation for why you are

1   bringing two lawsuits based on two incidents on the same day?

2        Are you Mr. Smith?

3        MR. SMITH:  I am, your Honor.

4        THE COURT:  Do you want to have a conversation with

5   your client before answering that question?

6        MR. SMITH:  I do.

7        THE COURT:  Step down.  Step down and have a

8   conversation with your lawyers.

9        (Recess)

10       THE COURT:  What are we going to do here?

11       MR. BARRETT:  So this is a lawsuit related to the same

12   slip and fall, and Workers' Comp took the money back.

13       THE COURT:  Why is this not a fraud on the Court?  He

14   brought a lawsuit alleging that he was injured on the job, at

15   the fire department and he -- not at the fire -- while on duty

16   with the fire department and now we see that he brought a

17   lawsuit for a slip and fall in front of a meat market in

18   Manhattan.

19       MR. BARRETT:  It's not a fraud on the Court because he

20   was on duty.  We're not suing because he fell at the fire

21   department.  He was on duty when he slipped and fell here.

22       THE COURT:  He was on duty in front of this -- but how

23   can he bring two lawsuits based on the claims?

24       MR. BARRETT:  It's a third-party action.  We are not

25   suing -- we're not suing the city for negligence.  This is not

O1MAPIT6                          Pitre-Cross

1   a personal injury lawsuit.  We're suing the city for something

2   else.  We're suing them for failure to --

3            THE COURT:  You're seeking recovery for injuries that

4   in this lawsuit, the meat market lawsuit, you're claiming he

5   suffered in that case.

6            MR. BARRETT:  They're different injuries.  We're

7   seeking --

8            THE COURT:  How are they different injuries?

9            MR. BARRETT:  In this case we're seeking backpay and

10  front pay because he was forced out of his career by a failure

11  to accommodation and retaliation for the 2011 lawsuit.  This --

12  and we're not seeking any money for his injuries.  We're not --

13  there's no personal injury claims in this lawsuit.  So this is

14  a third-party claim.

15           THE COURT:  I'm looking at paragraph 42, for example,

16  of Defendant's Exhibit MM.  By reason of the foregoing,

17  plaintiff Edward Pitre was severely injured and damaged,

18  rendered sick, sore, lame, and disabled, sustained severe

19  nervous shock and mental anguish, great physical pain and

20  emotional upset, some of which injuries are permanent in nature

21  and duration.

22           Those allegations are not inconsistent with the

23  allegations he's making in this case that the police

24  department's failure to give him light duty exacerbated his

25  injuries?

O1MAPIT6                         Pitre-Cross

1          MR. BARRETT:  We're not claiming any damages from the

2     exacerbation of his injuries.

3          THE COURT:  You been making -- did you not make that

4     argument in your opening statement?

5          MR. BARRETT:  We made the argument that it exacerbated

6     his injuries, but we're not seeking damages related to his

7     personal injury.  We're not saying, hey, the city's liable for

8     his injuries.  Even if the exacerbation, we're saying the city

9     is liable for his loss of income because he was terminated in

10    2011, two completely different things.

11         THE COURT:  You're seeking damages for emotional

12    anguish, loss of enjoyment of life, all of those good things.

13         MR. BARRETT:  No.

14         THE COURT:  The mood, you asked questions about his

15    mood.

16         MR. BARRETT:  So it's -- we're seeking emotional

17    anguish from the way that he was treated at the fire

18    department.  Not from his injury.

19         THE COURT:  You're saying that this fall in front of

20    the meat market is the fall; he was on duty?

21         MR. BARRETT:  Yes, yes, that's right.

22         THE COURT:  He was on duty?

23         MR. BARRETT:  Yes.

24         THE COURT:  Well, let me hear from defense counsel.

25         MS. DECASTRO:  Well, your Honor, I pulled this from

1    ECF.  There was no mention in here about anything about him

2    being on duty.  There's no mention that he also fell that

3    day -- if that's what they're saying -- that he fell that day

4    as part of an FDNY slip and fall.  He also mentions in this

5    complaint at paragraph 45:  Loss of time and earnings from

6    employment.  And he directly in this complaint claims that this

7    injury led to him being disabled, the injury at the meat

8    market.

9           THE COURT:  Let me look at 45.

10          MR. BARRETT:  The injury at the meat market is the

11   same.

12          THE COURT:  Stop.  Stop.  Paragraph 45, by reason of

13   the foregoing, plaintiff Edward Pitre has suffered and in the

14   future will necessarily suffer additional loss of time and

15   earnings from employment.

16          Is he not seeking damages for that in this case?

17          MR. BARRETT:  He is, but Workers' Comp had a lien.

18   They took the money back.

19          THE COURT:  That's not the point.  The point is he

20   brought a lawsuit in state court seeking -- among other

21   things -- damages for loss earnings.  And he's making the very

22   -- that very same claim in this case.

23          MR. BARRETT:  The loss earnings.

24          THE COURT:  Is that not right?

25          MR. BARRETT:  I mean, I need to go into this case

O1MAPIT6                    Pitre-Cross

1    more.  But what I can tell you --

2              THE COURT:  You were not aware of this?

3              MR. BARRETT:  Right now --

4              THE COURT:  You were not aware of this case?

5              MR. BARRETT:  I just told you that, no.

6              THE COURT:  I understand that.  You were not aware

7    that he was seeking damages for loss earnings in this other

8    lawsuit?

9              MR. BARRETT:  I was not aware of the other lawsuit.

10             THE COURT:  Do you agree that this is duplicative of

11   the claims in this case?

12             MR. BARRETT:  I would have to look more into it.  I

13   can't make a statement one way or the other right now.

14             THE COURT:  You can't make a statement as to whether

15   -- does he have a claim in this case for lost income dating

16   back to the accident?

17             MR. BARRETT:  No.  His -- the lost income in this case

18   dates back to September 11, of -- later this year, after he

19   went out of work on --

20             THE COURT:  Is that not related to the accident?

21             MR. BARRETT:  Well, the accident is related to both

22   lawsuits.  But I'm not -- it's a third-party action.  This is a

23   separate set of claims.

24             THE COURT:  Let me hear from the city.

25             MS. DECASTRO:  Yes, your Honor.  Throughout this trial

O1MAPIT6                          Pitre-Cross

1    plaintiff since the beginning has stated that he fell off an

2    FDNY fire truck and injured his hand and he injured his

3    shoulder.  He has been saying that since the beginning of this

4    case.  Now there is a lawsuit that he filed that he was

5    represented in, where it is very clear that he was alleging

6    that he was injured due to the conditions at this meat market,

7    that he was disabled due to these conditions.

8              THE COURT:  Does he say anything about a fire truck in

9    this complaint?

10             MS. DECASTRO:  Not that we've seen, your Honor.  It

11   just says while walking at the premises.

12             THE COURT:  Hold on.  What paragraph is that?

13             MS. DECASTRO:  Your Honor, we also --

14             THE COURT:  Hold on a second.

15             MS. DECASTRO:  Yep.

16             THE COURT:  I'm looking at paragraph 27.  On February

17   27, 2015, plaintiff was walking at the premises and slipped,

18   tripped, and fell due to an icy, black icy, snowy, wet, dirty,

19   hazardous, defective, and unsafe premises.  That's page 37 -- I

20   mean paragraph 27.  And the argument is that in the next

21   paragraph, the next couple of paragraphs is that the

22   defendants -- that is the meat market -- did not properly

23   maintain the premises.

24             I see no reference in here to anything about being on

25   duty, about a fire truck.  Wouldn't it be a completely

O1MAPIT6                         Pitre–Cross

 1   different kind of an accident if he is getting off of a fire

 2   truck versus walking on the premises?

 3          I've heard enough.  I've heard enough.  I've heard

 4   enough.  I am dismissing the complaint in the interest of

 5   justice.  I do believe this is an effort to defraud the Court.

 6   I'm going to issue an order to show cause, why the defendant

 7   and counsel should not be sanctioned.  I'll do that in writing.

 8   I'm going to bring back the jury.

 9          Mr. Pitre, you can step down.

10          MS. DECASTRO:  Your Honor, can I have a moment.  I

11   think you just meant plaintiff.  You said defendants and

12   counsel.

13          THE COURT:  I meant plaintiffs and counsel, Mr. Pitre

14   and counsel.

15          MS. DECASTRO:  For the record, your Honor, just so you

16   have it, we actually have a verified bill of particulars.

17          THE COURT:  Please hand it up.  Is it marked?

18          MS. DECASTRO:  We'll mark it right now, your Honor.

19   We'll give a copy to plaintiff's counsel.

20          THE COURT:  As long as I have a copy.  Just the

21   culmination of circumstances, the poor lawyering throughout,

22   this, I've had enough.

23          I've been handed Defendant's Exhibit NN, which is the

24   Verified Bill of Particulars in *Pitre vs. Morningside Heights*.

25          Is there something you want to point me to?  Paragraph

O1MAPIT6                    Pitre-Cross

1   four, it says that plaintiff was walking at the premises and

2   slipped and tripped and fell.

3            MS. ALEXANDER:  Paragraph 15 has the injuries, that

4   includes the surgeries.

5            THE COURT:  Hold on one second.

6            Yeah, paragraph 15 describes all the injuries.

7            MR. BARRETT:  Oh, I need a copy of that.  I don't have

8   it.

9            MS. ALEXANDER:  Here you go.  And paragraph 18 has the

10  lost wages.

11           THE COURT:  Your only other witness was going to be

12  Adams?

13           MR. BARRETT:  Yes.

14           THE COURT:  And he was also a CE, right,

15  communications?

16           MR. BARRETT:  Yes.

17           THE COURT:  Yeah.  We're going to bring back the jury.

18  I'm going to tell them I am terminating the case.  I'm going to

19  let them go in the back.  I'm going to go back and talk to them

20  myself, that's what I do in every jury trial.

21           Counsel are excused.  Mr. Pitre is excused.

22  Mr. Pitre, you can step down.  I'm going to issue an order to

23  show cause.  Everyone will have a chance to be heard.  Bring

24  out the jury.

25           (Continued on next page)

O1MAPIT6                         Pitre-Cross

1          THE DEPUTY CLERK:  All rise for the jury.

2          (Jury present)

3          THE COURT:  Please be seated.  Ladies and gentlemen,

4    we're done.  I am going to end the case.  I'm going to

5    terminate the case and order that the complaint be dismissed.

6    So there will be a judgment in favor of the defendants.  I want

7    to thank you for your service.  If you wait inside in the jury

8    room, I would like to come back with my clerks and thank you

9    personally and answer any questions that you might have.  And

10   do they need to go back downstairs?  We'll check to see whether

11   you need to go back downstairs, but if you wait in the jury

12   room, I'll be right in in a couple minutes.  Thank you.

13          (Continued on next page)

1          (Jury not present)

2          THE COURT:  Please be seated just for a moment.

3          I'm going to issue an order to show cause on why

4    sanction should not be imposed on the plaintiff and/or counsel.

5    Of course, if Mr. Pitre wishes to make a motion for

6    reconsideration, in essence ask for another trial, you can make

7    that motion.  And the city can respond, and then I can see it.

8    That way you can make your arguments in writing.

9          This is all very troubling.  And, by the way, I have

10   seen zero evidence that race was a motivating factor.  Other

11   than that Mr. Pitre was Hispanic, there's zero evidence.

12   There's virtually zero evidence that Mr. Mastropietro and

13   Mr. Borodo were involved.  Each had one little minor thing.  I

14   see zero evidence that there was any intent on their part to

15   discriminate or retaliate.  I don't even know that there's

16   evidence of what Mr. Pitre's injury was.  We've gotten no

17   medical records.  We know he had a surgery a year later, but

18   you need to prove up a certain injury.  I don't think we have

19   that evidence.

20         There's so many problems with the case.  It's been so

21   poorly tried on the plaintiff's part.  But I'm deeply troubled

22   that Mr. Pitre did not disclose this other lawsuit where there

23   is an overlap in terms of the damages and the relief requested.

24   There's no mention of anything involving a fire truck.  No

25   mention of him being on duty.  He did not disclose this to

01MAPIT6                          Pitre—Cross

1    plaintiff's counsel.  I could go on, but I won't.  I will issue

2    an order to show cause and I'll include in that a schedule so

3    that if there are any other applications, the parties can make

4    them and we'll give the other side a chance to be heard.

5             All right.  We're adjourned.  My practice is to go

6    back and talk to the jury.  I'm going to do that now, and see

7    if they have any questions.  You know, if the lawyers want to

8    go talk to the jury, you're welcome to after I'm done.  But

9    I'll tell them that if they want to, they can talk to you.  All

10   right.  We're adjourned.

11            (Adjourned)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                       INDEX OF EXAMINATION

2     Examination of:                              Page

3     GREGORY SEABROOK

4     Direct By Mr. Barrett  . . . . . . . . . . . 395

5     Cross By Ms. Alexander . . . . . . . . . . . 417

6     Redirect By Mr. Barrett  . . . . . . . . . . 424

7     EDWARD PITRE

8     Direct By Mr. Barrett  . . . . . . . . . . . 427

9     Cross By Ms. Silver  . . . . . . . . . . . . 540

10                      PLAINTIFF EXHIBITS

11    Exhibit No.                              Received

12     17    . . . . . . . . . . . . . . . . . . . 464

13     18    . . . . . . . . . . . . . . . . . . . 507

14     19    . . . . . . . . . . . . . . . . . . . 524

15

16

17

18

19

20

21

22

23

24

25